# 22-4745(L), 22-4746, 23-4005, 23-4006, 23-4020

# United States Court of Appeals

## *for the*

# Fourth Circuit

---•---

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

RONALD HERRERA CONTRERAS, a/k/a Espeedy, a/k/a Speedy,
a/k/a Joster Hrndz, a/k/a Chucho; PABLO MIGUEL VELASCO BARRERA,
a/k/a Oscuro, a/k/a Pablo Miguel Barrera Velasco, a/k/a Miguel Barrera;
HENRY ZELAYA MARTINEZ, a/k/a Certero, a/k/a El Kakarra;
DUGLAS RAMIREZ FERRERA, a/k/a Mortal, a/k/a Darwin, a/k/a Artillero;
ELMER ZELAYA MARTINEZ, a/k/a Killer, a/k/a Morenito Martinez,
a/k/a Perez Danillo,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANTS

JESSE I. WINOGRAD
LAW OFFICE OF
  JESSE WINOGRAD PLLC
5335 Wisconsin Avenue, N.W.
  Suite 440
Washington, DC 20015
(202) 302-7429

*Counsel for Appellant*
*Ronald Herrera Contreras*

PAUL P. VANGELLOW
ATTORNEY AT LAW
6109-A Arlington Boulevard
Falls Church, Virginia 22044
(703) 241-0506

*Counsel for Appellant*
*Pablo Miguel Velasco Barrera*

DAVID J. KIYONAGA
LAW OFFICE OF
  DAVID J. KIYONAGA
510 King Street, Suite 400
Alexandria, Virginia 22314
(703) 549-7576

*Counsel for Appellant*
*Henry Zelaya Martinez*

BENJAMIN M. SCHIFFELBEIN
OFFICE OF THE FEDERAL
  PUBLIC DEFENDER
210 1st Street, SW, Suite 400
Roanoke, Virginia 24011
(540) 777-0888

*Counsel for Appellant*
*Duglas Ramirez Ferrara*

ROBERT L. JENKINS, JR.
BYNUM & JENKINS, PLLC
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309-0899

*Counsel for Appellant*
*Elmer Zelaya Martinez*

CP  COUNSEL PRESS • VA – (804) 648-3664

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................vi

JURISDICTIONAL STATEMENT .......................................................1

IDENTIFICATION OF APPELLANTS WITH FULL NAMES
AND ALLEGED ALIASES...............................................................2

IDENTIFICATION OF DECEDENTS WITH FULL NAMES
AND ALIASES ................................................................................2

STATEMENT OF ISSUES PRESENTED.............................................2

STATEMENT OF THE CASE..............................................................4

STATEMENT OF FACTS ....................................................................7

    Pretrial...............................................................................................7

        H. Martinez's Motions to Suppress....................................7

        February 23, 2021 Suppression Hearing.............................8

        Court Order Denying Motions to Suppress........................16

    Trial: 5-11-22..................................................................................17

        1.     EXPERT.................................................................17

        2.     VCAR.....................................................................18

    Trial: 5-12-22..................................................................................18

    Trial: 5-17-22..................................................................................19

        3.     SUBSTANTIVE COUNTS ....................................19

    Trial: 5-17-22 (cont'd)....................................................................19

    Trial: 5-18-22..................................................................................20

    Trial: 5-19-22..................................................................................21

    Trial: 5-20-22..................................................................................21

    Trial: 5-31-22..................................................................................23

        4.     MORIS CASTRO .................................................25

Trial: 6-1-22 ...........................................................................25

Trial: 6-2-22 ...........................................................................27

Trial: 6-3-22 ...........................................................................29

Trial: 6-9-22 ...........................................................................30

Trial: 6-10-22 .........................................................................31

Trial: 6-13-22 .........................................................................32

Trial: 6-14-22 .........................................................................33

Trial: 6-15-22 .........................................................................36

Trial: 6-16-22 – AM .................................................................38

Trial: 6-17-22 .........................................................................39

     5.      DUBRAVETZ ...............................................39

Trial: 6-21-22 .........................................................................41

Trial: 6-22-22 .........................................................................43

Trial: 6-23-22 .........................................................................44

Trial :6-24-22 .........................................................................45

     6.      SENTENCING ............................................47

SUMMARY OF ARGUMENTS ...........................................................48

ARGUMENTS ......................................................................................50

    1.     The Court erred when it permitted the qualification of a
         government witness as a gang expert under FRE 702
         and FRE 703 ...............................................................50

         A.     Standard of Review .......................................50

         B.     Argument .......................................................50

    2.     The Court violated the Appellants' constitutional rights to due
         process under the 5th Amendment to the U.S. Constitution
         when it permitted the government to introduce alleged gang
         events unrelated to the appellants in this case under the
         VCAR statutes ...............................................................52

         A.     Standard of Review .......................................53

       B.       Argument ......................................................................53

3.      The Court erred when it admitted into evidence material
        containing graphic video and audio evidence of decedents
        MENDEZ and TRIMINIO in this case, and others unrelated
        to the Appellants in this case, in violation of FRE 403 and
        their constitutional rights under the 5th Amendment to the
        U.S. Constitution ...................................................................53

     3.a.    The Court erred when it admitted Exhibits 51-12b
          (JA6695) and 51-13b (JA6696). The videos were more
          prejudicial than probative under Federal Rule of
          Evidence 403 ...............................................................53

           A.      Standard of Review ..............................................53

           B.      Argument...............................................................53

     3.b.    The court erred when it denied the motions to exclude
          the admission of Government Exhibit 2-1E-24-25
          [JA501, JA5702], 2-2S8-29 [JA5871-JA5892] and
          2S-33-34 [JA5896, JA5897, JA5898] as those
          exhibits were more prejudicial than probative.........................57

           A.      Standard of Review ..............................................57

           B.      Argument...............................................................57

     3.c.    The Court erred when it admitted the autopsy photos,
          Government Exhibits, 4-2B-2QQ [JA6009-JA6050]
          and Government Exhibits 5-2B-2GG [JA6059-JA6090]
          as they were more prejudicial than probative, and they
          were cumulative .......................................................58

           A.      Standard of Review ..............................................58

           B.      Argument...............................................................58

4.      The Court erred when it denied Appellants' Rule 29 motions
        and found that the evidence was sufficient to find the
        appellants guilty of violations under 18 U.S.C. Sections
        1959(a)(5), 1201(c), 1959 (a)(1) and (2), and 1201(a)(1)
        and (2)..................................................................................60

           A.      Standard of Review ......................................................60

B.       Argument ....................................................................61

Appellant Velasco Barrera ....................................61

a.     The evidence was insufficient
for the jury to find appellant
Velasco Barrera guilty of
Counts 5 and 6, 18 U.S.C.
Sections 1959 (a)(1) and (2) ............61

5.    The Court erred when it failed to sever each of the charged
indictment counts and the appellants from each other ........................65

     A.      Standard of Review .......................................................65

     B.      Argument ....................................................................65

          1.     Background ..........................................................65

          2.     Law/Argument.....................................................65

              a.     Defendants ................................................65

                    1.     The Jury May Find the
Defendant Guilty by
Association ...............................66

                    2.     Bruton problems existed, and
a severance should have been
granted to avoid them ....................66

              b.     Counts ......................................................70

          3.     Law ...................................................................70

6.    The Court erred when it declined to give the jury the duress
jury instruction in violation of violated the Appellants due
process rights ........................................................................74

     A.      Standard of Review .......................................................74

     B.      Argument ....................................................................74

7.    The Court erred when it admitted into evidence certain notes
of a jailhouse snitch Jose Delgado in violation of FRE 803(1)
and the Appellants' due process rights under the 5th Am to
U.S. Constitution ...............................................................76

|   |   | A. | Standard of Review ........................................................ | 76 |
|   |   | B. | Argument ..................................................................... | 76 |
| 8. | The trial court erred when it denied Appellant HZMartinez's motion to suppress evidence procured in violation of the 4th Amendment ...................................................... | | | 77 |
|   |   | A. | Standard of Review ........................................................ | 77 |
|   |   | B. | Argument ..................................................................... | 77 |
| 9. | The trial court erred when it denied Appellant HZMartinez's motion to suppress his statements procured in violation of the 5th Amendment ...................................................... | | | 84 |
|   |   | A. | Standard of Review ........................................................ | 84 |
|   |   | B. | Argument ..................................................................... | 85 |
| 10. | The trial court erred when it denied Appellant HZMartinez's motion for a lesser-included offense jury instruction ........................ | | | 89 |
|   |   | A. | Standard of Review ........................................................ | 89 |
|   |   | B. | Argument ..................................................................... | 89 |
| 11. | The Court erred when it imposed sentences of life in prison without the possibility of parole for each of the Appellants; such sentences were disproportionate to the crimes of conviction and otherwise in violation of the 8th Amendment to the U.S. Constitution ...................................................... | | | 92 |
|   |   | A. | Standard of Review ........................................................ | 92 |
|   |   | B. | Mandatory Life Sentence ............................................... | 92 |

CONCLUSION .......................................................................... 94

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000)............................................................75

*Arizona v. Evans,*
  514 U.S. 1 (1995)..............................................................84

*Arizona v. Fulminante,*
  499 U.S. 279 (1991) ..................................................... 84, 89

*Beaty v. Stewart,*
  303 F.3d 975 (9th Cir. 2002) ............................................86

*Bruton v. United States,*
  391 U.S. 123 (1968)..................................................... 67, 69

*Bumper v. North Carolina,*
  391 U.S. 543 (1968)..........................................................78

*Butler v. United States,*
  317 F.2d 249 (8th Cir. 1963) ...........................................72

*Chapman v. California,*
  386 U.S. 18 (1967)....................................................... 88, 89

*Collins v. Virginia,*
  138 S. Ct. 1663 (2018).......................................................80

*Crawford v. Washington,*
  541 U.S. 36 (2004).............................................................68

*Davis v. Shearin,*
  CIVIL ACTION No. AW-08-3453 (D. Md. June 23, 2010)..............................60

*Florida v. Jardines,*
  569 U.S. 1 (2013)......................................................... 79, 80

*Glasser v. United States,*
  315 U.S. 60 (1942).............................................................60

*Gray v. Maryland,*
    523 U.S. 185 (1998) ................................................................. 68, 69

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.,*
    542 U.S. 177, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004) ................................. 85

*Hoffa v. United States,*
    385 U.S. 293 (1966) ................................................................. 63

*Kotteakos v. United States,*
    328 U.S. 750 (1946) ................................................................. 91, 92

*Krulewitch v. United States,*
    336 U.S. 440 (1949) ................................................................. 66

*Lilly v. Virginia,*
    527 U.S. 116 (1999) ................................................................. 63

*Miller v. Alabama,*
    567 U.S. 460 (2012) ................................................................. 93

*Milton v. Wainwright,*
    407 U.S. 371 (1972) ................................................................. 92

*Minnesota v. Olson,*
    495 U.S. 91 (1990) ................................................................. 78

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ................................................................. *passim*

*Montgomery v. Louisiana,*
    134 S. Ct. 718 (2016) ................................................................. 93

*Moran v. Burbine,*
    475 U.S. 412 (1986) ................................................................. 17, 86

*North Carolina v. Butler,*
    441 U.S 369 (1979) ................................................................. 85

*Old Chief v. United States,*
    519 U.S. 172 (1997) ................................................................. 60

*Ornelas v. United States,*
    517 U.S. 690 (1996) ................................................................. 77

*PBM Prods., LLC v. Mead Johnson &Co.*,
   639 F.3d 111 (4th Cir. 2011) ..............................................................56

*Pennsylvania Bd. of Prob. & Parole v. Scott*,
   524 U.S. 357 (1998)..........................................................................84

*Pennsylvania v. Muniz*,
   496 U.S. 582 (1990)..................................................................... 87, 88

*Phoenix Mut. Life Ins. Co. v. Adams*,
   30 F.3d 554 (4th Cir. 1994) ....................................................... 34, 76

*Pinkerton v. United States*,
   328 U.S. 640 (1946)..........................................................................74

*Richardson v. Marsh*,
   481 U.S. 200 (1987)..................................................................... 67, 68

*Rogers v. Pendleton*,
   249 F.3d 279 (4th Cir. 2001) ............................................................79

*Roper v. Simmons*,
   543 U.S. 551 (2005)..........................................................................93

*U.S. v. King*,
   232 F. Supp. 2d 636 (E.D. Va. 2002) ................................................59

*United States v. Abdallah*,
   911 F.3d 201 (4th Cir. 2018) ............................................................89

*United States v. Arrington*,
   719 F.2d 701 (4th Cir. 1983) ............................................................61

*United States v. Baker*,
   985 F.2d 1248 (4th Cir. 1993) ..........................................................90

*United States v. Blair*,
   661 F.3d 755 ......................................................................................65

*United States v. Breza*,
   308 F.3d 430 (4th Cir. 2002) ............................................................77

*United States v. Brooks*,
   111 F.3d 365 (4th Cir. 1997) ....................................... 53, 54, 57, 58

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) .................................................................60

*United States v. Cardwell*,
    433 F.3d (4th Cir 2005) ...................................................................65

*United States v. D'Anjou*,
    16 F.3d 604 (4th Cir. 1994) ...............................................................87

*United States v. Daniels*,
    770 F.2d 1111 (D.C. Cir. 1985) .........................................................71

*United States v. Dunn*,
    480 U.S. 294 (1987) ...........................................................................78

*United States v. Gamble*,
    290 F. App'x 592 (4th Cir. 2008) ......................................................54

*United States v. Gordon*,
    895 F.2d 932 (4th Cir. 1990), *cert. denied*, 498 U.S. 846 (1990) ......................82

*United States v. Gray*,
    491 F.3d 138 (4th Cir. 2007) .............................................................77

*United States v. Hubbell*,
    530 U.S. 27 (2000) .............................................................................85

*United States v. Johnson*,
    617 F.3d 286 (4th Cir. 2010) ......................................... 50, 51, 52, 76

*United States v. Kabbaby*,
    672 F.2d 857 (11th Cir. 1982) ...........................................................70

*United States v. Lewis*,
    787 F.2d 1318 (9th Cir 1986) ..................................................... 71, 72

*United States v. Lomax*,
    293 F.3d 701 (4th Cir.), *cert. denied*, 537 U.S. 1031 (2002) ............60

*United States v. Lombardozzi*,
    491 F.3d 61 (2d Cir. 2007).................................................................51

*United States v. Maumau*,
    993 F.3d 821 (10th Cir. 2021) ...........................................................94

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008).............................................................51

*United States v. Miltier*,
  882 F.3d 81 (4th Cir. 2018) ...........................................................89

*United States v. Morrow*,
  731 F.2d 233 (4th Cir. 1984), *cert. denied*, 467 U.S. 1230 (1984) ...................82

*United States v. Najjar*,
  300 F.3d 466 (4th Cir.), *cert denied*, 537 U.S. 1094 (2002) ...........................71

*United States v. Nguyen*,
  565 F.3d 668 (9th Cir. 2008) .........................................................69

*United States v. Palmer*,
  820 F.3d 640 (4th Cir.2016) ..................................................... 65, 92

*United States v. Pelton*,
  835 F.2d 1067 (4th Cir. 1987), *cert. denied*, 486 U.S. 1010 (1988) .................85

*United States v. Pierce*,
  409 F.3d 228 (4th Cir. 2005) .........................................................60

*United States v. Ramapuram*,
  632 F.2d 1149 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981) .................84

*United States v. Ramsay*,
  2021 U.S. Dist. LEXIS 89741 (S.D.N.Y. May 11, 2021) ...............................93

*United States v. Reavis*,
  48 F.3d 763 (4th Cir. 1995) ..........................................................65

*United States v. Roberts*,
  467 F. App'x 187 (4th Cir. 2012) (per curiam) ...................................81

*United States v. Sonmez*,
  777 F.3d 684 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 689 (Mem),
  193 L. Ed. 2d 520 (Mem) (2015).................................................74

*United States v. Takizal*,
  940 F.2d 654 (4th Cir. 1991) .........................................................90

*United States v. Tillmon*,
  954 F.3d 628 (4th Cir. 2019) ................................................. 54, 56

*United States v. Tobin*,
   923 F.2d 1506 (11th Cir. 1991), *reh'g denied*, 935 F.2d 1297 (1991),
   *cert. denied*, 502 U.S. 907 (1991) ....................................................................81

*United States v. Vickers*,
   387 F.2d 703 (4th Cir. 1967), *cert. denied*, 392 U.S. 912 (1968) ....................82

*United States v. Wilson*,
   118 F.3d 228 (4th Cir. 1997) ............................................................................61

*United v. Queen*,
   132 F.3d 991 (4th Cir. 1997) .................................................................... 54, 56

*Zafiro v. United States*,
   506 U.S. 534 (1993) ................................................................................ 65, 73

## Statutes and Other Authorities:

U.S. Const. amend. IV .................................................................................. *passim*

U.S. Const. amend. V ................................................................................... *passim*

U.S. Const. amend. VI ...................................................................................3, 67

U.S. Const. amend. VIII ............................................................................... *passim*

18 U.S.C. § 1201 ..............................................................................................62

18 U.S.C. § 1201(a)(1) ................................................................................ *passim*

18 U.S.C. § 1201(a)(2) ................................................................................ *passim*

18 U.S.C. § 1201(c) .................................................................................. 4, 49, 60

18 U.S.C. § 1959 ........................................................................................ 18, 63

18 U.S.C. § 1959(a)(1) ............................................................................... *passim*

18 U.S.C. § 1959(a)(2) ...................................................................... 3, , 48, 6061

18 U.S.C. § 1959(a)(5) .............................................................................. 4, 49, 60

18 U.S.C. § 3231 ................................................................................................1

28 U.S.C. § 1291 ................................................................................................1

Fed. R. App. P. 3 ...............................................................................................1

Fed. R. App. P. 4 ..................................................................................1

Fed. R. Crim. P. 8 ................................................................................70

Fed. R. Crim. P. 8(a) ..................................................................... 70, 71

Fed. R. Crim. P. 14 ........................................................................ 65, 71

Fed. R. Crim. P. 14(a) ..........................................................................72

Fed. R. Crim. P. 31(c) ...........................................................................90

Fed. R. Evid. 403 ........................................................................... *passim*

Fed. R. Evid. 404(b) .............................................................................71

Fed. R. Evid. 702 .......................................................................... 50, 51

Fed. R. Evid. 703 ....................................................................... 2, 48, 50

Fed. R. Evid. 801(d)(2)(A) ...................................................................66

Fed. R. Evid. 803(1) ...................................................................... *passim*

Fed. R. Evid. 803(5) .............................................................................77

40A Am. Jur. 2d Homicide § 417 .........................................................59

Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals
    as Witnesses*, 47 Hastings L.J. 1381 (1996) .......................................64

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. The district court entered its judgments of conviction against the Appellants as follows:

1.  Elmer Zelaya Martinez ("EZMartinez") on December 21, 2022; EZMartinez filed his notice of appeal on January 10, 2023;

2.  Ronald Herrera Contreras ("Contreras") on December 21, 2022; Contreras filed his notice of appeal on November 3, 2022;

3.  Henry Zelaya Martinez ("HZMartinez") on December 21, 2022; HZMartinez filed his notice of appeal on December 29, 2022;

4.  Pablo Miguel Velasco Barrera ("Velasco Barrera") on December 21, 2022; Velasco Barrera filed his notice of appeal on November 2, 2022;

5.  Duglas Ramirez Ferrera ("Ferrera") on December 21, 2022; Ferrera filed his notice of appeal on October 13, 2022;

The Fourth Circuit Court of Appeals has jurisdiction over these appeals pursuant to 28 U.S.C. § 1291 and Federal Rules of Appellate Procedure 3 and 4. This appeal is from final trial court judgments disposing of all claims.

This Court consolidated the appeals in this matter during December 30, 2022 to January 12, 2023.

**IDENTIFICATION OF APPELLANTS**
**WITH FULL NAMES AND ALLEGED ALIASES:**

1. Elmer Zelaya Martinez:   "Killer," "Morenito Martinez," "Danilo Perez," and "Chucho";

2. Ronald Herrera Contreras:   "Espeedy," "Speedy" and "Joster Hrndz";

3. Henry Zelaya Martinez:   "Certero," and "El Kakarra";

4. Pablo Miguel Velasco Barrera:   "Oscuro," and "Miguel Barrera";

5. Duglas Ramirez Ferrera:   "Mortal, "Darwin," and "Artillero".

**IDENTIFICATION OF DECEDENTS**
**WITH FULL NAMES AND ALIASES:**

1. Edvin Eduard Escobar Mendez: "El Chino" ("MENDEZ");

2. Sergio Arita Anthony Triminio: "Speedy" ("TRIMINIO");

**STATEMENT OF ISSUES PRESENTED**

1.   Whether the Court erred when it permitted the qualification of a government witness as a gang expert under FRE 703;

2.   Whether the Court erred when it permitted the government to introduce alleged gang events unrelated to the Appellants in this case under the VCAR and RICO statutes in violation of the Appellants' constitutional rights to due process under the 5th Amendment to the U.S. Constitution;

3.   Whether the Court erred when it admitted into evidence material containing graphic video and audio evidence of decedents MENDEZ and

TRIMINIO, and others unrelated to the Appellants in this case, in violation of FRE 403 and their constitutional rights to due process under the 5th Amendment to the U.S. Constitution;

      3.a.   Whether the Court erred when it admitted Exhibits 51-12B and 51-13b;

      3.b.   Whether the Court erred when it denied motions to exclude the admission of Government Exhibits 2-1E-24-25, 2-S8-29 and 2S-33-34;

      3.c.   Whether the Court erred when it admitted the decedents' autopsy photos.

    4.   Whether the Court erred when it found that the evidence was sufficient to find the appellants guilty of violations under 18 U.S.C. Sections 1959 (a)(1) and (2), and 1201(a)(1) and (2);

    5.   Whether the Court erred when it failed to sever each of the charged indictment counts and the Appellants from each other;

    6.   Whether the Court erred when it denied Appellants' request for the duress jury instruction in violation of the Appellants' due process rights under the 5th and 6th Amendments to the U.S. Constitution;

    7.   Whether the Court erred when it admitted into evidence the notes of a jail house snitch in violation of FRE 803(1) and the Appellants' due process rights under the 5th Amendment to the U.S. Constitution;

8.   Whether the Court erred when it denied Appellant HZMartinez' motion to suppress evidence procured in violation of the 4th Amendment;

9.   Whether the Court erred when it denied Appellant HZMartinez' motion to suppress evidence procured in violation of the 5th Amendment.

10.   Whether the trial court erred when it denied Appellant HZMartinez's motion for a lesser-included offense jury instruction.

11.   Whether the Court erred when it imposed life sentences in prison without the possibility of parole for each of the Appellants that were disproportionate to the crimes of conviction and otherwise in violation of the 8th Amendment to the U.S. Constitution.

## STATEMENT OF THE CASE

On February 21, 2019, a federal grand jury in the Eastern District of Virginia returned an eight-count Second Superseding Indictment ("Indictment") against Elmer Zelaya Martinez ("EZMartinez"), Ronald Herrera Contreras ("Contreras"), Henry Zelaya Martinez ("HZMartinez"), Pablo Miguel Velasco Barrera ("Velasco Barrera"), Duglas Ramirez Ferrera ("Ferrera"), and six others. The United States charged the Appellants with various crimes stemming from the kidnapping and deaths of MENDEZ and TRIMINIO, including conspiracy to commit kidnapping and murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5); conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c); murder in

aid of racketeering activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; and, kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2.

In its indictment, the United States alleged that the Appellants were members or associates of the Park View Locos Salvatrucha ("PVLS") clique of La Mara Salvatrucha ("MS-13"). The Indictment also charged that MS-13 is a racketeering enterprise and that the alleged kidnappings and deaths of MENDEZ and TRIMINIO were committed by the Appellants in aid of racketeering activity.

The Appellants were variously arraigned on June 7, 22 and July 23, 2018 and February 28, 2019 and entered pleas of not guilty on each of those dates. The case was continued several times due to the Covid epidemic and to determine whether the government would seek the death penalty against one or all of the Appellants. Motions hearings were held on February 21, 2020 (Opinion March 2, 2020, at #509), July 16, 2021 (Opinion July 26, 2021 at #946), April 20, 2022 (Order May 2, 2022 at #1145), and May 4, 2022 (Order May 6, 2022 at #1160).

The Appellants proceeded to trial on May 9, 2022. During the trial, the government sought to admit evidence that the Appellants and others kidnapped and murdered 17-year-old MENDEZ, on or about August 28, 2016, and, less than a month later on or about September 26, 2016, kidnapped and murdered 14-year-old TRIMINIO. The government alleged that for both murders, members of Virginia's PVLS clique obtained from a co-defendant Edenilson Misael Alfaro ("Alfaro"), a

high-ranking PVLS member, the "green light" to kill the decedents. MENDEZ and TRIMINIO, both active participating members of MS-13, were targeted for violating MS-13 rules: MENDEZ was suspected of being a member of a rival gang, and TRIMINIO was believed to be cooperating with law enforcement. The two decedents were brought to the same park, Holmes Run Stream Valley Park (the "Park") in Fairfax County, Virginia, to attend an MS-13 gang ("clique") meeting.

Before each death, the United States alleged that some of the Appellants and their coconspirators communicated with the decedents using Facebook Messenger to get them to leave their homes and attend the meeting. Once at the park, each decedent was allegedly surrounded by some of the Appellants while others served as lookouts. Then, while one of the participants recorded the attack, others allegedly held and assaulted each decedent. The decedents' remains were then buried in the park. The videos of the incidents were subsequently sent to Alfaro allegedly to prove to gang leadership that each incident had been committed and that the participants were worthy of being promoted in rank in the gang. The potential promotions were based on mistakes of facts and accordingly ineffective. The government alleged that the Appellants committed the murders for the purpose of maintaining or increasing their positions in MS-13.

On or about July 1, 2022, the jury found the Appellants guilty of all Counts.

On different days, the Appellants appeared before the court for sentencing. The court sentenced each appellant to a term of life imprisonment (consisting of 120 mos. on each of Counts 1 and 2, and Life Imprisonment on each of Counts 3, 4, 5, 6, 7, and 8 to run concurrently with each other); the Court also imposed 5 year SR term imposed (consisting of 3 years on each of counts 1 and 2, and 5 years on each of counts 3, 4, 5, 6, 7, and 8 to run concurrently with each other)and $100 assessments on each of Counts 1-8.   The court also imposed restitution.

## STATEMENT OF FACTS

**Pretrial**

**H. Martinez's Motions to Suppress:**

Pertinent to his Appeal, Appellant H. Martinez filed two suppression motions.[1]   The first, premised on the violation of H. Martinez's Fourth Amendment rights, sought the suppression of all evidence seized as a result of the search of the residence of his mother.   *See* Motion to Suppress All Evidence Derived from Illegal Arrest of Defendant [JA382].   During the search, H. Martinez who was staying at the residence at that time, was arrested.   The second motion, premised on the lack of a voluntary and knowing *Miranda* waiver, sought the suppression of his confession as procured in violation of the Fifth Amendment.

---

[1] H. Martinez is not appealing the denial of his third Motion to Suppress given intervening case law.

*See* Motion to Suppress Statements [JA351]. After the Government filed its oppositions, the trial court set the motions for an evidentiary hearing.

**February 23, 2021 Suppression Hearing:**

On February 23, 2021, the trial court held an evidentiary hearing on H. Martinez's Motions to Suppress. At the hearing, the Government called three witnesses and the Defense called four. Pertinent to the appeal, the hearing addressed the Fourth Amendment issues arising from H. Martinez's arrest at his mother's house and the related seizure of his cellphone, and the Fifth Amendment issues arising from his subsequent custodial confession.

The Government first called Special Agent Christopher Pixton. [JA577]. During the relevant time period, SA Pixton was a special agent with the Washington Field Office, assigned to the Northern Virginia Safe Streets Gang and Drug Task Force. [JA579]. SA Pixton testified that the FBI first attempted to arrest H. Martinez at an address in Woodbridge, Virginia. [JA580]. After the SWAT team had cleared the residence and it was determined H. Martinez was not at the residence, SA Pixton left to surveil an apartment in Alexandria. [JA580] He testified that he and another agent began surveilling the "back door," which he described as "a black door [with] three large windows that were to the left of the door and a smaller set of windows to the right of the door." [JA582]. SA Pixton

further testified that he met up with ICE agents, who went to the "front door" to knock, while he and his colleague knocked on the "back door." [JA583].

SA Pixton and his colleague stopped knocking when they were informed that the agents at the "front door" had gotten consent to enter. [JA588]. He further testified that when he entered, all the agents were in the living room, talking to a lady on the couch. [JA587]. He then heard the lady, known to be Ms. Portillo, H. Martinez's mother, say "he's here." [JA588].

On cross, SA Pixton testified that the SWAT team raid of the Woodbridge residence started at approximately 6:10 a.m., and as many as ten agents remained when he left to go to the second location, an apartment in Alexandria. [JA596]. About six agents arrived at the second location to conduct the "knock and talk." [JA597]. SA Pixton further testified that when he was informed that SA Fontanez had entered the residence, he walked around to the other side of the residence and entered the apartment. [JA598]. On cross, SA Pixton continued to refer to the wooden door leading into the apartment as the rear of the apartment complex and the glass sliding door leading to the patio as the "front." [JA599].

The Government next called Special Agent Fontanez. [JA609]. SA Fontanez testified that, when H. Martinez was not apprehended at the Woodbridge address, the goal was to talk to his mother at her Alexandria apartment – to do a

"knock and talk." He further testified that he did not expect to find H. Martinez at his mother's house in Alexandria. [JA609].

SA Fontanez testified that the apartment had a sliding glass door that allowed people to come outside. He explained that law enforcement had seen people coming in and out through that door "as a main entrance." [JA610]. On the morning in question, SA Fontanez had gone to the sliding door and knocked on the window until someone came to the door. [JA610]. He testified that he knocked two or three times, and within a minute an individual came to the door. [JA611]. He recognized the individual as H. Martinez's mother, showed her his credential and stated that he "was with the FBI, [] was a special agent, we were looking for her son, if we could come inside and talk to her." [JA611].

After he went into the apartment, SA Fontanez the two agents that had gone to the other side of the apartment were called to join the agents inside the apartment. [JA613]. SA Fontanez testified that he then sat on the couch with H. Martinez's mother while the other agents stood around. [JA614]. On the couch, he told Ms. Portillo "that we had an arrest warrant for her son, that we had been looking for him for some time, that I knew that she had been in communication with him, and that it was a violent crime. That it was, given the nature of the crime, that it would be ideal for him to surrender. And I asked her if she would be willing to cooperate with us and give us at least the phone number that she was using to

communicate with him" [JA614-615]. Per SA Fontanez, Ms. Portillo started crying and, after a little bit, whispered to him, "He's in the back." [JA615].

The agents arrested H. Martinez and searched him finding his wallet, his cell phone and necklace. [JA617]. H. Martinez was transported to the Washington Field Office where he placed in an interview room [JA618], equipped with video and audio recording [JA619]. Speaking in Spanish, SA Fontanez began asking what he described in testimony as "biological questions." [JA623]. He further testified that he was not using these questions to solicit information for investigative purposes. [JA624]. SA Fontanez admitted he asked H. Martinez questions about how he came to be in the US from El Salvador, but stated that he was not investigation H. Martinez for immigration violation. [JA626-627].

SA Fontanez also testified as to H. Martinez's purported *Miranda* waiver. He testified that he started filling out the top of the form, and, after each line, asked H. Martinez if he understood everything. [JA630]. SA Fontanez further testified that H. Martinez was nodding as SA Fontanez went over the form. And after the form was complete, SA Fontanez gave H. Martinez the document, telling him that this is the consent part. According to SA Fontanez "[a]t that point, [H. Martinez] read the consent part, and I told him that I had signed right below, and that that's where his signature would go." [JA630].

SA Fontanez further testified that he did not read the waiver statement to H. Martinez, instead merely showing him the language. [JA631]. He testified that he observed H. Martinez reading, and when H. Martinez was done, "he looked up nodded and signed." [JA631]. Ultimately, under SA Fontanez's subsequent questioning, H. Martinez admitted to his participation in the murder of Sergio Triminio. [JA633]. Per the testimony of SA Fontanez, during H. Martinez's interrogation the agents showed him a video and "he was definitely very affected by it." *Id.* "[H] was very cooperative. There were no issues at all. He provided certain details as to what happened." [JA633].

On cross, SA Fontanez testified that law enforcement had known H. Martinez was coming to Virginia and in contact with his mother. [JA655]. Regarding the mother's residence, SA Fontanez testified that the apartment buildings were three floors high, and only ground floor apartments have patios in the back. [JA660]. The ground floor apartments generally have sliding glass doors and another metal door opening onto the green space. [JA661]. He further acknowledged that the entrances to the upper floor apartments can only be accessed by entering the building through doors on the side opposite to the patio. These doors on the other side of the building, which also permit access to Ms. Martinez Portillo's apartment, lead to the mailboxes for the various apartments.

Describing his approach to the residence, SA Fontanez testified that he went to the "front" of the house with other agents, while two FBI agents went to the back. [JA662]. But despite his insistence of describing his approach to the "front" of the apartment, he testified that the side of the apartment he went to was, in fact, the side with the sliding glass door. [JA662]. SA Fontanez testified that he began knocking on the sliding glass door, the one beside it or both, before 8 a.m. [JA662].

Once he entered the apartment, he radioed SA Fisher and Pixton, who then came around to the back of the apartment and met SA Fontanez inside. SA Fontanez confirmed that Ms. Portillo did not provide permission for SA Fisher and Pixton to enter. [JA667]. And SA Fontanez confirmed that at this point there were five agents in the small apartment. [JA671]. SA Fontanez testified that the other agents were standing around in the small living room as he kneeled by the couch talking to Ms. Portillo. [JA671]. At some point, Ms. Portillo begins crying and tells SA Fontanez that "He's here. He's in the back." [JA673].

Addressing his custodial questioning of H. Martinez, SA Fontanez admitted that he asked, pre-*Miranda*, whether H. Martinez had crossed the border illegally by train or walking. [JA680]. He acknowledged that H. Martinez paused before answering even basic questions [JA685]. And when it came to reading the rights aloud to H. Martinez, SA Fontanez did not read the consent portion aloud,

[JA691], nor did he ask H. Martinez to read the consent portion out loud [JA692].

SA Fontanez confirmed that he did not check or verify in any other way that H.

Martinez understood the consent section, relying instead on the facts that H.

Martinez told him he had gone to school and could read and write Spanish.

[JA692].   When H. Martinez pushed the paper back to SA Fontanez, SA Fontanez

gave the paper back and told him where H. Martinez should sign. [JA692].

Lastly, the Government called FBI Agent Megan Atkins, who testified on

the process used to extract data from the seized phone and the nature of the

extraction of used.   [JA695].

The Defense called John O'Donoghue, a private investigator who initially

testified as to witnesses he had interviewed regarding the attempted arrest at the

Woodbridge address.   [JA711].   Turning to the location where H. Martinez was

arrested, Mr. O'Donoghue testified that he visited the location on four separate

occasions.   [JA717].   He testified that to reach the mailboxes for the apartments,

one had to enter through the front door.   [JA721].   When you first enter the front

door there is a stairwell going up to the third floor and a stairwell going down to

the first floor.   [JA721]. He testified that he took a photograph of the front door to

the apartment, which had a knocker and a peephole.   [JA722].   Mr. O'Donoghue

continued to testify that the back door, of which he took a photograph, notably did

not have a door knocker or peephole.   In terms of the back door's use, he testified

that it was not a primary entryway for nonfamily or any noninvited guest. He

testified that FedEx and delivery services would always go through the front door

of the building, down the stairs and deliver at the front door of the apartment.

[JA724].

The defense then called Jackie Ferrufino, who was the property manager for

the property containing Mr. Portillo's apartment. [JA740]. She testified that the

door with the knocker and peephole was the front door to the apartment and the

sliding glass door was the back door. [JA741].

The defense also called Erlinda Portillo, the mother of H. Martinez.

[JA763-764]. She confirmed that the door with the knocker and peephole was, in

fact, the front door, while the sliding glass door leading to the patio was, in fact,

the back door. [JA765].

Ms. Portillo also testified as to the incident leading to the search of her house

and arrest of her son. Ms. Portillo testified that she was asleep that Sunday

morning when knocking woke her up. [JA768]. She heard individuals say

"Police, open the door," but she testified that she was scared and did not want to

open the door. She testified that law enforcement was knocking on both her front

door and the back door. [JA769]. She testified that law enforcement was

knocking for approximately five minutes, [JA769], and the officer on the patio was

telling her to open the door – "open the door, police," [JA770]. She further testified

that when she opened the door, the officer told her that they were coming for "Henry." [JA771]. Ms. Portillo elaborated that the officer came in, along with his three colleagues, when she opened the door, but that she did not want him to come in. [JA771].

Ms. Portillo testified that, after the officers came inside, she was told that she needed to give "Henry" up, and that she should do it for her daughter that was undocumented. [JA771]. She elaborated that she wanted to be left alone, but the officers kept insisting that she tell them to give up Henry and to think of her daughter. [JA772]. She further testified that she felt pressured to tell the officer that H. Martinez was at the house. [JA772].

On cross, Ms. Portillo acknowledged that sometimes she would enter through the back door when she parked in the abutting parking lot. [JA773].

**Court Order Denying Motions to Suppress:**

On October 19, 2021, the trial court issued an order denying H. Martinez's Motions to Suppress. *See* Order Denying Motion to Suppress [JA1147]. Regarding the alleged violation of the Fourth Amendment, the trial court concluded that the officer had a reasonable belief that the back, patio entrance to the residence was the proper entrance. [JA1156-1157]. The trial court found that the officers did not approach the back of the home with the aim of discovering incriminating evidence. [JA1157-1158]. The court proceeded to find that "the

totality of all circumstances" that H. Martinez's mother consented to the search of her home free from duress or coercion.   [JA1158].

Regarding the motion to suppress statements, the trial court divided the inquiry into two areas:   pre- and post-*Miranda* statements.   Addressing H. Martinez's pre-*Miranda* statements, the trial court denied the motion as moot on the Government's commitment to not use any of H. Martinez's pre-*Miranda* statements.   [JA1160].   Nonetheless, the trial court went on to conclude that law enforcement's pre-*Miranda* questioning, did not deviate from the standard booking questions that fall within the "booking-question" exemption to *Miranda* requirements.   [JA1161].   Addressing the post-*Miranda* statements, the trial court found that H. Martinez waived his *Miranda* rights, and that his decision to do so was the product of a free and deliberate choice rather than intimidation, coercion or deception.   [JA1163] (*quoting Moran v. Burbine*, 475 U.S. 412, 421 (1986)).   The trial proceeded to find that H. Martinez also implicitly waived his *Miranda* rights by demonstrating a subsequent willingness to answer questions after acknowledging his *Miranda* rights. [JA1163].

**Trial: 5-11-22:**

**1. EXPERT:**

The United States of America ("USA" or "government") opened its case with testimony by an alleged expert, law enforcement officer ("LEO") Ricardo

Guzman ("Guzman"), that it had designated pretrial over defense objection. Guzman had no direct connection to the instant case and testified principally based on his experience with gangs in Texas. During his testimony, he described time spent on other investigations, [JA1301-1302; JA1307-1308] all of which were insufficient to qualify him as a gang expert [JA1354-1359; JA1298-1352].

## 2. VCAR:

Next, the government called several witnesses to testify about unrelated gang murders and attempted murders in support of its charges under 18 USC §1959 (Violent Crimes in Aid of Racketeering or "VCAR"). Witnesses first testified about the murder of Urrutia [JA1430, et seq] to support the government's VCAR charges. The government also called Genaro Sen Garcia, [JA1439] whose testimony referenced gang murders, extortion, drug sales and a murder during a gang fight [JA1464], all unrelated to the instant case to prove in part, the enterprise elements of the VCAR counts. His testimony was very prejudicial to the Appellants.

## Trial: 5-12-22:

Prince William County ("PWCo") Detective Armstrong detailed another unrelated case, the attempted murder of Peligroso, in further support of the government's VCAR theories of the case. [JA1507]. The government then called Jaime Rosales Villegas [JA1530-1533], who the government alleged was

responsible for planning the attempted murder of Peligroso [JA1549-1560].     The

government then called Edgar Blanco Torres ("Torres") [JA1603]   regarding his

participation in, and respecting the details of, the death of Christian Sosa Rivas

[JA1631-1645], which was also unrelated to this case.

**Trial: 5-17-22:**

Furr, a PWCo Police Officer ("PO") identified a picture of a partially

decomposed body of Sosa Rivas as further evidence to support the government's

VCAR counts, to which the defense duly objected based on the prejudicial impact

of this evidence [JA1703-1713].

**3. SUBSTANTIVE COUNTS:**

**Trial: 5-17-22 (cont'd):**

FBI Special Agent ("SA") Paul Fisher was called to identify MENDEZ,

TRIMINIO and the rest of the alleged participants [JA1876].   He made in court

identifications of the Appellants which were objected to because unnecessarily

suggestive. [JA1902].

The government then called Josue Vigil Mejia ("Mejia") to testify regarding

his alleged knowledge of the events leading to the death of MENDEZ [JA1905].

MEJIA discussed his gang background [JA1904] in El Salvador where he was

involved in extortion activity to finance drug purchases. MEJIA detailed his gang

rank and gang aliases ("tacas"). [JA1931].   MEJIA testified that he worked with

PVLS gang leaders "Yanki" (Salmeron Larios) and Alfaro to encourage gang activity [JA1940]. Mejia identified those he claimed were MS13, Park View Locos Salvatrucha ("PVLS") gang members in the summer of 2016, including some of the Appellants in this case. [JA1940].

**Trial: 5-18-22:**

Mejia claimed that Yanki and Alfaro were running PVLS in the summer of 2016. Mejia again identified alleged PVLS members and ranks [JA1970, JA1974-1983]. Mejia described [JA1986-1987] gang methods of communication [JA1998, et seq.], detailed specific phone numbers and described how [JA2010] drug sales were used to support gang activity. Mejia continued to describe gang discipline, clique meetings [JA2014-2017], and an attack on a rival that occurred before the death of MENDEZ. He did not identify Velasco Barrera during this part of his testimony [JA2027]. Mejia testified about a member whose taca was Lil Navaja (Santiago Amaya) and whose apparent disrespect for the gang [JA2036-2037] led to a decision by Mejia to plan the discipline of Lil Navaja. Again, Mejia did not identify Velasco Barrera as a participant in planning the discipline of Lil Navaja [JA2048, JA2061-2062].

Mejia described how MENDEZ came to the gang's attention, *viz.*, by TRIMINIO who introduced Mejia to MENDEZ, whose death Mejia was responsible for. [JA2066-2069]. A picture of MENDEZ ("666 pic") [JA2074]

was described and displayed.   Mejia went [JA2076] on a trip to Los Angeles with

Mejia, EZMartinez and Alfaro. [JA2080].   Mejia claimed that he did not tell

TRIMINIO about MENDEZ' green light (order to kill) which was based in large

part on the "666 pic." [JA2083-2083]. Mejia sent the MENDEZ green light to

other PVLS members who Mejia claimed helped with the planning that resulted in

the death of MENDEZ. [JA2088].

**Trial: 5-19-22:**

Mejia further claimed that he and Contreras talked about MENDEZ.

[JA2113, JA2124].   Mejia discussed plans with Contreras, but Velasco Barrera

was not included because Mejia did not need his assistance.     [JA2126-2127].

Mejia alleged that Velasco Barrera only participated as a lookout [JA2123;

JA2142; JA2149].   Mejia claimed that promotions were made after MENDEZ'

death.   After MENDEZ' death, messages were exchanged among some gang

members but Velasco Barrera was not included as a recipient of these email

messages.

**Trial: 5-20-22:**

Mejia described the events leading up to the death of TRIMINIO.   He stated

that a PVLS gang member from Maryland, Salmeron Larios ("Lobito"),

participated because he was part of PVLS. [JA2249-2250].   Yonathan Melgar

Martinez ("Yonathan") told Mejia that he participated but arrived after TRIMINIO

died. Anderson Villatoro Rivera ("Anderson") told Mejia about his role in the death of TRIMINIO and [JA2250] stated that Velasco Barrera did not participate. According to Mejia, the PVLS leadership passed along the details of TRIMINIO's death to one of the El Salvador leaders, Viejo Cabro [JA2254]. Mejia claimed that some members were promoted [*see* JA2256-2257, JA2270]. Mejia learned that leaders were replaced after others were arrested and/or disappeared.

Mejia made calls to El Salvador about the condition of the PVLS clique. [JA2271, JA2273-2274]. Velasco Barrera did not participate in any of these calls [JA2281-2282]. Mejia later alleged that Velasco Barrera sent messages to Mejia from New Jersey. [JA2283-2288, JA2292], [JA2294-2295] The main leader of PVLS in El Salvador was Sicario who explained MS13 rules to Mejia [JA2299]. Mejia alleged that he was promoted in violation of the gang rules because he had not killed anyone [JA2301, 2307].

On cross-examination, Mejia revealed the benefits of his cooperation with law enforcement while [JA2317] he displayed a selective memory [JA2323]. Mejia assisted in transferring TRIMINIO from the Silvas clique of MS-13 to the PVLS clique [JA2329]. Mejia talked about his trip to Los Angeles with the PVLS leaders Alfaro and Yanki. [JA2330-2331]. Only the clique leaders made the trip. Mejia denied discussing his potential role as leader in PVLS but was shown contradictory evidence of same. Mejia received information from the Silvas

clique that TRIMINIO had cooperated [JA2335-2336] with law enforcement. Mejia acknowledged that any member of MS13 was under a duty to kill any 18th street gang member that he came across. Mejia enlisted the cooperation of TRIMINIO to stay quiet about the MENDEZ "666 pic." [JA2342-2343]. Mejia denied planning the death of MENDEZ by himself and continued to display more selective memory.

**Trial: 5-31-22:**

Mejia explained that lower ranking gang members [JA2380], e.g., paros and observacions, never knew about plans to assault others ("green lights") because they were not to be trusted. [JA2384] Mejia discussed how he planned MENDEZ' death. [JA2386-2389] Mejia told Alfaro about TRIMINIO's suspected cooperation with the authorities and thereafter, Alfaro authorized Mejia to end TRIMINIO's life. [JA2396]. Mejia discussed money sent to El Salvador and how monthly dues were collected. Mejia admitted to stealing money otherwise belonging to the gang [JA2399], lying, cheating, and killing during his time in the gang. [JA2403-2404] Mejia contradicted the content of his interviews with law enforcement and minimized his role in several El Salvador murders. Mejia explained that no one was promoted upon the death of a person who was not a competing gang member ("chavala"). [JA2421]. Mejia believed that Contreras had been green lighted by the gang because they believed he was cooperating with law enforcement.

[JA2427-2439] [JA2430-2431] Mejia asked TRIMINIO to keep MENDEZ "calm", to "have the guy ready." [JA2431]. TRIMINIO readily followed Mejia's requests. [JA2435]. Mejia stated that TRIMINIO knew that the gang would kill MENDEZ if he was a chavala. [JA2431]. Mejia agreed that if TRIMINIO had not sent the "666 pic" of MENDEZ to Mejia, MENDEZ would have still been alive as of the time of the trial. [JA2434].

With regard to the plans to discipline Lil Navaja, the allegedly disrespecting member of PVLS, Mejia first testified that everybody new about the plans that were supposed to lead to the death of Lil Navaja. Mejia changed his testimony and later claimed that TRIMINIO did not know. During the course of his testimony, Mejia again displayed selective memory while reiterating that he did not have the authority to promote. [JA2435-2438, JA2454]. He described all those who were involved in the death of MENDEZ, but did not mention Velasco Barrera.

There was testimony regarding criminal charges pending in California against Alfaro and alleged drug dealing by Yanki, both of whom were PVLS leaders. [JA2470-2502]. The seizure of Alfaro's phone yielded a video of a purported assault on a decedent. It was claimed that Alfaro was involved in someone's death in California.

**4. MORIS CASTRO:**

Moris Castro ("Castro") discussed his past drug use, the provisions of his plea agreement and his participation in the events leading to TRIMINIO's death. [JA2504]. He described his MS13 career and its gang structure [JA2512]. He identified many of those involved in the case [JA2521-2534]. [JA2527]. Castro claimed that Velasco Barrera belonged to PVLS before Castro joined but he did not explain the basis for this knowledge. Castro identified EZMartinez, HZMartinez [JA2529, JA2532], and Contreras who belonged to the Western clique. [JA2534] Castro also identified Duglas Ramirez Ferrera ("Ferrera") and his alleged aliases.

**Trial: 6-1-22:**

Castro described how he stole a vehicle. [JA2561-2563]. Castro described gang communications among various members [JA2583] about death "Cultivo". [JA2588] Castro claimed that he viewed the video of MENDEZ' death at another gang member's residence. [JA2591]. Castro claimed that Velasco Barrera was present but silent during the alleged display of the video. Castro described activities that he was involved in to get promoted [JA2599] from paro to observacion. [JA2606]. Castro stated that he and Contreras wanted to kill chavalas to be promoted. [JA2607-2608]. Castro cooperated with law

enforcement but stated that TRIMINIO was the cooperator to deflect attention from Castro's cooperation.

Castro was present [JA2609] when gang members discussed with Alfaro TRIMINIO's cooperation with law enforcement. [JA2613] TRIMINIO kept asking Castro about MENDEZ. Castro lied to TRIMINIO about his knowledge of MENDEZ' whereabouts [JA2616] and warned TRIMINIO that a profile picture of TRIMINIO wearing Nike Cortez sneakers was a violation of gang protocol which could provoke the gang to punish TRIMINIO.

Castro discussed the events leading up to the assault on TRIMINIO from beginning to end. [JA2620]. Castro claimed that EZMartinez discussed the plans regarding TRIMINIO with all those present. [JA2625-2629]. Castro was later shown a map with what he believed to be the location of TRIMINIO's death. [JA2645]. Before the assault of TRIMINIO began, many ran because they thought they heard noises that might be law enforcement. Castro observed gang members going up and coming down the hill from the alleged scene of TRIMINIO's assault. [JA2661] Castro stated that he walked up the hill and [JA2663] when he reached the top, he viewed TRIMINIO lying face down near other gang members. Castro admitted hitting TRIMINIO's body with a pickax and described other weapons allegedly used. TRIMINIO was buried and the weapons used in the assault were

cleaned [JA2669]. Castro identified and described some of those allegedly present.

Castro removed TRIMINIO as a friend on his Facebook ("FB") account [JA2676-2677] and discussed promotions. His testimony about promotions was very much inconsistent with Mejia's earlier testimony that no one received promotions after the death of a "nonchavala." Castro [JA2693-2694] had no basis to believe that anyone present had the authority to promote. Castro admitted that he lied to MS13 members about his knowledge of TRIMINIO's law enforcement cooperation and about his participation in the assault on TRIMINIO to be promoted. [JA2696-2698, JA2706-2707]. Castro was on release from juvenile detention and was already cooperating with law enforcement at the time of the assault on TRIMINIO but did not tell law enforcement about the plans to assault TRIMINIO. [JA2717 et seq.]. After TRIMINIO's death, Castro continued to lie and mislead law enforcement.

**Trial: 6-2-22:**

Castro confirmed that the failure to follow gang orders could result in death [JA2746, JA2768]. Castro testified that Mejia lied about Castro's involvement in planning the MENDEZ assault, and as a result, Mejia lied about "everyone involved" in planning the MENDEZ assault. [JA2762-2763]. Castro stated that TRIMINIO was happy about the prospect of being promoted after killing someone.

27

[JA2768] Mejia lied about Castro participating in planning of the MENDEZ assault. [JA2770-2771]. Castro admitted that he was cooperating with law enforcement while he "walked" with the gang. [JA2774]. Castro testified that he never observed Velasco Barrera strike TRIMINIO. <u>Castro also testified that no one promised anything including promotions for participating in the assault on TRIMINIO. Mejia also testified to this.</u>

Yonathan Melgar Martinez ("Yonathan") participated in the assault on TRIMINIO with many others. Yonathan explained how and why he wanted to join PVLS, viz., [JA2816-2817, JA2819] because he had problems with another gang that was threatening him. His reason for joining PVLS was to "hit" the other gang members. [JA2822-2827]. Yonathan knew that by joining the gang, he would have to kill. Yonathan identified various gang members [JA2830-2831] and explained his understanding of gang dues. [JA2836-2837] Yonathan discussed gang promotions [JA2845-2849] and communications. [JA2855, JA2860]. Yonathan communicated with EZMartinez about obtaining drugs.

Yonathan discussed the events surrounding Lil Navaja. Yonathan described the park where the gang members met, and the roles played by those he claimed to be present. [JA2863] Yonathan described that his understanding of why they wanted to bring Lil Navaja to the park was for a "good kicking." Yonathan testified that he attended a meeting subsequent to the Lil Navaja incident where

those present discussed TRIMINIO's cooperation with the police [JA2880] and their plans to assault TRIMINIO. Yonathan identified those he recalled as present at the meeting.

**Trial: 6-3-22:**

Yonathan [JA2902] testified that TRIMINIO was greenlighted [JA2904] and described the events leading up to the assault on TRIMINIO. [JA2909, JA2915 et seq.]. Yonathan stated that he and Velasco Barrera started walking to the scene but could not find the location. Yonathan stated that when he arrived [JA2918-2919] he found a body face down, not moving and believed to be dead. He observed Contreras, EZMartinez, HZMartinez, Francisco Avila Avalos ("Avalos") and Eric Palacio Ruiz ("Eric") watching others strike TRIMINIO's lifeless body. Yonathan identified himself and others striking the lifeless body [JA2935].

Yonathan claimed to identify EZMartinez's voice while throwing gang signs at the scene of the TRIMINIO assault. [JA2940-2942]. Yonathan stated that "we" buried him, breaking his feet to fit into the grave. [JA2952]. Weapons apparently used were disposed of and Yonathan, along with others, incorrectly believed that they had been promoted even though promotions for the deaths of nonchavalas were never made. [JA2952-2957]. He described more claimed promotions and smoked weed while repeating that he joined MS13 because the 18th St gang was after him.

29

**Trial: 6-9-22:**

Anderson Villatoro Rivera ("Anderson") [JA3064] took the stand and described his guilty plea relating to TRIMINIO's death.   He admitted to being a long time substance abuser. He testified about payment of gang dues [JA3070], the role of a paro, and described various gang rules. [JA3088-3089] Anderson described the events on the day that lead to TRIMINIO's death. [JA3092-3106].

Anderson stated that the gang threatened Eric with a beating after he had almost warned TRIMINIO about the impending assault. [JA3113] Anderson followed the group consisting of HZMartinez, Lobito, Francisco Avila Avalos ("Avalos"), TRIMINIO, EZMartinez, Contreras and Eric to the top of a hill. Anderson described TRIMINIO's assault and observed HZMartinez, Avalos, Eric, and Lobito stabbing Triminio but not see Velasco Barrera assault Triminio [JA3121].   Anderson testified that TRIMINIO stopped moving after a while and believed that the attack lasted 30-40 minutes [JA3123-3125].   Anderson claimed to identify voices and images of those present [JA3135].

Anderson [JA3142] described his actions and those of the others allegedly present after the assault on TRIMINIO. [JA3159]. Anderson exchanged messages with others looking for EZMartinez.   Anderson described his status and that of others before the assault on TRIMINIO. [JA3171]. Anderson admitted to

inconsistent testimony when recalling what happened to TRIMINIO. [JA3199-3205 et seq.]

**Trial: 6-10-22:**

After participating on the assault on Triminio [JA3217], Anderson incredulously claimed that he did not become associated with MS13 until after TRIMINIO's death. He admitted to being drunk that night [JA3219] and that neither Anderson nor Velasco Barrera did anything to trick TRIMINIO into going along with the group. [JA3220]. Anderson described TRIMINIO as happy about being promoted by virtue of his participation in a killing [JA3221]. Anderson stated that he held TRIMINIO's legs until TRIMINIO stopped struggling after which Anderson believed him to be dead. Anderson struck TRIMINIO after he was dead. He then claimed that Yonathan and Velasco Barrera appeared after Triminio died [JA3225]. Anderson did not observe Ferrara present at the assault on TRIMINIO. [JA3249].

Avalos admitted to being in jail for two murders. [JA3252]. He described gang rules and structure, and then identified PVLS gang members [JA3263-3269] and some belonging to other cliques. He believed that Mejia and EZMartinez were in charge of Northern Virginia's PVLS. He described gang communication methods and fund raising through drug sales [JA3287]. AVALOS described a gang fight involving EZMartinez, Mejia, HZMartinez, Ferrera, Contreras and Eric

wherein those present tried to grab and stab chavalas.  Velasco Barrera was not

involved.   Avalos stated that Mejia reported the attack to Maryland PVLS

leadership and contended that at least one chavala was killed [JA3299]. Avalos

recounted the events leading up to Mendez's death, which began with a bus ride

and a meeting outside an apartment building attended by various gang members.

**Trial: 6-13-22:**

Avalos [JA3313-3315] identified all of the Appellants.   He further

[JA3317] identified Velasco Barrera as a lookout   All those present allegedly gave

their phones to EZMartinez.   [JA3320-3321].   Avalos stated that Velasco Barrera

was not present at the assault on MENDEZ   Avalos recorded the assault and

described [JA3324] the "666 pic" of MENDEZ.   After Mendez's death, Avalos

left the park [JA3327-3329].   Avalos believed that he was promoted to chequeo

and given the taca "Picador."   He described [JA3332] a New York trip by Mejia,

HZMartinez, EZMartinez and Avalos [JA3335].

Avalos then described the death of TRIMINIO [JA3342].   He stated that

lookouts allegedly included Castro, Velasco Barrera, Yonathan and Eric.

Someone summoned all to the top of the hill to assault TRIMINIO and [JA3348]

he described how TRIMINIO was buried afterwards.   Weapons were bagged and

disposed of [JA3352].   Mejia and EZMartinez told Avalos to drop Trimino as a

FB friend.   Avalos described his understanding of gang promotions. [JA3388].

Avalos knew MENDEZ' death was a mistake but accepted his alleged promotion anyway.

Fredys Baires Abarca ("Abarca") [JA3412] testified that he suffered from substance abuse and apparently some intellectual impairment issues [JA3415]. He joined the Maryland PVLS as a paro in 2016. On the evening of TRIMINIO's death, Lobito persuaded Abarca who reluctantly [JA3419-3420] agreed to bring Lobito to Virginia to participate in a gang event. After Abarca and Lobito arrived in Virginia, they picked up HZMartinez who guided them to a park. When they arrived at the park [JA3429] Lobito and HZMartinez left the car and Abarca behind. They later came back to get Abarca. Abarca only remembered HZMartinez, Lobito, EZMartinez and Contreras as present. He arrived at the scene and observed a lifeless body on the ground. Abarca took his turn to hit the lifeless body [JA3445]. HZMartinez, Lobito and Abarca returned to Abarca's car and drove back to Maryland where they met others at an apartment to discuss the events of that night. [JA3449]. Abarca went to New York with Lobito for promotions. Abarca believed he was promoted to chequeo and received the taca, "Lil Clandestino."

**Trial: 6-14-22:**

While growing up in El Salvador, Abarca described participating in marijuana sales to make money for the gang [JA3479-3481]. Abarca also testified

33

that Contreras was not at the New York gang meeting and never had any contact with EZMartinez.   [JA3487]

The government next called Jose Delgado ("Delgado"), a jailhouse snitch, who claimed to have made notes containing certain admissions alleged to have been made to him by Velasco Barrera and others while all were in Alexandria Adult Detention Center ("ADC").   For purposes of voir dire, the Court listened to Delgado's testimony, including length of time between the alleged conversations and Delgado's notes [JA3522-3528].   On cross examination, the alleged intervals between conversations and note making by Delgado became much less credible [JA3535], especially in light of his later testimony that he suffered [JA3588-3589] from physical problems, including memory loss.   Over the defenses' objection, the Court admitted #124-6 under FRE 803(1) as present sense impression. [JA3496-3508, JA3513-3514, JA3521].

[JA3542] The Court ruled that the only exhibit in controversy (#124-6) satisfied the present sense impression exception to the hearsay rule (FRE 803(1)), relying on the 4th Circuit's decision in *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554 (4th Cir. 1994). The notes contained what Delgado claimed were alleged admissions made by several of the Appellants relating to the deaths of MENDEZ and TRIMINIO.

The government then called Fairfax County Police Department ("FCPD") Detective Ray Betts who went into the background of case. [JA3619-3624] He [JA3637] identified photos of Contreras and TRIMINIO from FCPD investigations. Betts described how Contreras [JA3641] waived his Miranda rights and then led law enforcement to the decedents' bodies in 2017 [JA3643-3658].

[JA3665] FCPD Detective Sassano detailed her interview of Contreras and his Miranda waiver. During the interview, Sassano claimed that Contreras identified TRIMINIO [JA3670] and MENDEZ [JA3672], and admitted [JA3678] that MS13 gang members lie. [JA3685] Contreras brought law enforcement to the decedents' locations. [JA3687-3689] Contreras advised that he warned TRIMINIO to leave the scene as they walked up hill where TRIMINIO was eventually assaulted.

The government then called another FCPD Detective Uribe. He recounted a 2017 interview of Contreras [JA3698] during which Contreras led them to parks to allegedly locate bodies. First, they went to Pimmit Hills and then to Holmes Run Park where Contreras [JA3701] allegedly provided the location of graves [JA3704-3705]. Contreras allegedly discussed plans relating to Lil Navaja that he received from Mejia. [JA3707]. Contreras identified the decedents as MENDEZ and TRIMINIO, and described them as chavalas. [JA3711 et seq]. Contreras

described the sequences of their assaults, explained that he told TRIMINIO to stop asking about the MENDEZ, and most importantly, warned TRIMINIO and told him to leave. [JA3712-3713, JA3723]. The detective agreed [JA3723] that the language used by TRIMINIO while he was being assaulted could be interpreted to mean that he was in fact a snitch, and that he accordingly knew the consequences of being a snitch.

**Trial: 6-15-22:**

[JA3739] On June 15th, the government then called law enforcement witnesses who found the bodies of the decedents and processed the scenes at that location. [JA3746, JA3765 et seq., JA3783]. The pictures were so disturbing that the Court warned the jury and the gallery about them [JA3767]. The government's witnesses displayed in picture format, the remains [JA3796] of the decedents. [JA3817 et seq.].

The Government called Jocelyn Posthumus, a surgical pathologist at Mary Washington, Fredericksburg. [JA3828]. Dr. Posthumus testified that during the pertinent period, she was an assistant chief medical examiner for the northern district of Virginia. [JA3829]. In this role, she conducted the autopsies of the two bodies found at Holmes Run Park. [JA3831]. The first was the body of TRIMINIO. [JA3832]. Dr. Posthumus testified that TRIMINIO had died as a result of sharp force injuries [JA3852]. She further testified as to the state of the

clothing recovered with TRIMINIO's body, namely that it contained many defects (holes) consistent with a sharp implement.   [JA3858].   Dr. Postumus testified that, based on injuries to the soft tissue, there were 19 stab wounds in the back of TRIMINIO's body.   [JA3860-61].

The second body was the body of MENDEZ.   Per the testimony of Dr. Posthumus, MENDEZ' body Mendez had many wounds reflected in its soft tissue. [JA3844].    Dr. Posthumus further testified that the autopsy did not reveal which blow was fatal or the order in which he suffered the blows.   [JA3849].

Through its witnesses, the government displayed more pictures of MENDEZ' remains and effects [JA3855-3856], and more [JA3861-JA3878] cumulative graphic details of TRIMINIO's remains.

The Government also called David R. Hunt, a forensic anthropologist. [JA3880].   Dr. Hunt testified that in early March 2017, Virginia's Office of the Chief Medical Examiner contacted him regarding two sets of human remains found in Virginia.   [JA3884].   The Medical Examiner asked him to provide an assessment of the trauma each skeletal remain revealed.   [JA3885].   On direct, Dr. Hunt detailed the trauma reflected in each skeleton.   As to the skeletal remains of TRIMINIO, he testified that three or possibly four different weapons were used in the attack, and he could not determine which blow was the fatal blow.

[JA3908].   As to the remains of MENDEZ, Dr. Hunt testified that at least two

weapons were used.   [JA3914].

The government then called two LEOs who testified about a traffic stop in

Gaithersburg, Md, involving Ferrera where a phone and a legal firearm were

recovered.   All of Ferrera's documentation was in order [JA3925, JA3928,

JA3937, JA3946].   Ferrera was detained based on his possession of a firearm and

denied associating with MS13.

**Trial: 6-16-22 – AM:**

The government next called Paul Lee, an FBI SA CART Examiner who

testified about cell phone extractions and the underlying methodology.   Lee

admitted that not all data is used to prepare a report regarding a phone's contents

[JA3990-3991] and that much of it can be left out.

The government then called Megan Atkins, another FBI SA CART forensic

analyst [JA4116] regarding cell phone data. [ JA4120] The government introduced

a stipulation that a phone was seized from Velasco Barrera at the time of his arrest

[JA4130].   The FBI extracted phone contacts from that phone [JA4132] including

the name "Juan Carlos". [JA4155-4157].   The agent also confirmed that some

amount of data is always omitted from the investigators final report when

compared to the full data dump of the phone contents by the FBI CART analyst.

[JA4157].

The government called Ryan Miller [JA4158], a communication specialist with Prince George's County Police Department, who testified that [JA4162] often times cellphones will reflect deleted files.

**Trial: 6-17-22:**

The government then called Ryan Lamb, an FBI Computer Forensic Examiner [JA4205] who described Ferrera's phone contents relating to an alleged assault [JA4226] on a chavala by several members of PVLS, excluding Velasco Barrera [JA4227].   Lamb was unable to explain [JA4231-4232] how all of the extracted data had the same date and time stamps, an anomalous development that undermined the integrity of the evidence and the validity of his testimony.

The government then called JENNA WALKER, an FBI Audio/Video Enhancer who explained the process by which [JA4240] she obtained the data that she enhanced.   She testified as to the various filters and software application features that she used to enhance the data that found its way into evidence in this case.

**5. DUBRAVETZ:**

The government's next witness was FBI SA Dubravetz [JA4283] who worked in counterterrorism at the time of the trial but who had a gang investigation background. [JA4289].   She investigated the deaths of MENDEZ and TRIMINIO. While conducting her investigation, she examined Facebook ("FB") accounts of

the decedents [JA4296] as well as those of Mejia and Eric [JA4305]. She testified

about MENDEZ flashing gang signs and detailed communications between

TRIMINIO and Mejia during August and September 2016.

She described how the MENDEZ "666" picture was discovered, and that she

learned that Eric used three different FB accounts at the time. Eric started

communicating with MENDEZ [JA4324] to arrange a meeting that would lead to

MENDEZ' death. She testified that [JA4335-4337] Eric blocked and removed

MENDEZ from his FB account on 9-29-2016. Dubravetz testified that she was

able [JA4338] to connect Contreras to the Joster Hernandez FB account [JA4339]

and described communications between Contreras and Mejia regarding actions

against others and promotions.

[JA4354] Dubravetz learned that TRIMINIO had two FB accounts [JA4363]

and detailed communications between TRIMINIO and MENDEZ' brother

regarding MENDEZ' whereabouts [JA4365-4369]. In one of the intercepted

communications, TRIMINIO told another gang member, Flaco Ramos, that

chavalas in the Culmore area of Falls Church, Virginia, had taken MENDEZ.

TRIMINIO asked EZMartinez and Mejia about MENDEZ. Communications

between TRIMINIO and EZMartinez ended on 9-26-2016.

**Trial: 6-21-22:**

Dubravetz [JA4395] outlined the communications between TRIMINIO, Eric and EZMartinez about a gang meeting and place.   She concluded that TRIMINIO lost his life on 9-26-2016. (p23) The agent obtained a thumb drive of Alfaro's phone with videos on it that she sent along to get enhanced. She recounted certain audio heard on the videos and other information from the phones.   She speculated that the differences in rank came about as a result of alleged murders committed by the gang [JA4416-4430].

She identified a communication from Alfaro to "Miguel" but to a number associated with EZMartinez, not Velasco Barrera.   She described gang rules and procedures [JA4438-4447] that she used to obtain Alfaro's phone.

FBI SA Fennern was called out of order. At the time, he was a member of the Cell Analysis Survey Team, where he was responsible for phone forensics including cell location data, [JA4471-4487], call detail records ("CDRs"), time frames and communications among the various gang members from August 26 to 29, 2016, and September 24 to 27, 2016.   Velasco Barrera was not mentioned in any of Agent Fennern's analyses.   Fennern admitted that he had no way of knowing who set up any account he discussed [JA4546]. He could at best only describe where data is located, not where a person in possession of any phone subject to her analysis may be located or the identity of that person.

Dubravetz resumed her testimony and went on to discuss gang transactions [JA4577-4591] and phone numbers.   She described pictures of Ferrera, EZMartinez, and HZMartinez throwing gang signs. [JA4593] Mejia was arrested on 9-1-2017 and his phone seized. [JA4595] Mejia had changed his phone and received a message from El Salvador with gang rules and instructions to keep the rules safe and circulate them to other cliques. [JA4603-4606].

[JA4607] Dubravetz recounted her interview of Contreras in the presence of Detectives Sassano and Betts.   Contreras described his knowledge of the events surrounding the death of MENDEZ because some gang members thought MENDEZ was a chavala based on the "666" picture.   Contreras knew TRIMINIO before he lost his life.   He was also aware of TRIMINIO's deactivation from the Silvas clique [JA4616] as well as suspicions of TRIMINIO's cooperation with law enforcement.

[JA4617-4618] Dubravetz testified that Contreras described his warnings to TRIMINIO on the evening of TRIMINIO's death, and the events leading up to and then after TRIMINIO's death. [JA4622]   Contreras also claimed to be aware of gang activity relating to Lil Navaja [JA4623] because he was threatening to kill other gang members.

**Trial: 6-22-22:**

Dubravetz continued [JA4644] to describe her interview of Contreras and his communications with other gang members. She identified FB accounts belonging to Mejia, Eric, Yonathan, Avalos and others. [JA4662]. She described communications between Contreras and Ferrara. [JA4666-4668].

[JA4673]. The agent identified communications between Contreras and others, some of which related to Lil Navaja [JA4699, JA4724 et seq]. TRIMINIO had advised gang members that warrants were out for Contreras who wanted to know the basis for TRIMINIO's knowledge. TRIMINIO gave an explanation to Contreras that persuaded him, along with other information, that TRIMINIO was in fact cooperating with law enforcement. Dubravetz identified other accounts of gang members, which reflected gang member "friends" and their respective promotions and ranks.

[JA4761-4762] Dubravetz identified alleged communications between EZMartinez and Velasco Barrera, his alleged move to New Jersey and developments in El Salvador. She claimed that certain FB accounts allegedly associated with Velasco Barrera ("Miguel Velasco") and other gang members, reflected questions regarding promotions. She claimed these accounts were deactivated after TRIMINIO's death. The agent identified those who allegedly

removed TRIMINIO as a FB friend from their respective accounts. [JA4781-4789].

Dubravetz described her interview [JA4818] with Velasco Barrera and recounted his statements admitted into evidence over counsel's objections. [JA4826-4828, JA4836, JA4850-4846]. The Agent then discussed the arrest of Miguel Angel Sorona Medina ("Medina" or "Viejo Cabro"), one of the alleged leaders of PVLS in El Salvador, the seizure from him of a tablet, and its extractions [JA4870] that referenced the death of MENDEZ.

**Trial: 6-23-22:**

Dubravetz admitted on cross-examination that TRIMINIO was in juvenile detention for violent criminal conduct. She agreed that [JA4897] TRIMINIO was a committed gang member who wore gang clothing and threatened to kill chavalas. She stated that TRIMINIO brought MENDEZ to meet PVLS members. The agent identified Mendez's display of devil horns [JA4970], an MS13 gang symbol. [JA4971]. The agent concluded that the quoted language attributable to MENDEZ could relate to a murder. [JA4974] TRIMINIO was known to law enforcement and the judicial system as a "clear and substantial threat" [JA4974]

The Agent acknowledged that MENDEZ was also a committed gang member by confirming that he told someone to kill themselves [JA4965] and used violent language and actions [JA4965-4971] directed at others.

FBI SA Carlos Fontanez identified many of the MS gang members he alleged were associated with the PVLS clique.   [JA5005 et seq.] He also allegedly corroborated much of the testimony that preceded him during the trial. He confirmed that Contreras [JA5117] warned TRIMINIO to leave the scene where TRIMINIO would later lose his life.

**Trial :6-24-22:**

On June 24th, Fontanez continued his testimony.   Fontanez [JA5142] interviewed HZMartinez who admitted to the taca "Certero," and who did not deny participating in the events that lead to the death of TRIMINIO.   He testified that, after he arrested HZMartinez, he played him the video of the death of TRIMINIO. [JA5150].   The Government played a portion of the video confession in court, wherein HZMartinez admitted to stabbing TRIMINIO twice with a pocketknife in the stomach and chest.

On cross-examination, the agent agreed that the [JA5163-5205] gang rules prohibit cooperation with law enforcement.   SA Fontanez confirmed that HZMartinez confessed to stabbing TRIMINIO without excuse and did not resort to blaming others.   [JA5208].   Indeed, SA Fontanez confirmed that HZMartinez showed remorse, talked about regretting what he did, and believed he had to pay for what he did.   [JA5208].   Fontanez confirmed he was investigating the murder of MENDEZ, and yet despite HZMartinez apparent contrition and willingness to

freely talk about his own culpability, he did not ask HZMartinez anything about

the MENDEZ' death. [JA5213].

On redirect, the Government sought to have SA Fontanez explain this lapse.

To no avail:

Q. Why didn't you ask him more questions about Edvin?

A. At that point in time it has -- it was a very long day, we had been in surveillance for many, many hours. It was a Sunday. We were trying to wrap up this operation that we had been working for weeks to try and locate him and arrest him. After he confessed, after the murder of Sergio, I made the call to actually stop the interview at that point just to kind of wrap it up.

[JA5226].

[JA5227] Rule 29 motions were argued and denied.

After the defenses rested, HZMartinez moved for a lesser included offense

jury instruction.  *See* Additional Proposed Jury Instruction [JA5308].   The

Government filed a written opposition, and the court heard argument in open court.

In court, Counsel argued that the evidence was sufficient to demonstrate that there

was a distinction with HZMartinez' conduct such that it is reasonable for the jury

to conclude that the conduct was merely aggravated assault. [JA5332].   In support,

Defense counsel elaborated by pointing to the testimony of Dr. Posthumus and Dr.

Hunt.   Dr. Posthumus testified that she could not tell when Sergio died or what

killed him.    [JA5335].   Similarly, Dr. Hunt testified that he could not tell what

killed Sergio. [JA5335]. The evidence adduced regarding HZMartinez' conduct,

was that he merely assaulted TRIMINIO with a pocketknife twice.  Given this testimony, Defense counsel argued that it is, ultimately, up to the jury to decide, whether HZMartinez' conduct would be enough by itself to kill Sergio.  [JA5335].

The Government, on the other hand, argued that the evidence conclusively demonstrated that both victims were murdered, and it is not fairly inferable that they were merely assaulted.  [JA5337].

The trial court denied the requested lesser-included offense instruction, finding that the evidence in this case does not support a rational inference that HZMARTINEZ merely assaulted the victims.  [JA5338].

**6. SENTENCING:**

The Appellants were sentenced as follows:

1.   On November 2, 2022, the Court sentenced EZMartinez to life imprisonment and he filed his notice of appeal on January 10, 2023;

2.   On October 20, 2022, the Court sentenced Contreras to life imprisonment and he filed his notice of appeal on November 3, 2022;

3.   On September 28, 2022, the Court sentenced HZMartinez to life imprisonment and he filed his notice of appeal on December 29, 2022;

4.   On October 26, 2022, the Court sentenced Velasco Barrera to life imprisonment and he filed his notice of appeal on November 2, 2022;

5. On October 12, 2022, the Court sentenced Ferrera to life imprisonment and he filed his notice of appeal on October 13, 2022.

## SUMMARY OF ARGUMENTS

1. The Court erred when it permitted the qualification of a government witness as a gang expert under FRE 703;

2. The Court erred when it permitted the government to introduce alleged gang events unrelated to the appellants in this case under the VCAR and RICO statutes in violation of the Appellants' constitutional rights to due process under the 5th Amendment to the U.S. Constitution;

3. The Court erred when it admitted into evidence material containing graphic video and audio evidence of decedents MENDEZ TRIMINIO and others unrelated to the appellants in this case, in violation of FRE 403 and their constitutional rights under the 5th Amendment;

3.a. The Court erred when it admitted Exhibits 51-12b and 51-13b. The videos were more prejudicial than probative in violation of Federal Rule of Evidence 403.

3.b. The court erred when it denied the defense motions to exclude the admission of Government Exhibits 2-1E-24-25, 2-S8-29 and 2S-33-34 as those exhibits were more prejudicial than probative;

3.c.   The Court erred when it admitted the decedents' autopsy photos as they were more prejudicial than probative and cumulative.

4.   The Court erred when it found that the evidence adduced by the government in its case, was sufficient to find the appellants guilty of violations under 18 U.S.C. Sections 1959(a)(5), 1201(c), 1959 (a)(1) and (2), and 1201(a)(1) and (2);   The Court erred when it denied Appellant's Rule 29 motion which was based on the uncontroverted evidence that Triminio knowingly, willingly and voluntarily joined the conspiracy that resulted in his death and by doing so precluded a finding of guilt because he could not reasonably be found to have been inveigled.

5.   The Court erred when it failed to sever each of the charged indictment counts and the appellants from each other;

6.   The Court erred when it refused to give the jury the duress jury instruction in violation of the Appellants' due process rights;

7.   The Court erred when it admitted into evidence the notes of the jail house snitch Delgado in violation of FRE 803(1) and the Appellants' due process rights under the 5th Amendment;

8.   The Court erred when it denied Appellant H. Martinez' motion to suppress evidence procured in violation of the 4th Amendment.

9.   The Court erred when it denied Appellant H. Martinez' motion to suppress evidence procured in violation of the 5th Amendment.

10.   The trial court erred when it denied Appellant H. Martinez's motion for a lesser-included offense jury instruction.

11.   The Court erred when it imposed sentences of life in prison without the possibility of parole for each of the Appellants that were disproportionate to the crimes of conviction and otherwise in violation of the 8th Amendment to the U.S. Constitution.

## ARGUMENTS

**1.   The Court erred when it permitted the qualification of a government witness as a gang expert under FRE 702 and FRE 703.**

A.   Standard of Review:

This Court reviews evidentiary rulings for an abuse of discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010)

B.   Argument:

On or about March 31, 2022, the United States withdrew its earlier designation of Claudio Saa as an expert witness in the area of gang related activity, focusing on the MS-13 and 18th Street gangs. The United States replaced Det. Saa with TFO Ricardo A. Guzman ("Guzman") who was designated as the government's expert witness to testified at trial generally about MS-13 as a criminal enterprise and its history, organization, rules, and activities."

Federal Rule of Evidence ("FRE") 702 requires in part, that the proponent of expert testimony demonstrate how the expert's alleged "expertise" will assist the jury to: understand evidence or determine a fact in issue; provide an opinion based on sufficient facts or data; demonstrate that the testimony is a product of reliable principles and methods, and that the expert has reliably applied the principles and methods to the facts of the case. The "expert's testimony at trial was insufficient to satisfy these threshold requirements.

> the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot 'out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion' would provide an end run around Crawford."  *United States v. Johnson*, *id*, at 635, citing *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)).

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008); (in a case in which all of the appellants' convictions were vacated, the Court concluded that the expert's testimony concerned material well within the grasp of the average juror. E.g., that MS-13 had committed multiple murders. The expert failed to explain how "he pieced together bits of information from different sources and reach a studied conclusion that he then gave the jury." *Id*, at pp 194-198).

Similarly in this case, the government's so-called gang expert had no direct experience with gang operations in the MidAtlantic region and relied principally on what he was told or the information he reviewed as part of the case. [JA868,

JA953, JA961; JA1301-1302, JA1307-1308; JA1359, JA1299-JA1353; JA1402-1403]

**2.    The Court violated the Appellants' constitutional rights to due process under the 5th Amendment to the U.S. Constitution when it permitted the government to introduce alleged gang events unrelated to the appellants in this case under the VCAR statutes.**

A.    Standard of Review:

This Court reviews evidentiary rulings for an abuse of discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010);

B.    Argument:

The Court permitted the government to introduce into evidence at trial, several instances of unrelated assaults in furtherance of the government's claim that these incidents were relevant and material to the enterprise elements of the RICO and VCAR counts. [JA1430-1439; JA1464; JA1530-1533, JA1549-1560, JA1602, JA1631-1645; JA1865-1875]

The defense objected to this evidence under FRE 403 which provides that a trial judge may exclude proffered evidence if its probative value is substantially outweighed "by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Of the negative factors listed that would support exclusion, one refers to the jury directly—the danger of "misleading the jury." It is not clear that a jury, and

especially the one in this case, could fairly distinguish between the unrelated

incidents that the government introduced to prove the enterprise elements of its

indictment counts, and those directly related to the instant case that were sufficient

to prove the enterprise elements of the government's case, if believed by the jury.

The spillover effect was clearly prejudicial to the Appellants. For these reasons, the

Court erred in admitting such evidence.

**3.      The Court erred when it admitted into evidence material containing
         graphic video and audio evidence of decedents MENDEZ and
         TRIMINIO in this case, and others unrelated to the Appellants in this
         case, in violation of FRE 403 and their constitutional rights under the
         5th Amendment to the U.S. Constitution.**

**3.a.    The Court erred when it admitted Exhibits 51-12b (JA6695) and
51-13b (JA6696). The videos were more prejudicial than probative under
Federal Rule of Evidence 403.**

A.      Standard of Review:

The review of a district court's decision to admit evidence to which there has

been an objection under Rule 403 is judged under an abuse of discretion standard.

*United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)

B.      Argument:

The Court admitted the government's Ex-51-12b [JA6695] and 51-13b

[JA6696]. This was the video of the assault of TRIMINO. The video is a gruesome

depiction of TRIMINO's death and shows that death in close and vivid detail. The

accompanying audio depicts the screams of the TRIMINO as he dies. It was

simply unnecessary to have the video introduced as evidence. The fact that the murder was recorded was not needed to prove any of the essential elements of the crime. The evidence regarding the gang members that were present at the time came from many different sources. The violent nature of the video could serve only one purpose; to inflame the passions of the jury.

"Under Fed.R.Evid. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Review of a district court's determination of the admissibility of evidence is for abuse of discretion." *United States v. Gamble*, 290 F. App'x 592, 594 (4th Cir. 2008) (quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)). But even relevant evidence may be excluded if its probative value is "substantially outweighed" by the potential for undue prejudice, confusion, delay or redundancy. Fed.R.Evid. 403. Prejudice, as used in Rule 403, refers to evidence that has an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997) (internal quotations omitted); see also *United States v. Tillmon*, 954 F.3d 628, 643 (4th Cir. 2019).

Prior to the introduction of the video's depicting TRIMINO's murder, counsel objected to the introduction of the video on the basis of the video being

more prejudicial than probative and that there had been, and would be, ample testimony regarding his death. [JA2803]. There was extensive testimony regarding the murder over the course of the trial. Multiple witnesses described the murder and how TRIMINO was placed in the grave in which he was eventually found. When the video was eventually played, the court was careful to make sure that the jury was informed that there would be graphic evidence played and warned spectators in the gallery that they may want to leave the courtroom. [JA2802, JA2914]. Later in the same witness's testimony, the Court admitted another government exhibit, an audio recording of the murder; exhibit 51-13B and its accompanying transcript 51-13C. Again, there were objections to the prejudicial and cumulative nature of the evidence.

Under normal circumstances, the effect that graphic or potentially prejudicial evidence could have on the jury is analyzed in a vacuum. But in this case, the jury was very specific about how the evidence in the videos affected them. When the jury returned from recess the jury sent the Court a note. The note read "Please warn the jury in advance that a graphic video will be shown before we enter the courtroom." [JA2945]. This note demonstrated that the jury had a visceral reaction to the graphic video. Throughout the course of the lengthy trial, the jury did not make a specific reference to any other piece of evidence. But the jury did express an emotional reaction to the video.

This Court has cautioned that "[U]nfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Tillmon*, 954 F.3d at 643 (cleaned up). "Thus, under Rule 403, relevant evidence is inadmissible 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence.'" *United States v. Bartee*, (No.21-4585 at *4 (4th Cir. Aug. 11, 2002 unpublished) (quoting *PBM Prods., LLC v. Mead Johnson &Co.*, 639 F.3d 111, 124 (4th Cir. 2011).

It is not speculation or conjecture that the jury had an emotional reaction in this case. The jury informed the Court that it had such an emotional reaction. And the evidence that caused that emotional reaction was not necessary for the government to prove its case. The government could have shown still pictures, and it did. The government had witnesses that identified the participants involved. What was unnecessary was to play graphic video and risk that the jury would decide the case on an improper emotional basis. *Queen*, 132 F.3d at 994.

The Court should have exercised its discretion and prevented the government from playing the videos of the murder and their accompanying audio.

**3.b.   The court erred when it denied the motions to exclude the admission of Government Exhibit 2-1E-24-25 [JA501, JA5702], 2-2S8-29 [JA5871-JA5892] and 2S-33-34 [JA5896, JA5897, JA5898] as those exhibits were more prejudicial than probative.**

A.    Standard of Review:

The review of a district court's decision to admit evidence to which there has been an objection under Rule 403 is judged under an abuse of discretion standard. *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)

B.    Argument:

In pre-trial motions, Mr. Contreras objected to the government's introduction of scraps of pajamas. Mr. Contreras argued that their pajamas that TRIMINO was allegedly wearing at the time of the murder were more prejudicial than probative because there was no specific forensic evidence to support the contention that the pajamas were tied to TRIMINO.   Mr. Contreras further argued that there was no need for picture of a child's pajamas – which would play on the emotions of the jury – because there was never going to be a question regarding TRIMINO's identification. This argument was born out at trial. None of the defendant's raised the defense that it was not TRIMINO whom the MS-13 members murdered. The admission of the pictures of pajamas, only served to play on the prejudices of the jury.

Much like the video, the pictures of the pajamas served to play directly on the emotions of the jury. No one at trial argued that TRIMINO was not murdered.

None of the defendants at trial argued that TRIMINO was not a young man. But to introduce pictures of the pajamas was an attempt to have the jury decide the case based on an improper emotional basis.

### 3.c. The Court erred when it admitted the autopsy photos, Government Exhibits, 4-2B-2QQ [JA6009-JA6050] and Government Exhibits 5-2B-2GG [JA6059-JA6090] as they were more prejudicial than probative, and they were cumulative.

A.      Standard of Review:

The review of a district court's decision to admit evidence to which there has been an objection under Rule 403 is judged under an abuse of discretion standard. *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)

B.      Argument:

In pre-trial motions, Mr. Contreras objected to the government's introduction of the admission of the autopsy photos. Mr. Contreras argued that autopsy photos would be more prejudicial than probative as they showed MENDEZ' body in a manner that showed the violent nature of the attack. Mr. Contreras further argued that this evidence was cumulative and would not serve to prove who committed the murder of MENDEZ. Mr. Contreras made the same arguments for the autopsy photos of TRIMINO.   The trial court overruled the objections. As he did before trial, Mr. Contreras maintains that admission of these photographs was both more prejudicial than probative as well as cumulative.

"Cumulative evidence is that which addresses trial testimony on the same subject." *U.S. v. King*, 232 F. Supp. 2d 636, 650 (E.D. Va. 2002). At trial, the government admitted many photographs. There was simply no need to introduce many pictures of the various autopsy photos. "Generally, photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. 40A Am. Jur. 2d Homicide § 417. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. *Id*.

However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime even though they may tend to arouse the passion or prejudice of the jurors. *Id*. Thus, the test for determining whether a photograph maybe shown to the jury is whether the photograph's probative value outweighs its possible prejudicial effect. *Id*. "If . . . relevant evidence is inadmissible in the presence of other evidence related to it, its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its

relevance notwithstanding." *Old Chief v. United States*, 519 U.S. 172, 179 (1997).

See also *Davis v. Shearin*, CIVIL ACTION No. AW-08-3453, at *19-20 (D. Md.

June 23, 2010) (citing secondary sources).

In this particular case, the pictures showed a rather gruesome murder. But

the nature of the murder was not one of the essential elements charged in any of

the counts of the indictment. Showing the vast number of pictures was overly

cumulative and this was prejudicial.

**4.    The Court erred when it denied Appellants' Rule 29 motions and found that the evidence was sufficient to find the appellants guilty of violations under 18 U.S.C. Sections 1959(a)(5), 1201(c), 1959 (a)(1) and (2), and 1201(a)(1) and (2).**

A.    Standard of Review:

In assessing the sufficiency of evidence, the Court must determine whether

the verdict of the jury is sustained by "substantial evidence, taking the view most

favorable to the Government." *United States v. Pierce*, 409 F.3d 228, 231 (4th Cir.

2005) (*quoting Glasser v. United States*, 315 U.S. 60, 80 (1942)). The question is

whether "any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt."   *United States v. Lomax*, 293 F.3d 701, 705

(4th Cir.), *cert. denied*, 537 U.S. 1031 (2002) (internal quotations and citations

omitted); *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)

("[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as

adequate and sufficient to support a conclusion of a defendant's guilt beyond a

reasonable doubt.")

The jury, not the reviewing court, assesses the credibility of the witnesses

and resolves any conflicts in the evidence presented. *See United States v. Wilson*,

118 F.3d 228, 234 (4th Cir. 1997); *United States v. Arrington*, 719 F.2d 701, 704

(4th Cir. 1983). "Those functions are reserved for the jury, and if the evidence

supports different, reasonable interpretations, the jury decides which interpretation

to believe.")   *Id*.

B.     Argument:

Appellant Velasco Barrera

The evidence was insufficient for the jury to find appellant Velasco Barrera

guilty of Counts 5 and 6, 18 U.S.C. Sections 1959 (a)(1) and (2).

For purposes of this argument, the Court instructed the jury that one of the

essential elements that the government has to prove is that the defendant's alleged

purpose in allegedly engaging in racketeering activity is that he did so to "maintain

or increase his position in the enterprise."

Appellant Velasco Barrera asserts that substantial evidence was not

presented at trial for the jury to find the defendant guilty of Count 5 and Count 6.

During the government's case, there was ample testimony from witnesses

that indicated that none of the alleged participants including the Appellants were

promised any sort of consideration for their participation in the events leading to the deaths of the decedents as required under the VCAR statutes. [JA2421] E.g., Mejia had no authority to promote [JA2435-2438, JA2454]. Castro testified that no one was promised anything for participating in the assault on TRIMINO [JA2774-2775].

For purposes of this argument, the Court instructed the jury that one of the essential elements that the government has to prove under 18 USC 1201 is that the victim was tricked ("inveigled") into the events that led to his death. There was ample evidence that one of the Appellants warned TRIMINO to leave the scene because anyone could be assaulted. [JA3502, JA3686-3689, JA3712-3713, JA3723; JA4617-4618; JA5117]

In an unusually anomalous aspect of this case, the uncontroverted evidence demonstrated that TRIMINO knowingly, willingly, voluntarily and happily joined the conspiracies that resulted in his death and that of MENDEZ. [JA2427-2431, JA2434; JA3219-3221; JA4897, JA4974]

Similarly, MENDEZ was also a committed gang member who regularly engaged in assaultive and violent behavior against others [JA4965-4971, JA4974] As a result, he was not inveigled as required under the statue.

As set forth above, there was ample evidence to demonstrate that the gang rules precluded promotions when either a fellow gang member was greenlighted

(marked for death) and permitted only certain members in the highest echelons of the gang to authorize such promotions. Neither Mejia nor any others alleged to be in leadership positions in the gang, and who were present, possessed the authority after each of the decedent's deaths to promote anyone. Accordingly, whatever the Appellants' actions were either individually or collectively in this case, they could not have received promotions for the reasons stated above. As a result that element of the VCAR count required the government to prove beyond a reasonable doubt that they engaged in racketeering activities for the purpose of maintaining or increasing their position in the enterprise and the government failed to do so. (18 U.S.C. §1959).

Furthermore, the Court failed to adequately account for the fact that the government's case relied on an ample amounts of cooperators' testimony. Appellant acknowledges that there is longstanding authority holding that the use of cooperator testimony may be sufficient sustain a conviction. *Hoffa v. United States*, 385 U.S. 293, 310-12 (1966). However, there are indications that growing concern regarding the unreliability of cooperating witness testimony have caused concern and a shift in thinking. In another context, the Supreme Court has held that statements of individuals seeking leniency who implicate others in their criminal activity lack particularized guarantees of reliability. See *Lilly v. Virginia*, 527 U.S. 116 (1999). Although Lilly focused upon out of court statements, the

Supreme Court's concerns regarding cooperating witnesses should also apply with

equal force when considering in court testimony which, in this case, was materially

variable.

It is appropriate to bear in mind the cautionary words of the Honorable

Stephen S. Trott, a former official with the United States Department of Justice:

> Criminals are likely to say and do almost anything to get what they
> want, especially when what they want is to get out of trouble with the
> law ☐ This willingness to do anything includes not only truthfully
> spilling the beans on friends and relatives, but also lying, committing
> perjury, manufacturing evidence, soliciting others to corroborate their
> lies with more lies, and double-crossing anyone with whom they come
> into contact, including – and especially – the prosecutor.   A drug
> addict can sell out his mother to get a deal, and burglars, robbers,
> murderers and thieves are not far behind.   Criminals are remarkably
> manipulative and skillfully devious. Many are outright conscienceless
> sociopaths to whom "truth" is a wholly meaningless concept. To
> some, "conning" people is a way of life. Others are just basically
> unstable people. A "reliable informer" one day may turn into a
> consummate prevaricator the next.

Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as
Witnesses*, 47 Hastings L.J. 1381, 1383 (1996).

Judge Trott's warning rings particularly true in considering the testimony of

the cooperators. Appellants convictions derived primarily from the testimony of

several cooperators, should be reversed and dismissed.

**5.    The Court erred when it failed to sever each of the charged indictment counts and the appellants from each other.**

A.    Standard of Review:

This Court reviews questions of law de novo. *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir.2016).

B.    Argument:

1.  Background:

The United States charged Mr. Velasco Barrera in an eight-count indictment that alleged Conspiracy to Commit Kidnapping, Murder in Aid of Racketeering and Kidnapping resulting in Death, inter alia.   The Appellants were convicted of all the charged counts and receive life sentences.

2.  Law/Argument:

**a.   Defendants:**   Under Rule 14 of the Federal Rule of Criminal Procedure, severance for prejudicial joinder is discretionary.   See e.g., *United States v. Blair*, 661 F.3d 755, at 770, citing *United States v. Cardwell*, 433 F.3d at 378 (4th Cir 2005).   If it appears that a joint trial would compromise a defendant's specific trial right (*Zafiro v. United States*, 506 U.S. 534, 539 (1993)) or result in actual prejudice to the Defendant (*United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995)), then severance of defendants should be granted.

The Appellants' trials should have been severed from that of the co-defendants for at least two reasons: the jury may find the defendant guilty by

association; and, there may be Bruton problems with any statements made by co-defendants and/or co-conspirators.

1.  The Jury May Find the Defendant Guilty by Association.

It is extraordinarily difficult for a jury to follow limiting instructions and to keep separate evidence that is relevant only to a or other co-defendants.   A co-defendant in a conspiracy trial is in a dangerously precarious position. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe him guilty by association.   *Krulewitch v. United States*, 336 U.S. 440, 454 (1949).   The weight of the evidence as to each co-defendant is not clear at this time and any spillover effect on Velasco Barrera from evidence pertaining to others could make it impossible for him to receive a fair trial.

2.  Bruton problems existed, and a severance should have been granted to avoid them.

Appellants contend that Bruton problems arose at trial [JA5130-5132]. Federal Rule of Evidence ("FRE") 801(d)(2)(A) provides that a statement by an opposing party is not hearsay when it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity. . .." The government may introduce a defendant's statement against him at trial, but

Constitutional restraints are implicated in the use of such statements in a multi-defendant trial.

The Sixth Amendment Confrontation Clause guarantees the right of a criminal defendant "to be confronted with the witnesses against him" and includes the right to cross-examine witnesses. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). A defendant's Confrontation Clause rights are violated in a joint trial situation when a co-defendant's confession that facially incriminates the defendant is admitted even with a jury instruction that the confession was only to be considered against the codefendant. *Bruton v. United States*, 391 U.S. 123, 125-26 (1968).

In Bruton, the Court reasoned that a limiting jury instruction could not overcome the "powerfully incriminating extrajudicial statement" naming the defendant. *Id*. at 135-36. However, the defendant's Confrontation Clause rights are not violated if the trial court admits a redacted statement that omits all reference to both the defendant and to the fact that anyone other than the co-defendant and a third person committed the crime, as well as a limiting instruction. *Richardson*, 481 U.S. at 201-02. Importantly, it is not the fact of redaction alone that is sufficient to withstand a Bruton challenge but rather the manner and extent of any proposed redaction.

In *Gray v. Maryland*, 523 U.S. 185, 192 (1998), the Court ruled that the redaction of the confession of a non-testifying co-defendant by replacing the defendant's name with an obvious indication of deletion violates Bruton. The Court explained that Bruton applies where the inferences "involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id*. at 196.   The redacted confession in *Gray* referred to the "existence" of the nonconfessing defendant unlike the redacted confession in *Richardson*. *Id*.

Subsequent to the Bruton-Richardson-Gray line of cases, the Supreme Court in, a single-defendant case, held that admission of testimonial hearsay against a defendant violates the Confrontation Clause unless the witness is unavailable and the defendant against whom the statement is offered has not had an opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36 (2004).

At trial, the government introduced many Bruton statements that were testimonial in nature.   In fact, the government did not offer "any statements of co-defendants that reference a defendant by name or otherwise facially implicate a defendant."

However, Appellants submit that the introduction of any testimonial statement of a non-testifying co-defendant, whether or not inculpatory, violates a

co-defendant's rights under Crawford. In *United States v. Nguyen*, 565 F.3d 668

(9th Cir. 2008), the Government had initially planned to introduce a co-defendant's

statement and had offered to redact the portion specifically naming the defendant.

Subsequently, a co-defendant actually introduced it and did so in an unredacted

form. The court found that a Confrontation Clause issue arose regardless of which

party introduced the statement and that the admission violated Crawford whether

the statement was inculpatory or not.

In a footnote, the court cited Bruton in rejecting the Government's argument

that the limiting instruction given by the district court rendered any error admitting

the statement harmless:

> In *Bruton*, the Court held that a case of the admission of a confession
> that implicates a co-defendant and where the co-defendant cannot
> cross-examine the confessor was a situation "in which the risk that the
> jury will not, or cannot, follow the instructions is so great . . . that the
> practical human limitations of the jury system cannot be ignored." *Id*.
> at 675 n.3 (citing *Bruton*, 391 U.S. at 135).   Because the statement
> expressly implicated the defendant, the court did not have to engage in
> a *Richardson* or *Gray* analysis and proceeded with a Crawford
> analysis instead.

In this case, any co-defendant's statements, even if redacted implicated other

defendants, either facially or inferentially. Further, any limiting instruction

directing the jury to consider the statement only as evidence of the speaker's

knowledge was insufficient to satisfy the requirements of the Bruton-Richardson-

Gray line of cases and ensure that the other defendants' rights of confrontation were not violated.

**b. Counts:** The United States charged Velasco Barrera in an eight-count indictment that alleged Conspiracy to Commit Kidnapping, Murder in Aid of Racketeering Activity and Murder in Aid of Racketeering Activity, as well as other charges. The government alleged that the Defendant conspired with others to kidnap and kill other individuals. Velasco Barrera was convicted on all counts and received a life sentence in prison with no parole. The government charged the other codefendants with the same substantive counts.

3. Law:

Rule 8 of the Federal Rules of Criminal Procedure ("FRCrP") provides that two or more offenses may be charged in the same indictment only if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." FRCrP 8(a). "Misjoinder under Rule 8 is prejudicial per se and if the limits of the rule are exceeded, severance is mandatory." *United States v. Kabbaby*, 672 F.2d 857, 860 (11th Cir. 1982).

The determination of the legal question of whether or not joinder is proper under Rule 8(a)'s requirement of the "same series of acts or transactions" must be based on a finding that there is a substantial identity of facts and participants

between the events charged. Under this standard, joinder of the two sets of counts is not proper. The counts here relate to completely separate allegations.

Even if the Court found that joinder of the counts is not prejudicial per se under Rule 8(a), the prejudicial effect of joining the counts requires severance. Under FRCrP 14, "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . the court may order an election or separate trial of counts . . .." The primary concern of the court is whether the jury will be able to segregate the evidence applicable to each count. Severance is required where the defenses are so inconsistent as to essentially confuse the jury.  See, e.g., *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir.), *cert denied*, 537 U.S. 1094 (2002).

Severance was mandated in this case because of the prejudicial effect that joinder would have. One circuit has recognized that "[t]here is a 'high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." See *United States v. Daniels*, 770 F.2d 1111 (D.C. Cir. 1985); *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir 1986). This is so because the use of other crimes evidence pursuant to Rule 404(b) is discouraged:

> Our reluctance to sanction the use of evidence of other crimes stems
> from the underlying premise of our criminal justice system, that the
> defendant must be tried for what he did, not for who he is. Under our
> system, an individual may be convicted only for the offense of which
> he is charged and not for other unrelated criminal acts which he may
> have committed. Therefore, the guilt or innocence of the accused must

be established by evidence relevant to the particular offense being tried, not by showing that the defendant engaged in other acts of wrongdoing.

*Lewis*, 787 F.2d at 1321.

There was insufficient evidence in this case that the purported victims were allegedly kidnapped and murdered as part the same act or transaction nor was there sufficient evidence of a common plan or scheme. The government alleges that both kidnappings and murders had different patterns of events, and that the events involved different sets of individuals. The only commonalities in the government's allegations is that the outcome for both purported victims was their kidnapping and murder, and the defendants' alleged membership in MS-13.

Severance is appropriate when a joint trial will prejudice one of the parties. The Federal Rules provide that "[i]f the joinder of offenses or defendants . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a); see, e.g., *Butler v. United States*, 317 F.2d 249, 264 (8th Cir. 1963) (noting that "the question whether a defendant is prejudiced by a joinder of offenses or of defendants in an indictment is in the first instance addressed to the sound discretion of the trial court . . . .").

In addition to this Court's discretionary power to sever, the United State Supreme Court requires that severance be granted "if there is a serious risk that a

joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The risk that the jury might be prevented from making a reliable judgment "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id*. The Supreme Court has noted that "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Id*. (emphasis added).

Finally, the first part of the definition of enterprise under the VCAR and RICO statutes is "a group of individuals associated in fact." By virtue of the government's charging decisions, the jury viewed the Appellants sitting together in the courtroom dock thus easily lending itself to a jury conclusion that these Appellants were associated in fact. I.e., the government's charging decisions and the trial courtroom configuration, gave the government its enterprise element, " a group of individuals associated in fact," on the proverbial "silver platter."

As a result, joinder of the Appellants' cases deprived each of them the presumption of innocence by increasing the likelihood that a jury could find them

guilty by association.   For these reasons, the Appellants' cases should have been severed from each other.

**6.     The Court erred when it declined to give the jury the duress jury instruction in violation of violated the Appellants due process rights;**

A.     Standard of Review;

This Court reviews the denial of a proposed jury instruction for abuse of discretion. *United States v. Sonmez*, 777 F.3d 684, 688 (4th Cir. 2015) *cert. denied*, 136 S. Ct. 689 (Mem), 193 L. Ed. 2d 520 (Mem) (2015).

B.     Argument:

First, the government's evidence at trial suggested that two people violently lost their lives in the presence of, and at the hands of, several other people, some of whom were alleged by the government to include the Appellants.   There was testimony throughout the trial from gang members who claimed that if they didn't participate in the events leading up to the deaths of the decedents in this case, they themselves would lose their lives. [JA2746, JA2768]     If there ever was a basic set of facts that lent itself to the issuance of the duress instruction, it would be the facts in this case.

Second, the duress instruction proposed by the Appellants was not complicated.   Indeed, if the Court and the government could trust the jury to sort out an instruction based on the *Pinkerton* case (*Pinkerton v. United States*, 328 US 640, 1946), e.g., surely they could trust the jury to determine both the facts and

whether the duress instruction was appropriate to the Appellants in this case based on the jury's factfinding.

Third, and finally, the Court's failure to give the duress jury instruction violated and disrespected one of the most fundamental due process rights of a person standing trial on charges against him, *viz.*, the right to have the jury exercise its constitutional role of determining criminal liability by applying facts to the offense elements and any defenses.

An important example of why the Court's decision refusing to give the duress instruction was wrong is the *Apprendi v. New Jersey* case (530 U.S. 466, at 476-77, 2000). *Apprendi* involved legislative attempts to take from the jury the authority to make findings relevant to fixing the maximum sentence and vest that determination in the Court.

In *Apprendi*, the Supreme Court stated that core due process in criminal cases include the following interrelated principals: the right to a trial by jury, the presumption of innocence and the government's burden respecting each of the elements of the charged offenses (proof beyond a reasonable doubt).

The constitutional process that justifies the imposition of punishment has three (3) parts: (1) the legislature sets out the offense elements; (2) the executive carries the burden of proof beyond a reasonable doubt; and, (3) the judiciary presides over the proof and the authority to impose punishment. Importantly

however, the authorization of the imposition of punishment by the judiciary is retained by the people in the institution of the jury.

By refusing to give the duress jury instruction, the trial Court stripped the jury of its power to properly authorize imposition of punishment and by doing so violated the Appellants constitutional due process rights under the 5th Amendment to the U.S. Constitution.

**7.     The Court erred when it admitted into evidence certain notes of a jailhouse snitch Jose Delgado in violation of FRE 803(1) and the Appellants' due process rights under the 5th Am to U.S. Constitution.**

A.     Standard of Review:

This Court reviews evidentiary rulings for an abuse of discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).

B.     Argument:

The government called Jose Delgado as a witness to testify about, inter alia, conversations that he allegedly had at the Alexandria ADC with Yonathan, Ferrera and Velasco Barrera.   The government sought to admit certain of his notes and the Court approved the admission of a limited number of notes because the Court concluded that they fell within the present sense impression exception to the prohibition against hearsay under FRE 803(1).   *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554 (4th Cir. 1994).

On cross examination, Delgado admitted that he did not need the notes to testify because his recollection was sufficient to support his testimony. [JA3522-3528, JA3535, JA3588-3589] Counsel argued that the best evidence was his testimony, either refreshed by viewing his notes, or if not refreshed, then by employing the past recollection recorded exception to the hearsay rule under FRE 803(5).   Under this Rule, Delgado would have been able to read certain portions of his notes into the record but the government would not have been able to admit the notes into evidence consistent with provisions of FRE 803(5). The unnecessary admission of these notes in violation of FRE 803(5) prejudiced the Appellants in this regard.

**8.     The trial court erred when it denied Appellant HZMartinez's motion to suppress evidence procured in violation of the 4th Amendment.**

A.     Standard of Review:

This Court reviews a trial court's factual findings underlying a motion to suppress for clear error, *United States v. Gray*, 491 F.3d 138, 143–44 (4th Cir. 2007) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)), but reviews de novo any legal conclusions as to whether conduct infringes upon Fourth Amendment rights, *United States v. Breza*, 308 F.3d 430, 433 (4th Cir. 2002).

B.     Argument:

The Government violated HZMartinez's Fourth Amendment rights by conducting an unreasonable "knock and talk" demand before 8:00 am on a Sunday

morning at the house of Ms. Portillo, HZMartinez's mother, while intruding on the back patio door, i.e., the curtilage of the home. Moreover, while Ms. Portillo ultimately let SA Fontanez gain entry into her home, the interactions between Ms. Portillo and SA Fontanez were coercive and, even were they not, the additional officers entering her home violated the scope of her arguable consent for SA Fontanez to enter.

Axiomatically, the Fourth Amendment guarantees the people's right "to be secure in their persons, houses, papers, and effects." U.S. Const. Amend. IV. Fourth Amendment protections extend beyond the four walls of a person's home to include the curtilage surrounding the property. *United States v. Dunn*, 480 U.S. 294, 300–01 (1987). The Amendment safeguards the privacy interests of owners and overnight guests. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (stating "that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). See also, *Bumper v. North Carolina*, 391 U.S. 543, 546–48 (1968) (relatives of homeowners who regularly reside at the residence are protected by the Fourth Amendment).

In this case, rather than secure a warrant, law enforcement sought to use the "knock and talk" technique to determine HZMartinez's whereabouts and/or effect his arrest. And while courts generally recognize a "knock and talk" exception to

the warrant requirement, see, e.g., *Rogers v. Pendleton*, 249 F.3d 279, 289–90 (4th Cir. 2001), this exception is limited. Indeed, under it, officers may act only as any private citizen might – that is, they are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants. *Id*. As the Supreme Court has elaborated, "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Florida. v. Jardines*, 569 U.S. 1, 8 (2013) (internal citations omitted).

The testimony at the suppression hearing made clear that SA Fontanez acted well beyond the parameters of what "any private citizen might do." Per his testimony, SA Fontanez began knocking on Ms. Portillo's patio door, which had its shades drawn, before 8:00 am on a Sunday morning, announcing that he was law enforcement. See, Suppression Hearing Testimony of SA Fontanez and Ms.

Portillo, [JA611, JA662, and JA768-770]. The testimony made abundantly clear that the "patio door" was, in fact, the back door.    The metal door on Ms. Portillo's patio has no peep hole or knocker. There is no mail slot or mailbox next to it. Ms. Ferrufino, the former property manager for the apartment building and an independent witness with no stake in the motions, identified the patio and the door next to it as the back door.   [JA741].   She also identified the front entrance to the apartment building, which leads into a breezeway with mailboxes, and the door to Ms. Portillo's apartment within the breezeway as the proper front door.   [JA741]. Ms. Portillo stated the main door "is where you find the mailboxes" [JA765], and it is where she received packages and food delivery, [JA766].

In *Florida v. Jardines*, the Supreme Court recognized that the curtilage "area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" 569 U.S. at 7. The uninvited entry by several armed agents onto Ms. Portillo's back patio violated these "heightened privacy expectations" and "'when a LEO physically intrudes on the curtilage to gather evidence, a search within the Fourth Amendment has occurred. Such conduct thus is presumptively unreasonable absent a warrant.'" *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018).   And while the Fourth Circuit has held that accessing a back entrance to a home was permissible because, "during the course of surveillance, the officers saw that all guests

80

approached and entered the townhouse through the rear entrance," *United States v. Roberts*, 467 F. App'x 187, 188 (4th Cir. 2012) (per curiam) (unpublished), such is not the case here.   Despite this clear authority and the clear testimony indicating that officers approached the back door, thereby physically intruding onto the curtilage of Ms. Portillo's home, the trial court found that officers had a reasonable basis to presume that the back patio door entrance was the proper entrance.   This was clear error.

But even if this Court determines that the law enforcement's approach to Ms. Portillo's back door was permissible without a warrant, this hardly ends the analysis.   In this case, the intrusion was conducted by multiple armed men, knocking and announcing their presence before 8:00 am, on a Sunday, against a glass door that had the shades drawn, resulting in waking up Ms. Portillo.   Ms. Portillo, stated that the knocking went on for five minutes—beginning with law enforcement knocking on her front door as she viewed two LEOs through the door's peephole and then law enforcement agents began knocking at her back door. The "knock and talk" tactic has been upheld as a manner of obtaining consent to search. *United States v. Tobin*, 923 F.2d 1506, 1509 (11th Cir. 1991), reh'g denied, 935 F.2d 1297 (1991), *cert. denied*, 502 U.S. 907 (1991).   Put differently, the viability of the "knock and talk" method in any search ultimately turns on whether it procured consent.   As such, even if this Court determines that a "knock and

talk" executed early Sunday, simultaneously on multiple sides of the residence was permissible, its ultimate procedure retains its acceptable legal status only if the occupant gives voluntary consent to search his or her residence.

Consent has long been recognized as one of the few exceptions to the warrant requirement. In cases where the government alleges that consent was given, the government must prove that an individual "'freely and intelligently [gave his or her] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied.'" *United States v. Morrow*, 731 F.2d 233, 236 (4th Cir. 1984), *cert. denied*, 467 U.S. 1230 (1984) (quoting *United States v. Vickers*, 387 F.2d 703, 706 (4th Cir. 1967), *cert. denied*, 392 U.S. 912 (1968))

In determining whether consent was voluntarily given, courts look at several factors: the number of officers present at the time of consent; the subjective state of mind, intelligence and age of the consenting party; the length of detention; and the individual's knowledge of his or her right to refuse to consent. *Id*. Whether consent is voluntary is a question of fact determined by the totality of the circumstances. *Id*.; *United States v. Gordon*, 895 F.2d 932, 938 (4th Cir. 1990), *cert. denied*, 498 U.S. 846 (1990). Here the trial court clearly erred when it found that Ms. Portillo voluntarily consented to the entry of law enforcement given the clearly coercive circumstances – again, its early Sunday morning, numerous law enforcement

agents surround the house and begin knocking, simultaneously, on multiple doors of the house, for five minutes.

Lastly, the evidence makes clear that Ms. Portillo did not consent to the additional officers entering her residence. No doubt, as more LEOs entered the small apartment this only served to increase the pressure on Ms. Portillo to give the officers what they wanted. She recalled the additional officers "were all there standing up," [JA772] while she was being questioned by SA Fontanez. Fontanez characterized the conversation that he had with Ms. Portillo as comfortable [JA673], but on cross-examination, he failed to recall whether he had brought up Ms. Portillo's daughter's legal status, [JA669]. Conversely, Ms. Portillo clearly stated that SA Fontanez told her to give up her son and "do it for my daughter who was undocumented." [JA771]. This tactic by SA Fontanez was clearly coercive. It was used to frighten Ms. Portillo and succeeded in doing so. In the end, Ms. Portillo was crying and succumbed to law enforcement pressure, telling SA Fontanez that her son was in the home. [JA772]. The Defendant was thereafter arrested and law enforcement quickly took him away. *Id.*

In sum, law enforcement committed numerous fourth amendment violations to gain entrance into Ms. Portillo's home and secure HZMartinez's arrest, including (1) intruding onto the curtilage of Ms. Portillo's home; (2) conducting an unreasonableness "knock and talk", thereby coercing Ms. Portillo's consent to

entry; and (3) violating the scope of her purported consent for SA Fontanez to enter, by, thereafter, bringing in multiple additional officers into her home.

The Supreme Court created the exclusionary rule "to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." *Arizona v. Evans*, 514 U.S. 1, 10 (1995). The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights," *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998). The remedy for law enforcement significant and manifold violations of the Fourth Amendment should be the suppression of all fruits of HZMartinez's arrest, namely his seized cellphone.

9. **The trial court erred when it denied Appellant HZMartinez's motion to suppress his statements procured in violation of the 5th Amendment.**

A.    Standard of Review:

This Court reviews legal conclusions involved in the district court's suppression determination de novo but review factual findings underlying the legal conclusions subject to the clearly erroneous standard. *See United States v. Ramapuram*, 632 F.2d 1149, 1155 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981).   Turning to the trial court's determination regarding voluntariness, this Court reviews such a determination de novo, *Arizona v. Fulminante*, 499 U.S. 279 (1991), accepting the pertinent findings of fact on the circumstances surrounding

the confession unless clearly erroneous. *United States v. Pelton*, 835 F.2d 1067, 1071–72 (4th Cir. 1987), *cert. denied*, 486 U.S. 1010 (1988).

B.      Argument:

The government violated HZMartinez's Fifth Amendment rights by securing a Miranda waiver that was not the result of a "free and deliberate choice rather than intimidation, coercion, or deception" and thereafter adducing a confession.

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself." *United States v. Hubbell*, 530 U.S. 27, 34 (2000). "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty*., 542 U.S. 177, 189, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004). It is axiomatic that when the police interrogate an individual who is in their custody, they must first warn the individual, "[p]rior to any questioning … that he has a right to remain silent, that any statement he does make may be used against him, and that he has the right to any attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

A valid waiver, depends upon a finding that under the totality of the circumstances the waiver was voluntary, knowing and intelligent.   *North Carolina v. Butler*, 441 U.S 369, 374-375 (1979).   In order to determine the validity of a waiver, the Court must make two inquiries:   First, the relinquishment of the right

must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*. When an individual makes a statement in response to interrogation after the reading of these rights, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. Courts must apply a totality of the circumstances test to determine whether a defendant's statement was involuntary. *Beaty v. Stewart*, 303 F.3d 975, 992 (9th Cir. 2002).

In this case, the trial court erroneously ruled that HZMartinez waiver of his Miranda rights was knowing, intelligent and voluntary. In rendering its ruling, the trial court failed to take account of several key factors, including HZMartinez's low intellectual capacity, little schooling, and little to no prior understanding of the American criminal justice system. A full consideration of these critical factors shows that HZMartinez's waiver of his Miranda rights was not valid.

Although the Defendant signed the Miranda waiver form provided to him by SA Fontanez, that waiver was not the result of a "free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. SA Fontanez

86

engaged in extensive "rapport-building" questioning before introducing the *Miranda* rights. While the Fourth Circuit has adopted the "Routine Booking Question Exception," which creates an exception in which *Miranda* warnings are not required because there is no "interrogation" under *Miranda* when a defendant is asked "routine booking questions" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994), SA Fontanez's questions ventured far beyond the standard booking questions aimed at "securing 'biographical data necessary to complete booking or pretrial services", *id*. *See also*, *Pennsylvania v. Muniz*, 496 U.S. 582, 590 (1990) (The "booking" questions a plurality of the Supreme Court approved in Muniz involved only the defendant's "name, address, height, weight, eye color, date of birth, [and] current age ...."). Indeed, the questions explicitly exposed HZMartinez to potential criminal liability. SA Fontanez questioned HZMartinez as to the manner by which he had illegally crossed the border into the United States. [JA680].

The recording of the interview itself demonstrates that the Defendant has a low intellectual capacity, little schooling, and little to no prior understanding of the American criminal justice system or the rights of a defendant therein. He was therefore particularly susceptible to coercion and deception on the part of the police interrogators in this case. SA Fontanez engaged in extensive "rapport-building" questioning before introducing the *Miranda* rights. Those questions

ventured far beyond "booking questions," and indeed exposed H. Martinez to criminal liability.

When it came time to provide the warning, SA Fontanez read the rights quickly, did not read the consent portion aloud, [JA691], and did not ask HZMartinez to read the consent portion out loud, [JA692]   He did not check to see if the Defendant was actually capable of reading the *Miranda* waiver at the bottom of the form he handed to him, relying instead on the facts that HZMartinez told him he had gone to school and could read and write Spanish.   [JA692].   And, at the crucial moment after the Defendant appeared to finish reading the form, SA Fontanez merely directed him to sign the form.   When H. Martinez pushed the paper back to SA Fontanez, Fontanez gave the paper back and told him where HZMartinez should sign. [JA692]. Confronted with this evidence, the trial court erroneously held that HZMartinez had validly waived his *Miranda* rights, and that his decision to do so was the product of a free and deliberate choice rather than intimidation, coercion or deception.

Given the clear *Miranda* violation here, the Court must next determine whether the trial court's denial of the motion to suppress the statement constitutes reversible constitutional error."   *Chapman v. California*, 386 U.S. 18, 20 (1967). If there is no "reasonable possibility" that the offending evidence might have

contributed to the conviction, the error is considered harmless beyond a reasonable doubt.  *Chapman*, 386 U.S. at 23.

In conducting this analysis, the Court is "mindful that a confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him[.]" *United States v. Abdallah*, 911 F.3d 201, 216 (4th Cir. 2018) (*quoting Arizona v. Fulminante*, 499 U.S. 279 (1991)) (cleaned up).   This case is similar to others, in that there can be no question here that H. Martinez's confession to his involvement in the ultimate murder of Mr. Triminio was fundamental in the jury's decision to convict HZMartinez.   Accordingly, HZMartinez's convictions should be reversed and/or his case remanded for proceedings consistent with this Court's ruling.

**10.    The trial court erred when it denied Appellant HZMartinez's motion for a lesser-included offense jury instruction.**

A.    Standard of Review:

The district court's decision to give a particular jury instruction is reviewed for abuse of discretion but whether a jury instruction incorrectly stated the law is reviewed de novo. *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018).

B.    Argument:

Given the evidence adduced as to H. Martinez's conduct, his counsel filed a motion for the jury instruction for lesser included offense.

A lesser included offense instruction is mandated when requested, provided the lesser offense is necessarily included in the offense charged. See Fed.R.Crim.P. 31(c). The lesser included offense must be both lesser and included. These requirements can only be met where the included offense involves fewer of the same constituent elements as the charged greater offense and where the claimed lesser offense has a lighter penalty attached to it than does the charged offense. *United States v. Takizal*, 940 F.2d 654 (4th Cir. 1991). "For the defendant to be entitled to a lesser-included offense [instruction], the proof on the element that differentiates the two offenses must be sufficiently in dispute to allow a jury consistently to find the defendant innocent of the greater and guilty of the lesser offense." *United States v. Baker*, 985 F.2d 1248, 1258-59 (4th Cir. 1993).

Here the extent of H. Martinez's involvement and culpability with the murder of Sergio Triminio was sufficiently in dispute to allow it to consider it. The testimony at trial was that Henry Zelaya Martinez assaulted Mr. Triminio with a pocketknife, twice. See, e.g., Testimony of SA Fontanez [JA5530]. The testimony also demonstrated, per Dr. Posthumus, that Mr. Triminio suffered 19 stab wounds in the back as deduced from injuries to the soft tissue. [JA3860-61]. Examining the skeletal remains of Mr. Triminio, Dr. Hunt testified that three or possible four different weapons were used in the attack. [JA3908]. Dr. Posthumus testified that she could not tell when Sergio died or which blow had

killed him [JA3849]. Similarly, Dr. Hunt testified that he could not tell what killed Sergio. [JA3908]. As such, the evidence was sufficiently unclear as to require that the jury be provided the opportunity to decide, whether H. Martinez's actions would be enough by itself to kill him.

Additionally, the evidence indicated that H. Martinez freely confessed, admitted remorse to his assault of Mr. Triminio and that SA Fontanez concluded his interview with H. Martinez early and without asking H. Martinez any follow-up or pressing questions about the murder of Mr. Mendez. The clear implication, which a rational jury could reach, is that SA Fontanez believed H. Martinez did not have anything to do with the murder of Mr. Mendez. In sum, the totality of the evidence presented at trial made it reasonable for the jury to be able to have the choice of whether they want to treat differently the one defendant who said, "I was there, here's what I did, I'm sorry about it." Accordingly, including the lesser included offense of assault is a reasonable jury instruction. The trial court abused its discretion by denying H. Martinez's motion for a lesser-included-offense instruction.

Because the instruction and its bases were raised by trial counsel below, this Court must determine whether the error was harmless. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). To find an instructional error harmless, the Court "must be satisfied "with fair assurance … that the judgment was not substantially

swayed by the error." *Id*. Thus, the relevant inquiry is whether the jury would have reached the same result without the instruction in question. *Id*.; *see Milton v. Wainwright*, 407 U.S. 371 (1972).

In this case, there is every reason to believe, given the evidence adduced as to him compared to other co-defendants, that the jury would have convicted H. Martinez of the lesser included offense rather than greater given the opportunity. Accordingly, H. Martinez's convictions should be reversed and/or his case remanded for proceedings consistent with this Court's ruling.

**11. The Court erred when it imposed sentences of life in prison without the possibility of parole for each of the Appellants; such sentences were disproportionate to the crimes of conviction and otherwise in violation of the 8th Amendment to the U.S. Constitution;**

A. Standard of Review:

This Court reviews questions of law de novo. *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir.2016).

B. Mandatory Life Sentence:

The Trial Court sentenced the Appellants to mandatory life sentences. Velasco Barrera had just turned 18 years old at the time of the alleged offense conduct. Mr. Velasco Barrera appeals the sentence the Court imposed in this matter because it violates his rights under the 8th Amendment of the U.S. Constitution that prohibits cruel and unusual punishment. See [JA6709-6763; JA6798-6802], sealed as to Velasco Barrera.

Under the most recent Social Security Period Life Table, 2019, as used in the 2022 Social Security Trustees Report, Velasco Barrera has a current life-expectancy of approximately 53.35 years. For a young person of Velasco Barrera's age, such a sentence is inherently cruel and unusual.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court relied on neuroscience in holding that sentencing people to mandatory life without parole for crimes committed as juveniles violated the Eighth Amendment. *Id*. at 471-72. The Court held that individuals under age eighteen have the possibility to reform as they grew older. *Id*. The Supreme Court has also recognized that youth is a profound mitigating factor when considering crimes committed by a teenager. See *Montgomery v. Louisiana*, 134 S. Ct. 718, 734 (2016) (stating that only in the rarest cases will the transient immaturity defining "youth" fail to decisively mitigate against life imprisonment for murder). "Perhaps the important reason that adolescent crime merits less punishment is that 'the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" *Ramsay*, 2021 U.S. Dist. LEXIS 89741, at *35-36 (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005)).

Courts have found that "an offender's youth, combined with society's evolving understanding of the adolescent brain, constitute[s]" an extraordinary and compelling reason for reducing a sentence. See *United States v. Ramsay*, 2021 U.S.

Dist. LEXIS 89741, at *2 (S.D.N.Y. May 11, 2021) (granting compassionate release to defendant serving life for murder in aid of racketeering, which he committed at the age of eighteen); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) (affirming district court's consideration of defendant's young age as a factor in finding extraordinary and compelling reasons).

In 2017, the U.S. Sentencing Commission acknowledged the growing consensus in neuroscience and case law that a person's decision-making and emotional control faculties may not be fully developed until age 25. The Commission acknowledged that the prefrontal cortex is the last part of the brain to fully develop and is not mature until a person's mid-20s. Maturation of the prefrontal cortex leads to increased capacity to control one's behavior and impulses, to increased resistance to antisocial peer influence, and ultimately to fully adult levels of judgment. In 2010, the U.S. Sentencing Guidelines policy statement concerning age was amended to encourage courts to consider a defendant's youth as a mitigating factor in sentencing more frequently. These reasons, the Appellants' life imprisonment sentences violated the 8th Amendment to the U.S. Constitution and should be reversed.

## CONCLUSION

For the reasons set forth above, the Appellants' convictions should be reversed.

Respectfully submitted,

Pablo Miguel Velasco Barrera

By Counsel

/s/ *Paul P. Vangellow*
PAUL P. VANGELLOW, ESQ.
VSBar #23488
DCBar #367344
PAUL P. VANGELLOW, PC
6109A Arlington Blvd.
Falls Church, Virginia 22044
(703) 241-0506
Fax: (703) 241-0886
paul@vangellow.com


Additional counsel:

JESSE I. WINOGRAD
LAW OFFICE OF
   JESSE WINOGRAD PLLC
5335 Wisconsin Avenue, N.W.
   Suite 440
Washington, DC 20015
(202) 302-7429
*Counsel for Appellant*
*Ronald Herrera Contreras*

DAVID J. KIYONAGA
LAW OFFICE OF
   DAVID J. KIYONAGA
510 King Street, Suite 400
Alexandria, Virginia 22314
(703) 549-7576
*Counsel for Appellant*
*Henry Zelaya Martinez*

BENJAMIN M. SCHIFFELBEIN
OFFICE OF THE FEDERAL
   PUBLIC DEFENDER
210 1st Street, SW, Suite 400
Roanoke, Virginia 24011
(540) 777-0888
*Counsel for Appellant*
*Duglas Ramirez Ferrara*

ROBERT L. JENKINS, JR.
BYNUM & JENKINS, PLLC
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309-0899
*Counsel for Appellant*
*Elmer Zelaya Martinez*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*20,972*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>December 6, 2023</u>          <u>/s/ *Paul P. Vangellow*</u>
                                                     Paul P. Vangellow, Esq.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of December, 2023, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Christina Stam, Esq.
> Alex Blanchard, Esq.
> OFFICE OF THE U.S. ATTORNEY
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
>
> *Counsel for Appellee*

I further certify that on this 6th day of December, 2023, I caused a copy of the Sealed and Media Volumes of the Joint Appendix to be served, via FedEx, upon counsel for the Appellee, at the above address.

/s/ *Paul P. Vangellow*
Paul P. Vangellow, Esq.