# United States Court of Appeals
### for the
## Fourth Circuit

---•---

## UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

— v. —

**RONALD HERRERA CONTRERAS,** a/k/a Espeedy, a/k/a Speedy,
a/k/a Joster Hrndz, a/k/a Chucho; **PABLO MIGUEL VELASCO BARRERA,**
a/k/a Oscuro, a/k/a Pablo Miguel Barrera Velasco, a/k/a Miguel Barrera;
**HENRY ZELAYA MARTINEZ,** a/k/a Certero, a/k/a El Kakarra;
**DUGLAS RAMIREZ FERRERA,** a/k/a Mortal, a/k/a Darwin, a/k/a Artillero;
**ELMER ZELAYA MARTINEZ,** a/k/a Killer, a/k/a Morenito Martinez,
a/k/a Perez Danillo,
*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## JOINT APPENDIX
## VOLUME 15 OF 21 (PAGES 6493-6691)

JESSE I. WINOGRAD
LAW OFFICE OF
  JESSE WINOGRAD PLLC
5335 Wisconsin Avenue, N.W.
  Suite 440
Washington, DC 20015
(202) 302-7429
*Counsel for Appellant*
*Ronald Herrera Contreras*

PAUL P. VANGELLOW
ATTORNEY AT LAW
6109-A Arlington Boulevard
Falls Church, Virginia 22044
(703) 241-0506
*Counsel for Appellant*
*Pablo Miguel Velasco Barrera*

DAVID J. KIYONAGA
LAW OFFICE OF
  DAVID J. KIYONAGA
510 King Street, Suite 400
Alexandria, Virginia 22314
(703) 549-7576
*Counsel for Appellant*
*Henry Zelaya Martinez*

BENJAMIN M. SCHIFFELBEIN
OFFICE OF THE FEDERAL
  PUBLIC DEFENDER
210 1st Street, SW, Suite 400
Roanoke, Virginia 24011
(540) 777-0888
*Counsel for Appellant*
*Duglas Ramirez Ferrera*

ROBERT L. JENKINS, JR.
BYNUM & JENKINS, PLLC
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309-0899
*Counsel for Appellant*
*Elmer Zelaya Martinez*

JACQUELINE R. BECHARA
ALEXANDER E. BLANCHARD
CRISTINA C. STAM
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3819
*Counsel for Appellee*

# TABLE OF CONTENTS

**VOLUME 1 OF 21**

District Court Docket Sheet (Barrera – 1:18-cr-00123-RDA-8) .......................... JA1

District Court Docket Sheet (Contreras – 1:18-cr-00123-RDA-4) ................... JA62

District Court Docket Sheet (Ferrera – 1:18-cr-00123-RDA-12) ................... JA125

District Court Docket Sheet (E. Martinez – 1:18-cr-00123-RDA-2) .............. JA177

District Court Docket Sheet (H. Martinez – 1:18-cr-00123-RDA-6).............. JA235

Order of
The Honorable T.S. Ellis, III
Re:  Speedy Trial/Certifying Case as Complex
   filed June 7, 2018....................................................................... JA294

Order of
The Honorable T.S. Ellis, III
Re:  Speedy Trial
   filed July 23, 2018 ................................................................... JA295

Order of
The Honorable T.S. Ellis, III
Re:  Speedy Trial
   filed September 7, 2018....................................................... JA296

Second Superseding Indictment
   filed February 21, 2019 ....................................................... JA298

Government's Motion for Speedy Trial Findings
   filed March 28, 2019............................................................ JA327

Order of
The Honorable T.S. Ellis, III
Re:  Granting Government's Motion for Speedy Trial
   filed March 29, 2019............................................................ JA333

Defendant H. Martinez's Motion to Suppress Evidence
Seized from Search of Cellular Phone
     filed November 18, 2019 ......................................................... JA335

Defendant Contreras's Motion to Suppress Statement Taken in Violation of
Defendant's Fifth Amendment Privilege Against Self-Incrimination
     filed November 18, 2019 ......................................................... JA342

Defendant Contreras's Motion for Disclosure of Identities of
Confidential Informants
     filed November 18, 2019 ......................................................... JA344

Defendant H. Martinez's Motion to Suppress Statements
     filed November 18, 2019 ......................................................... JA351

Defendant Barrera's Motion to Dismiss Counts 3 and 7 of the Indictment
     filed November 18, 2019 ......................................................... JA362

Defendant Barrera's Motion to Sever Defendants
     filed November 18, 2019 ......................................................... JA366

Defendant Barrera's Motion to Sever Counts
     filed November 18, 2019 ......................................................... JA372

Defendant Contreras's Motion to Dismiss
Counts 3 and 4 of the Indictment as Multiplicitous
     filed November 18, 2019 ......................................................... JA376

Defendant Contreras's Memorandum in Support of Motion to Dismiss
Counts 3 and 4 of the Indictment as Multiplicitous
     filed November 18, 2019 ......................................................... JA378

Defendant H. Martinez's Motion to Suppress All Evidence
Derived from Illegal Arrest of Defendant
     filed November 18, 2019 ......................................................... JA382

Defendant H. Martinez's Memorandum on Supplemental Authority
To Defendant's Motion to Suppress Evidence Seized from
Search of Cellular Phone
     filed January 1, 2020 .............................................................. JA392

Government's Response in Opposition to Defendant Barrera's
Motion to Dismiss Counts 3 and 7 of the Indictment
      filed January 3, 2020................................................................JA396

Government's Response in Opposition to Defendant Contreras's
Motion for Disclosure of Identities of Confidential Informants
      filed January 3, 2020................................................................JA402

Government's Response in Opposition to Defendant Barrera's Motion
To Sever Counts
      filed January 3, 2020................................................................JA410

Government's Omnibus Response in Opposition to Defendants' Motions
To Sever Defendants
      filed January 3, 2020................................................................JA420

Government's Response in Opposition to Defendant Contreras's Motion
To Dismiss Counts 3 and 4 of the Indictment
      filed January 3, 2020................................................................JA433

Order of
The Honorable Rossie D. Alston, Jr.
Re: Denying Defendant Barrera's Motion to Dismiss
Counts Three and Seven of Indictment
      filed January 8, 2020................................................................JA441

Order of
The Honorable Rossie D. Alston, Jr.
Re: Denying Defendant Aguilar's Motion to Disclose Identities of each
Cooperator or Confidential Informant
      filed January 9, 2020................................................................JA444

Order of
The Honorable Rossie D. Alston, Jr.
Re: Denying Defendant Contreras's Motion to Dismiss Counts 3 and 4
Of the Indictment as Multiplicitous
      filed February 14, 2020 ..........................................................JA447

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Motion for Speedy Trial
        filed February 20, 2020 ........................................................................ JA451

Transcript of Motions Hearing before
The Honorable Rossie D. Alston, Jr.
        on February 21, 2020 ............................................................................ JA452

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Speedy Trial Time
        filed February 21, 2020 ........................................................................ JA527

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Various Motions, Including Severance
        filed February 24, 2020 ........................................................................ JA529

Memorandum Opinion of
The Honorable Rossie D. Alston, Jr.
Re:  Severance of Defendants
        filed March 2, 2020 .............................................................................. JA534

Government's Consent Motion to Cancel Scheduled Hearing
Re:  Defendant Contreras's Motion to Suppress
        filed March 21, 2020 ............................................................................ JA544

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Consent Motion to Cancel Scheduled Hearing
        filed March 26, 2020 ............................................................................ JA548

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Denying Defendant Contreras's Motion to Suppress
        filed May 6, 2020 ................................................................................ JA550

Order of
The Honorable Rossie D. Alston, Jr.
Re: Defendants' Motions to Continue
    filed July 28, 2020 ................................................................. JA558

Order of
The Honorable Rossie D. Alston, Jr.
Re: Speedy Trial Time
    filed September 14, 2020 ........................................................ JA563

Transcript of Suppression Hearing (Defendant H. Martinez) before
The Honorable Rossie D. Alston, Jr.
    on February 23, 2021 .............................................................. JA564

    Testimony of Agent Christopher Pixton:

    Direct Examination by Ms. Stam ........................................... JA578
    Cross Examination by Mr. King ............................................. JA591
    Redirect Examination by Ms. Stam ....................................... JA603

    Testimony of Agent Carlos Fontanez:

    Direct Examination by Ms. Stam ........................................... JA605
    Cross Examination by Mr. King ............................................. JA646
    Cross Examination by Mr. Beckman ...................................... JA675
    Redirect Examination by Ms. Stam ....................................... JA693

    Testimony of Megan Atkins:

    Direct Examination by Ms. Stam ........................................... JA695
    Cross Examination by Mr. King ............................................. JA703

    Testimony of Agent William Allen:

    Direct Examination by Mr. King ............................................. JA707

    Testimony of John O'Donoghue:

    Direct Examination by Mr. Twist ........................................... JA711
    Cross Examination by Ms. Bellows ........................................ JA725

Transcript of Suppression Hearing (Defendant H. Martinez) before
The Honorable Rossie D. Alston, Jr.
  on February 23, 2021, continued:

  Testimony of Jackie Ferrufino:

  Direct Examination by Mr. Twist ........................................... JA739
  Cross Examination by Ms. Stam ............................................ JA742

  Testimony of Jenny Perez:

  Direct Examination by Mr. King ............................................ JA745
  Cross Examination by Ms. Bellows ........................................ JA754

  Testimony of Erlinda Portillo-Martinez:

  Direct Examination by Mr. King ............................................ JA762
  Cross Examination by Ms. Stam ............................................ JA773

Minute Entry for Criminal Motion Hearing before
The Honorable Rossie D. Alston, Jr.,
With Attachments,
  filed February 23, 2021 ........................................................ JA797

  Attachments:

  1.    Government Admitted Exhibits 1-8 ............................. JA799

  2.    Defendant Admitted Exhibits 1.1-3.1 ......................... JA831

  3.    Defendant Admitted Exhibits 3-8 ............................... JA839

Defendant Ferrera's Motion to Continue Trial
  filed March 5, 2021 .............................................................. JA845

Defendant H. Martinez's Second Motion to Continue Trial
  filed March 8, 2021 .............................................................. JA853

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Defendant's Motion to Continue the Trial
        filed March 11, 2021..................................................................JA862

Defendant Berrera's Motion *In Limine* to Exclude Evidence
Pursuant to Rule 403
        filed March 15, 2021..................................................................JA864

Defendant Berrera's Motion *In Limine* to Strike Expert Designation
        filed March 15, 2021..................................................................JA868

Defendant Berrera's Motion *In Limine* to Exclude Irrelevant Evidence
        filed March 15, 2021..................................................................JA873

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Defendant's Motion to Continue the Trial
        filed March 23, 2021..................................................................JA878

Defendant H. Martinez's Reply to Government's Supplemental Response
In Opposition to Defendant's Motions to Suppress
        filed March 30, 2021..................................................................JA880

Government's Motion to Admit Certain Evidence at Trial of
Non-Capital Defendants
        filed June 25, 2021....................................................................JA899

**VOLUME 3 OF 21**

Defendant Barrera's Response to Government's Motion
To Admit Certain Evidence at Trial of Non-Capital Defendants
        filed July 9, 2021 .....................................................................JA921

Defendant Herrera's Response to Government's Motion
To Admit Certain Evidence at Trial of Non-Capital Defendants
        filed July 9, 2021 .....................................................................JA925

Government's Response in Opposition to Defendant Barrera's Motion
*In Limine* To Exclude Irrelevant Evidence
     filed July 9, 2021 ................................................................... JA931

Government's Response in Opposition to Defendant Berrera's Motion
*In Limine* to Exclude Evidence Pursuant to Rule 403
     filed July 9, 2021 ................................................................... JA940

Government's Response in Opposition to Defendant Berrera's Motion
*In Limine* to Strike Expert Designation
     filed July 9, 2021 ................................................................... JA953

Defendant Berrera's Omnibus Reply to Government's Responses
In Opposition
     filed July 14, 2021 ................................................................. JA961

Government's Reply in Support of Motion to Admit
Certain Evidence at Trial of Non-Capital Defendants
     filed July 14, 2021 ................................................................. JA966

Transcript of Faretta Hearing before
The Honorable Rossie D. Alston, Jr.
     on July 16, 2021 .................................................................... JA976

Minute Entry for Criminal Motion Hearing before
The Honorable Rossie D. Alston, Jr.
     filed July 16, 2021 ............................................................... JA1028

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Pretrial Motions
     filed July 26, 2021 ............................................................... JA1030

Defendants' Joint Constitutional Objections to Proposed Exhibits
     filed August 5, 2021 ............................................................. JA1034

Defendant Barrera's Objection to the Government's Intent
To Introduce Statements
     filed August 10, 2021 ........................................................... JA1040

Government's Response in Opposition to Defendants' Joint Constitutional
Objections to Proposed Exhibits
        filed August 17, 2021 .........................................................................JA1043

Government's Response in Opposition to Defendants' Joint Constitutional
Objections to Proposed Exhibits
        filed August 23, 2021 .........................................................................JA1060

Transcript of Faretta Hearing before
The Honorable Rossie D. Alston, Jr.
        on August 26, 2021..............................................................................JA1071

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Defendants' Motions to Continue Trial
        filed August 27, 2021 .........................................................................JA1136

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Denying Defendant Barrera's Motion to Strike Expert Designation
        filed September 8, 2021.......................................................................JA1141

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Motion for Speedy Trial
        filed September 10, 2021.....................................................................JA1145

Memorandum Opinion and Order of
The Honorable Rossie D. Alston, Jr.
Re:  Denying Defendant H. Martinez's Motion to Suppress
        filed October 19, 2021 .......................................................................JA1147

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Speedy Trial Time
        filed October 20, 2021 .......................................................................JA1167

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Motion for Speedy Trial
      filed January 27, 2022.............................................................JA1169

Defendant Barrera's Second Motion to Strike Expert Designation
      filed March 31, 2022.............................................................JA1172

Government's Response in Opposition to Defendant Barrera's
Second Motion to Strike Expert Designation
      filed April 1, 2022.................................................................JA1176

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Pretrial Motions
      filed April 7, 2022.................................................................JA1181

Transcript of Motions Hearing before
The Honorable Rossie D. Alston, Jr.
      on April 20, 2022..................................................................JA1189

Minute Entry for Criminal Hearing before
The Honorable Rossie D. Alston, Jr.
      filed April 20, 2022..............................................................JA1244

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Pretrial Motions
      filed May 2, 2022.................................................................JA1245

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Overruling Defendants' Constitutional Objections to the Admission of
Recorded Material
      filed May 4, 2022.................................................................JA1258

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Pretrial Motions
      filed May 6, 2022.................................................................JA1265

**VOLUME 4 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
   on May 11, 2022 ...................................................................JA1290

   Testimony of Ricardo Guzman:

   Direct Examination by Mr. Blanchard ................................JA1299
   Cross Examination by Mr. Jenkins.....................................JA1354
   Cross Examination by Ms. Manitta ....................................JA1380
   Cross Examination by Mr. Kiyonaga ..................................JA1395
   Cross Examination by Mr. Vangellow ................................JA1402
   Cross Examination by Mr. Brodnax ....................................JA1410
   Redirect Examination by Mr. Blanchard.............................JA1415

   Testimony of Thomas Buckley:

   Direct Examination by Ms. Stam ........................................JA1423
   Cross Examination by Mr. Leiva.........................................JA1434

   Testimony of Genaro Sen Garcia:

   Direct Examination by Ms. Stam ........................................JA1439
   Cross Examination by Mr. Jenkins.....................................JA1468
   Cross Examination by Ms. Manitta ....................................JA1479
   Cross Examination by Mr. Brodnax ....................................JA1485
   Redirect Examination by Ms. Stam.....................................JA1488

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
   on May 12, 2022 ...................................................................JA1501

   Testimony of Matthew Armstrong:

   Direct Examination by Mr. Blanchard ................................JA1507
   Cross Examination by Mr. Leiva.........................................JA1520
   Redirect Examination by Mr. Blanchard.............................JA1530

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on May 12, 2022, continued:

Testimony of Jaime Rosales:

Direct Examination by Mr. Blanchard ................................................JA1533
Cross Examination by Mr. Leiva.........................................................JA1557
Cross Examination by Mr. Manitta .....................................................JA1570
Cross Examination by Mr. Stewart ......................................................JA1575
Cross Examination by Mr. Easley ........................................................JA1580
Redirect Examination by Mr. Blanchard..............................................JA1584

Testimony of Silvia Escobar Mendez:

Direct Examination by Ms. Stam ........................................................JA1595
Cross Examination by Mr. Leiva.........................................................JA1599

Testimony of Edgar Blanco Torres:

Direct Examination by Ms. Bellows.....................................................JA1603

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on May 13, 2022 ..................................................................................JA1654

Testimony of Edgar Blanco Torres:

Cross Examination by Mr. Leiva.........................................................JA1660
Cross Examination by Mr. Winograd....................................................JA1679
Cross Examination by Mr. Twist..........................................................JA1685
Cross Examination by Mr. Brodnax .....................................................JA1685
Cross Examination by Mr. Stewart ......................................................JA1686
Redirect Examination by Ms. Bellows.................................................JA1692

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on May 13, 2022, continued:

Testimony of Karla Triminio:

Direct Examination by Ms. Bellows....................................................JA1715
Cross Examination by Mr. Leiva........................................................JA1752
Cross Examination by Ms. Manitta ...................................................JA1760
Redirect Examination by Ms. Bellows...............................................JA1765

Testimony of Johnnie Benningfield:

Direct Examination by Ms. Bellows....................................................JA1766

## VOLUME 5 OF 21

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on May 17, 2022 .................................................................................JA1816

Testimony of Johnnie Benningfield:

Direct Examination by Ms. Bellows....................................................JA1824
Cross Examination by Mr. Leiva........................................................JA1836
Redirect Examination by Ms. Manitta................................................JA1842
Redirect Examination by Ms. Bellows...............................................JA1849

Testimony of Michael Furr:

Direct Examination by Ms. Bellows....................................................JA1857

Testimony of Paul Fisher:

Direct Examination by Ms. Stam .......................................................JA1875

Testimony of Josue Vigil Mejia:

Direct Examination by Ms. Bellows....................................................JA1903

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
 on May 18, 2022 ....................................................................JA1960

 Testimony of Josue Vigil Mejia:

 Direct Examination by Ms. Bellows....................................JA1965

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
 on May 19, 2022 ....................................................................JA2104

 Testimony of Josue Vigil Mejia:

 Direct Examination by Ms. Bellows....................................JA2111

**VOLUME 6 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
 on May 20, 2022 ....................................................................JA2233

 Testimony of Josue Vigil Mejia:

 Direct Examination by Ms. Bellows....................................JA2247
 Cross Examination by Mr. Leiva.........................................JA2300

Government's Motion to Preclude Argument, Evidence, and
Instruction on Duress Defense
 filed May 30, 2022 ................................................................JA2356

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on May 31, 2022 .................................................................JA2371

    Testimony of Josue Vigil Mejia:

    Cross Examination by Mr. Leiva...........................................JA2379
    Cross Examination by Ms. Manitta .......................................JA2402
    Cross Examination by Mr. Twist...........................................JA2425
    Cross Examination by Mr. Vangellow ...................................JA2427
    Cross Examination by Mr. Brodnax ......................................JA2439
    Redirect Examination by Ms. Bellows ..................................JA2447

    Testimony of Richard Keys:

    Direct Examination by Ms. Blanchard ..................................JA2465

    Testimony of Dominic Dinisio:

    Direct Examination by Mr. Blanchard ..................................JA2470
    Cross Examination by Mr. Vangellow ...................................JA2481

    Testimony of Fernando Jaramillo:

    Direct Examination by Mr. Blanchard ..................................JA2482
    Cross Examination by Mr. Vangellow ...................................JA2496
    Redirect Examination by Mr. Blanchard...............................JA2502

    Testimony of Moris Castro Coreas:

    Direct Examination by Mr. Blanchard ..................................JA2504

Transcript of Jury Trial Proceedings, AM-1, before
The Honorable Rossie D. Alston, Jr.
on June 1, 2022 .................................................................JA2546

    Testimony of Moris Castro Coreas:

    Direct Examination by Mr. Blanchard ..................................JA2552

Transcript of Jury Trial Proceedings, AM-2/PM, before
The Honorable Rossie D. Alston, Jr.
on June 1, 2022 ......................................................................JA2565

Testimony of Moris Castro Coreas:

Direct Examination by Mr. Blanchard ...............................JA2569
Cross Examination by Mr. Leiva.........................................JA2681
Cross Examination by Ms. Manitta .....................................JA2713

## VOLUME 7 OF 21

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 2, 2022 ......................................................................JA2738

Testimony of Moris Castro Coreas:

Cross Examination by Mr. Twist.........................................JA2743
Cross Examination by Mr. Vangellow .................................JA2746
Redirect Examination by Mr. Blanchard.............................JA2775

Testimony of Yonathan Melgar Martinez:

Direct Examination by Ms. Bellows....................................JA2805

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 3, 2022 ......................................................................JA2896

Testimony of Yonathan Melgar Martinez:

Direct Examination by Ms. Bellows....................................JA2902
Cross Examination by Mr. Leiva.........................................JA2959
Cross Examination by Mr. Winograd...................................JA2999
Cross Examination by Mr. Twist.........................................JA3009
Cross Examination by Mr. Stewart .....................................JA3010
Redirect Examination by Ms. Bellows................................JA3021

Transcript of Jury Trial Proceedings, Morning Session, before
The Honorable Rossie D. Alston, Jr.
on June 9, 2022 ......................................................................JA3041

Testimony of Anderson Jose Villatoro Rivera:

Direct Examination by Ms. Stam ..........................................JA3059

Transcript of Jury Trial Proceedings, Afternoon Session, before
The Honorable Rossie D. Alston, Jr.
on June 9, 2022 ......................................................................JA3139

Testimony of Anderson Jose Villatoro Rivera:

Direct Examination by Ms. Stam ..........................................JA3141
Cross Examination by Mr. Leiva...........................................JA3164
Cross Examination by Mr. Winograd.....................................JA3190
Cross Examination by Mr. Vangellow ...................................JA3199

**VOLUME 8 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 10, 2022 ....................................................................JA3211

Testimony of Anderson Jose Villatoro Rivera:

Cross Examination by Mr. Vangellow ...................................JA3216
Cross Examination by Mr. Easley .........................................JA3224
Redirect Examination by Ms. Stam.......................................JA3240

Testimony of Francisco Manuel Avila Avalos:

Direct Examination by Ms. Stam ..........................................JA3252

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
    on June 13, 2022 ...................................................................... JA3309

    Testimony of Francisco Manuel Avila Avalos:

    Direct Examination by Ms. Stam ........................................... JA3312
    Cross Examination by Mr. Leiva............................................ JA3358
    Cross Examination by Ms. Manitta ....................................... JA3381
    Redirect Examination by Ms. Stam ....................................... JA3395

    Testimony of Fredys Baires Abarca:

    Direct Examination by Mr. Blanchard ................................... JA3406

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
    on June 14, 2022 ...................................................................... JA3469

    Testimony of Fredys Baires Abarca:

    Cross Examination by Mr. Winograd..................................... JA3474
    Cross Examination by Mr. Leiva............................................ JA3481
    Redirect Examination by Mr. Blanchard............................... JA3489

    Testimony of Jesus Delgado (Outside the Presence of the Jury):

    Direct Examination by Mr. Blanchard ................................... JA3497
    Cross Examination by Mr. Vangellow .................................. JA3512
    Cross Examination by Mr. Leiva............................................ JA3514
    Cross Examination by Mr. Easley ......................................... JA3517
    Redirect Examination by Mr. Blanchard............................... JA3531

    Testimony of Jesus Delgado (Within the Presence of the Jury):

    Direct Examination by Mr. Blanchard ................................... JA3546
    Cross Examination by Mr. Stewart ....................................... JA3580
    Cross Examination by Mr. Easley ......................................... JA3597
    Cross Examination by Mr. Winograd..................................... JA3610
    Redirect Examination by Mr. Blanchard............................... JA3612

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 14, 2022, continued:

Testimony of Raymond Eugene Betts:

Direct Examination by Mr. Blanchard .................................................JA3619

Testimony of Stacy Sassano-Regan:

Direct Examination by Mr. Blanchard .................................................JA3664
Cross Examination by Mr. Jenkins.....................................................JA3676
Cross Examination by Mr. Manitta .....................................................JA3682
Cross Examination by Mr. Vangellow .................................................JA3688
Redirect Examination by Mr. Blanchard............................................JA3690

Testimony of Fernando Uribe:

Direct Examination by Mr. Blanchard .................................................JA3695
Cross Examination by Mr. Vangellow .................................................JA3722
Redirect Examination by Mr. Blanchard............................................JA3724

## VOLUME 9 OF 21

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 15, 2022 ...................................................................................JA3731

Testimony of Jason Huggins:

Direct Examination by Ms. Stam .......................................................JA3736

Testimony of Mike Lamper:

Direct Examination by Mr. Blanchard .................................................JA3746

Testimony of Derek Hardy:

Direct Examination by Mr. Blanchard .................................................JA3783

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
        on June 15, 2022, continued:

Testimony of Jocelyn Posthumus:

Direct Examination by Mr. Blanchard .................................................JA3828
Cross Examination by Mr. Vangellow .................................................JA3866

Testimony of David Hunt:

Direct Examination by Mr. Blanchard .................................................JA3879
Cross Examination by Mr. Vangellow .................................................JA3915

Testimony of Michael Sears:

Direct Examination by Ms. Stam ........................................................JA3926
Cross Examination by Mr. Brodnax ....................................................JA3939

Testimony of Hugo Salazar:

Direct Examination by Ms. Stam ........................................................JA3945
Cross Examination by Mr. Brodnax ....................................................JA3954

Transcript of Jury Trial Proceedings (AM) before
The Honorable Rossie D. Alston, Jr.
        on June 16, 2022 ..................................................................................JA3965

Testimony of Paul Lee:

Direct Examination by Ms. Bellows....................................................JA3969

Transcript of Jury Trial Proceedings (PM) before
The Honorable Rossie D. Alston, Jr.
on June 16, 2022 ...................................................................JA4077

Testimony of Paul Lee:

Cross Examination by Mr. Leiva.........................................JA4081
Cross Examination by Ms. Manitta ....................................JA4089
Cross Examination by Mr. Vangellow ................................JA4100
Cross Examination by Mr. Brodnax ...................................JA4103
Cross Examination by Ms. Bellows ...................................JA4109

Testimony of Megan Atkins:

Direct Examination by Ms. Stam .......................................JA4116
Cross Examination by Mr. Jenkins.....................................JA4147
Cross Examination by Mr. Kiyonaga ..................................JA4154

Testimony of Ryan Miller:

Direct Examination by Mr. Blanchard ...............................JA4158
Cross Examination by Mr. Jenkins.....................................JA4179
Redirect Examination by Mr. Blanchard.............................JA4183

**VOLUME 10 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 17, 2022 ...................................................................JA4189

Testimony of Ryan Lamb:

Direct Examination by Mr. Blanchard ...............................JA4201
Cross Examination by Mr. Brodnax....................................JA4227
Redirect Examination by Mr. Blanchard.............................JA4233

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
        on June 17, 2022, continued:

Testimony of Jenna Walker:

Direct Examination by Mr. Blanchard .................................................JA4235
Cross Examination by Mr. Winograd....................................................JA4266
Cross Examination by Mr. Twist...........................................................JA4272
Cross Examination by Mr. Vangellow ..................................................JA4273
Redirect Examination by Mr. Blanchard...............................................JA4280

Testimony of Claudia Dubravetz:

Direct Examination by Ms. Bellows.......................................................JA4283

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
        on June 21, 2022 .....................................................................JA4388

Testimony of Claudia Dubravetz:

Direct Examination by Ms. Bellows.......................................................JA4395

Testimony of Richard Fennern:

Direct Examination by Mr. Blanchard .................................................JA4454
Cross Examination by Mr. Jenkins.........................................................JA4544
Cross Examination by Mr. Vangellow ..................................................JA4553
Cross Examination by Ms. Rhodes ........................................................JA4556
Redirect Examination by Mr. Blanchard...............................................JA4561

Testimony of Claudia Dubravetz:

Direct Examination by Ms. Bellows.......................................................JA4564

**VOLUME 11 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 22, 2022 ................................................................JA4638

Testimony of Claudia Dubravetz:

Direct Examination by Ms. Bellows...................................JA4644

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 23, 2022 ................................................................JA4887

Testimony of Claudia Dubravetz:

Cross Examination by Mr. Leiva........................................JA4892
Cross Examination by Mr. Winograd..................................JA4942
Cross Examination by Mr. Easley ......................................JA4976
Redirect Examination by Ms. Bellows...............................JA4982

Testimony of Carlos Fontanez:

Direct Examination by Ms. Stam .......................................JA5005

**VOLUME 12 OF 21**

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 24, 2022 ................................................................JA5134

Testimony of Carlos Fontanez:

Direct Examination by Ms. Stam .......................................JA5141
Cross Examination by Mr. Jenkins......................................JA5160
Cross Examination by Mr. Kiyonaga ..................................JA5206
Redirect Examination by Ms. Stam....................................JA5215

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
     on June 24, 2022, continued:

     Testimony of Raymond Betts:

     Direct Examination by Ms. Rhodes.....................................................JA5249
     Cross Examination by Mr. Blanchard .................................................JA5253

     Testimony of Carlos Fontanez:

     Direct Examination by Mr. Twist.......................................................JA5255

Government's Response in Opposition to Defendant H. Martinez's
Additional Proposed Jury Instructions,
With Exhibit,
     filed June 26, 2022...................................................................................JA5299

     Exhibit:

     A.     Defendant H. Martinez's Additional Proposed Jury Instructions
           dated June 25, 2022........................................................JA5308

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
     on June 27, 2022 ....................................................................................JA5313

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
     on June 28, 2022 ....................................................................................JA5581

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
     on June 29, 2022 ....................................................................................JA5620

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Motion to Preclude Argument
Or a Jury Instruction on a Duress Defense
     filed June 29, 2022..................................................................................JA5627

Transcript of Jury Trial Proceedings before
The Honorable Rossie D. Alston, Jr.
on June 30, 2022 ...................................................................................... JA5630

## VOLUME 13 OF 21

Transcript of Jury Trial Proceedings (Verdict) before
The Honorable Rossie D. Alston, Jr.
on July 1, 2022 ...................................................................................... JA5640

<u>Government's Exhibits:</u>

2-1E1 to 2-1E26    Photographs taken on March 1, 2017 of Holmes
Run Stream Valley Park and area surrounding
Site #2 ................................................................. JA5678

2-1S1 to 2-1S23    Photographs taken on March 1, 2017 of Holmes
Run Stream Valley Park and area surrounding
Site #1 ................................................................. JA5704

2-2E1 to 2-2E137  Photographs taken on March 2, 2017 of Site #2 ... JA5727

2-2S1 to 2-2S124  Photographs taken on March 2, 2017 of Site #1 ... JA5864

2-3S1 to 2-3S6    Photographs taken on March 3, 2017 of Site #1 ... JA5988

4-1A             Report of Autopsy for decedent E.E.E.M. ....................... JA5994

4-2A             Photograph of body recovery tag for human remains of
E.E.E.M. .......................................................................... JA6008

4-2B             Photograph of miscellaneous items recovered from
human remains taken in connection with the autopsy of
E.E.E.M. .......................................................................... JA6009

4-2C to 4-2AA    Photographs of clothing recovered from human
remains taken in connection with the autopsy of
E.E.E.M. ............................................................... JA6010

Government's Exhibits, continued:

4-2BB to 4-2QQ    Photographs of human remains taken during the
                  autopsy of E.E.E.M...............................................JA6035

5-1A              Report of Autopsy for decedent S.A.A.T. .......................JA6051

5-2A              Photograph of body recovery tag for human remains of
                  S.A.A.T. ............................................................................JA6058

5-2B to 5-2EE     Photographs of clothing recovered from or near to
                  human remains of S.A.A.T....................................JA6059

5-2FF to 5-2GG    Photographs of human remains taken in connection
                  with the autopsy of S.A.A.T. ..................................JA6089

## VOLUME 14 OF 21

Government's Exhibits, continued:

8-1A              Photographs of E.E.E.M. .................................................JA6091

8-2A              Photographs of S.A.A.T...................................................JA6092

11-5A             Facebook Messenger communications with Guanako
                  Torrez from 8/27/16 to 8/28/16 and translation (pp. 3250-
                  3258) ..............................................................................JA6093

12-11             Facebook Messenger communications with Morenito
                  Martinez from 9/22/16 to 9/26/16 and translation (pp. 96-
                  104) ...............................................................................JA6102

12-13A            Facebook Messenger communications with Erick Torres
                  on 9/26/16 and translation (pp. 398-413)........................JA6111

14-4A             Facebook Messenger communications with Catrachito
                  Triminio from 8/2/16 to 8/6/16 and translation (pp. 918-
                  936) ...............................................................................JA6127

Government's Exhibits, continued:

14-5A Facebook Messenger communications with Danilo Perez from 9/8/16 to 9/16/16 and translation (pp. 1536-1543) .................................................................. JA6151

14-8A Facebook Messenger communications with Joster Hrndz from 8/21/16 to 9/3/16 and translation (pp. 1573-1579) .................................................................. JA6165

14-10A Facebook Messenger communications with Joster Hrndz from 9/17/16 to 9/29/16 and translation (pp. 1602-1604) .................................................................. JA6178

15-16A Facebook Messenger communications with Ludwin Cruz on 9/7/16 and 9/27/16 and translation (pp. 2411-2412) .................................................................. JA6183

15-19A Facebook Messenger communications with Erick Contreras from 9/20/16 to 9/21/16 and translation (pp. 984-999) ......................................................................... JA6186

15-26A Facebook Messenger communications with Morenito Martinez from 9/3/16 to 9/8/16 and translation (pp. 1175-1179) .............................................................................. JA6204

16-13A Facebook Messenger communications with Jose Vigil from 7/13/16 to 7/15/16 and translation (pp. 5954-5957) .................................................................. JA6213

17-16A Facebook Messenger communications with 100004818043795 on 10/29/16 (p. 129) ......................... JA6219

18-10A Facebook Messenger communications with Rolando Cuadras on 10/13/16 and translation (pp. 305-308) ........ JA6221

25-4A Facebook Messenger communications with Morenito Martinez from 9/13/16 to 9/14/16 and translation (pp. 125-129) ............................................................................ JA6229

Government's Exhibits, continued:

| | | |
|---|---|---|
| 25-6 | Facebook Messenger communications with El Sarco Flores on 9/18/16 and translation (p. 89) | JA6235 |
| 26-11 | Searches on 2/1/18 (p. 278) | JA6236 |
| 30-8A | Facebook Messenger communications with Morenito Martinez from 8/29/16 to 8/30/16 and translation (pp. 982-986) | JA6237 |
| 31-7A | Facebook Messenger communications with Miguel Barrera from 9/15/16 to 9/19/16 and translation (pp. 361-365) | JA6242 |
| 40-5A | WhatsApp communications with 15713651303@s.whatsapp.net (Memito1331) on 8/31/16 and translation | JA6248 |
| 41-4A | Extraction report of data file, namely, a video named IMG_7624.MOV | JA6249 |
| 41-4C | Transcript and translation of audio heard on IMG_7624.MOV saved on iCloud of account with Apple ID franciscoavila920@gmail.com | JA6250 |
| 47-3A to 47-3E | Photographs from Google account Memito1331@gmail.com | JA6251 |
| 48 | CAST Report regarding Google location for Google accounts Henrryzm31@gmail.com, Sorto13oskal@gmail.com, and Desconocidotambien2424@gmail.com | JA6256 |
| 50-5 | User accounts report | JA6298 |
| 50-8A | WhatsApp communications with 50375763856@s.whatsapp.net from 8/28/16 to 8/29/16 and translation | JA6301 |

Government's Exhibits, continued:

50-9A          WhatsApp communications with
               50375763856@s.whatsapp.net from 8/28/16
               to 8/29/16 .......................................................................... JA6307

51-9           SMS message sent to 571-365-1303 at 10:23:15 pm on
               9/26/16 ................................................................................ JA6311

51-12C         Transcript and translation of audio on 51-12A and 51-
               12B ..................................................................................... JA6312

51-12D2        High glossy still image..................................................... JA6313

51-13C         Transcript and translation of audio on 51-13A and 51-
               13B ..................................................................................... JA6314

51-14A         Report of images of sector lists; Full-size images of
               sector lists......................................................................... JA6315

51-15, 51-15A to 51-15G          Report of images of screenshots; Full-
               size images of screenshots ............................................... JA6316

52-5           User accounts report......................................................... JA6324

53-3, 53-3A to 53-3G          Report of images of screenshots; Full-size
               images of screenshots....................................................... JA6327

54-7           Facebook Messenger communications with "Elperverso
               Melendez" on 1/24/17 and translation ............................ JA6336

57-10, 57-10A1 to 57-10G2          Report of screenshots of online news;
               Full-size screenshots of online news and translations ..... JA6339

58-5           WhatsApp communications extracted from GEX 58-1
               and translations ................................................................ JA6354

80             Summary chart reflecting government exhibits that link
               phone numbers to particular individuals........................... JA6360

86             Select toll records for 571-337-2688 ............................... JA6361

<u>Government's Exhibits</u>, continued:

87          Select toll records for 703-231-2883 ...............................JA6366

90-1        Excerpts from GEX 90 (Select toll records for 571-406-
            8905) ...............................................................................JA6371

104-1B      Transcript and translation of GEX 104-1A
            (Audio recording Ronald Herrera Contreras 11/30/17
            interview) ........................................................................JA6372

105-2B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6374

105-3B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6375

105-4B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6377

105-5B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6379

105-6B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6380

105-7B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6382

105-8B      Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6384

105-10B     Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6389

105-11B     Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6391

105-12B     Transcript and translation of statements made by Ronald
            Herrera Contreras during 7/2/18 post-arrest interview ....JA6392

Government's Exhibits, continued:

105-13B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6393

105-14B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6394

105-15B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6395

105-16B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6396

105-17B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6397

105-18B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6398

105-19B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6400

105-20B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6401

105-21B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6402

105-22B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6404

105-23B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6406

105-24B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6407

105-25B    Transcript and translation of statements made by Ronald Herrera Contreras during 7/2/18 post-arrest interview .... JA6408

<u>Government's Exhibits</u>, continued:

105-26B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6409

105-27B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6410

105-28B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6411

105-29B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6413

105-30B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6414

105-31B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6416

105-32B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6417

105-33B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6418

105-34B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6421

105-35B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6422

105-36B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6423

105-37B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6424

105-38B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6425

Government's Exhibits, continued:

105-39B     Transcript and translation of statements made by Ronald
Herrera Contreras during 7/2/18 post-arrest interview .... JA6426

107-2B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6427

107-3B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6430

107-4B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6431

107-5B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6432

107-6B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6433

107-7B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6436

107-8B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6437

107-9B     Transcript and translation statements made by Pablo
Velasco Barrera during 6/12/18 post-arrest interview..... JA6438

109-2B     Transcript and translation of statements made by Henry
Zelaya Martinez during 11/18/18 post-arrest interview .. JA6440

109-3B     Transcript and translation of statements made by Henry
Zelaya Martinez during 11/18/18 post-arrest interview .. JA6443

109-4B     Transcript and translation of statements made by Henry
Zelaya Martinez during 11/18/18 post-arrest interview .. JA6444

109-5B     Transcript and translation of statements made by Henry
Zelaya Martinez during 11/18/18 post-arrest interview .. JA6446

Government's Exhibits, continued:

109-6B    Transcript and translation of statements made by Henry
           Zelaya Martinez during 11/18/18 post-arrest interview .. JA6448

109-7B    Transcript and translation of statements made by Henry
           Zelaya Martinez during 11/18/18 post-arrest interview .. JA6449

109-8B    Transcript and translation of statements made by Henry
           Zelaya Martinez during 11/18/18 post-arrest interview .. JA6451

109-9B    Transcript and translation of statements made by Henry
           Zelaya Martinez during 11/18/18 post-arrest interview .. JA6453

109-10B   Transcript and translation of statements made by Henry
           Zelaya Martinez during 11/18/18 post-arrest interview .. JA6454

110-1B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6455

110-2B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6457

110-3B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6459

110-4B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6461

110-5B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6463

110-6B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6464

110-7B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6467

110-8B    Transcript and translation of statements made by Elmer
           Zelaya Martinez during 5/24/18 post-arrest interview .... JA6468

Government's Exhibits, continued:

110-9B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6469

110-10B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6470

110-11B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6471

110-12B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6473

110-13B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6474

110-14B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6475

110-15B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6476

110-16B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6480

110-17B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6481

110-18B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6483

110-19B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6484

110-20B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6485

110-21B    Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6487

Government's Exhibits, continued:

110-22B     Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6488

110-23B     Transcript and translation of statements made by Elmer
Zelaya Martinez during 5/24/18 post-arrest interview .... JA6489

124-6     Page of Notes from Jesus Delgado ................................. JA6490

160-3     Chart showing photographs of defendants and co-
conspirators as admitted through JVM ........................... JA6491

160-4     Chart showing photographs of defendants and co-
conspirators with names and gang monikers .................. JA6492

## VOLUME OF 21

Defendant H. Martinez's Position on Sentencing
filed September 20, 2022 ........................................................ JA6493

Government's Position on Sentencing as to Defendant H. Martinez
filed September 21, 2022 ........................................................ JA6522

Transcript of Defendant H. Martinez's Sentencing Hearing before
The Honorable Rossie D. Alston, Jr.
on September 28, 2022 ........................................................ JA6532

Defendant Ferrera's Notice of Appeal
filed October 13, 2022 ........................................................ JA6554

Government's Position on Sentencing as to Defendant Contreras
filed October 13, 2022 ........................................................ JA6556

Defendant Contreras's Position on Sentencing
filed October 13, 2022 ........................................................ JA6567

Government's Position on Sentencing as to Defendant Barrera
filed October 19, 2022 ........................................................ JA6575

Defendant Barrera's Position on Sentencing
        filed October 20, 2022 ........................................................JA6586

Transcript of Defendant Contrera's Sentencing Hearing before
The Honorable Rossie D. Alston, Jr.
        on October 20, 2022 ............................................................JA6595

Transcript of Defendant Barrera's Sentencing Hearing before
The Honorable Rossie D. Alston, Jr.
        on October 26, 2022 ............................................................JA6615

Defendant Barrera's Notice of Appeal
        filed November 2, 2022 ......................................................JA6647

Defendant Contreras' Notice of Appeal
        filed November 3, 2022 ......................................................JA6649

Judgment in a Criminal Case as to Defendant E. Martinez
        filed December 21, 2022 ....................................................JA6651

Judgment in a Criminal Case as to Defendant H. Martinez
        filed December 21, 2022 ....................................................JA6658

Judgment in a Criminal Case as to Defendant Barrera
        filed December 21, 2022 ....................................................JA6665

Judgment in a Criminal Case as to Defendant Ferrera
        filed December 21, 2022 ....................................................JA6672

Judgment in a Criminal Case as to Defendant Contreras
        filed December 21, 2022 ....................................................JA6679

Defendant H. Martinez's Notice of Appeal
        filed December 29, 2022 ....................................................JA6686

Defendant Ferrera's Notice of Appeal
        filed December 31, 2022 ....................................................JA6688

Defendant E. Martinez's Notice of Appeal
        filed January 10, 2023........................................................JA6690

**VOLUME 16 OF 21 (MEDIA)**[1]

Government's Exhibits from Suppression Hearing (Defendant H. Martinez)
on February 23, 2021:

2A.    Video Clip of Recorded Interview ............................................. JA6692

2B.    Video Clip of Recorded Interview ............................................. JA6693

Government's Trial Exhibits:

41-4B        Video named IMG_7624.MOV saved on iCloud of
account with Apple ID franciscoavila920@gmail.com... JA6694

51-12B        Enhanced video of murder (VID-20160927-WA0018
Enhanced.mov) .............................................................. JA6695

51-13B        Enhanced video of murder (VID-20160927-WA0017
Enhanced.mov) .............................................................. JA6696

124-2        Clip of recording of dining area at the Alexandria Adult
Detention Center on June 29, 2019 (15:48 to 15:50) -
Multimedia exhibit (video clip) ...................................... JA6697

---

[1] Exhibits are in .mp4, .wmv, and .MOV file format. A virus detection program, VIPRE Endpoint Security Version 13.1.8510, has been run on the electronic files and no virus was detected.

**VOLUME 17 OF 21 (SEALED - BARRERA)**

Exhibits to Government's Response in Opposition to Defendants'
Joint Constitutional Objections to Proposed Exhibits
    filed August 17, 2021:

        Sealed Exhibit 1 ...................................................................................JA6698

        Sealed Exhibit 2 ...................................................................................JA6703

Draft Presentence Investigation Report as to Defendant Barrera
    filed September 19, 2022......................................................................JA6709

Final Presentence Investigation Report as to Defendant Barrera
    filed October 14, 2022 .........................................................................JA6735

Statement of Reasons as to Defendant Barrera
    filed December 21, 2022 ......................................................................JA6798

## VOLUME 18 OF 21 (SEALED - CONTRERAS)

Defendant Contreras's Under Seal Memorandum
In Support of Motion to Suppress
        filed November 18, 2019 ....................................................... JA6803

Government's Response in Opposition to
Defendant Contreras's Motion to Suppress Statements,
With Exhibits,
        filed January 3, 2020............................................................ JA6808

Exhibits:

1.      Incident/Investigation Report
                dated February 13, 2017 ................................................ JA6832

3.      Transcript and Translation of Post-Arrest Interview
                dated February 13, 2017 ................................................ JA6933

4.      Fairfax Police Department Notice and Consent
                dated February 13, 2017 ................................................ JA6961

5.      Emails between John Wrenn and Raymond Betts
        Re:  Photo
                dated March 10-11, 2017 ............................................... JA6963

6.      Emails between John Wrenn and Raymond Betts
        Re:  Ronald
                dated March 23-22, 2017 ............................................... JA6967

7.      Emails between John Wrenn and Raymond Betts
                dated April 22-23, 2017 ................................................. JA6970

8.      Emails between John Wrenn and Raymond Betts
        Re:  Picture
                dated May 11-12, 2017 .................................................. JA6973

9.      Email from Aaron Waple to Raymond Betts
        Re:  HERRERA CONTRERAS, Ronald Fabricio (MS 13)
                dated May 20, 2017........................................................ JA6976

<u>Exhibits</u>, continued:

     10.    Emails between Aaron Waple and Raymond Betts
             Re:  Ronald Herrera
                  dated May 22-25, 2017 ..................................................... JA6978

     11.    Emails between Aaron Waple and Raymond Betts
             Re:  Assistance
                  dated November 17-18, 2017 .......................................... JA6981

     13.    Transcript and Translation of Post-Arrest Interview
                  dated July 2, 2018 .......................................................... JA6984

     14.    Federal Bureau of Investigations Notification of Rights
                  dated July 2, 2018 .......................................................... JA6996

Order of
The Honorable Rossie D. Alston
Re:  Granting Government's Unopposed Motion for Ruling on
Defendant Contreras's Motion to Suppress Statements Without a Hearing
        filed March 26, 2020 ............................................................ JA6998

Order of
The Honorable Rossie D. Alston
Re:  Denying Defendant Contreras' Motion to Suppress
        filed May 6, 2020 ................................................................ JA7000

Exhibits to Government's Response in Opposition to Defendants'
Joint Constitutional Objections to Proposed Exhibits
        filed August 17, 2021:

        Sealed Exhibit 1 .................................................................. JA7008

        Sealed Exhibit 2 .................................................................. JA7013

Draft Presentence Investigation Report as to Defendant Contreras
        filed September 15, 2022 ..................................................... JA7019

Final Presentence Investigation Report as to Defendant Contreras
        filed October 12, 2022 ...........................................................JA7052

Statement of Reasons as to Defendant Contreras
        filed December 21, 2022 .....................................................JA7089

**VOLUME 19 OF 21 (SEALED – FERRERA)**

Exhibits to Government's Response in Opposition to Defendants'
Joint Constitutional Objections to Proposed Exhibits
filed August 17, 2021:

Sealed Exhibit 1 ..................................................................................... JA7094

Sealed Exhibit 2 ..................................................................................... JA7099

## VOLUME 20 OF 21 (SEALED – H. MARTINEZ)

Government's Response in Opposition to Defendant H. Martinez's
Motions to Suppress,
With Exhibits,
    filed January 3, 2020...........................................................................JA7105

    Exhibits:

    2.     Post-Arrest Interview .................................................................JA7140

    3.     Federal Bureau of Investigations
          Notice of Your Rights (Spanish)
             dated November 18, 2018 ...............................................JA1760

Government's Supplemental Response in Opposition
To Defendant H. Martinez's Motions to Suppress
    filed March 19, 2021...........................................................................JA7162

Government's Reply in Opposition to Defendant H. Martinez's
Motions to Suppress
    filed April 5, 2021...............................................................................JA7179

Exhibits to Government's Response in Opposition to Defendants'
Joint Constitutional Objections to Proposed Exhibits
    filed August 17, 2021:

    Sealed Exhibit 1 ................................................................................JA7191

    Sealed Exhibit 2 ................................................................................JA7196

Final Presentence Investigation Report as to Defendant H. Martinez
    filed September 20, 2022.....................................................................JA7202

Statement of Reasons as to Defendant H. Martinez
    filed December 21, 2022 .....................................................................JA7261

**VOLUME 21 OF 21 (SEALED MEDIA[2] – CONTRERAS)**

Exhibits to Government's Response in Opposition to
Defendant Contreras's Motion to Suppress Statements,
    filed January 3, 2020:

2.    Video of Recorded Interview
          dated February 13, 2017 ..................................................JA7266

12.    Video of Recorded Interview
          dated July 2, 2018 ...........................................................JA7267

---

[2] Exhibits are in .mp4, file format. A virus detection program, VIPRE Endpoint
Security Version 13.1.8510, has been run on the electronic files and no virus was
detected.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | **Docket No.: 18 CR 00123-006 (RDA)** |
| **v.** | : | **Hon. Rossie D. Alston, Jr.** |
| | : | **Sentencing:  September 28, 2022** |
| **HENRY ZELAYA MARTINEZ** | : | |

**<u>MEMORANDUM IN AID OF SENTENCING</u>**

While the Court may be statutorily constrained in the sentence it may impose on Mr. Zelaya Martinez, it is nonetheless important to have a full appreciation of him, his background and the factors that contributed to his coming before the Court.  Without that appreciation, sentencing becomes a formulaic exercise with no acknowledgment of the many dimensions that comprise us all.  Moreover, it is critical that the Bureau of Prisons, where Mr. Zelaya Martinez will be confined, be made fully aware of his many limitations and frailties as they are entrusted with his custody and care and need to know how to properly ensure his safety and health.

### <u>Henry Zelaya Martinez</u>

Sad, obedient, loving, quiet, helpful, hard-working, reliable, introverted.  These are the descriptions provided by those who have known Henry Zelaya Martinez best: his family, his work supervisors, his teachers.  As discussed more fully *infra* at pp. 2-13, 17-19, Henry faced many challenges during his formative years --- a head injury with loss of consciousness when he was just four or five years old, abandonment by his father, and then his mother, as they left their small town in Moncagua, El Salvador for the United States during his childhood, impaired vision and ridicule by his age-mates for wearing glasses, and cognitive challenges that manifested in a variety of ways.  Despite these tremendous challenges, Henry demonstrated to his community that he was a law-

JA6493

abiding, sensitive and thoughtful person.  We are all better than the worst things we ever have done[1] and there is ample evidence that Henry Zelaya Martinez has demonstrated his capacity for empathy, kindness, love and profound remorse.

## Henry's Early Life - Learning and Neuropsychological Deficits - Social Observations - Athletics

Henry Zelaya-Martinez was born on November 29, 1993 in rural El Salvador, so underweight that he fit into the palm of his mother's hand.  He weighed just half of what his older brother had at birth, and was unable to leave the dimly lit, un-air-conditioned Hospital Nacional San Juan de Dios in San Miguel[2] for more than a week.

As a very young child, Henry contracted a parasitic infection, causing him to be unable to walk for several months.  When he was just 4-5 years old, he suffered a significant head injury when he was pushed to the ground by another child and hit his head on the concrete.  During the accident he lost consciousness and thereafter suffered a host of continuing health problems.  Throughout his childhood, and even now, Henry's eyesight is severely impaired.  He suffers from frequent and severe headaches and from significant memory problems.  One family memory described his memory as being like "a cassette tape that was erased."[3]

While Henry was not evaluated or diagnosed with learning disabilities as a child in El Salvador, he did not complete 9th grade in El Salvador until 2013, when he was about to turn 20 years old.  Similarly, an acquaintance recalled that he was in the 7th grade in 2011, when he was 18 years old.  Indications from a neuropsychological evaluation conducted in 2019 indicate that Henry

---

[1] JUST MERCY (2015), Stevenson, Bryan, p.17 ("Each of us is more than the worst thing we've ever done.")

[2] Henry is from the town of Moncagua, El Salvador, but was born in San Miguel because his mother was ill and hospitalized there for the month preceding his birth.

[3] *See* Note 12, *infra*

2

suffers from serious neuropsychological deficits and significantly compromised executive functioning and frontal lobe impairment, as well as clear memory problems. Preliminary results also reflect an impaired ability to problem solve and bespeak an overall portrait of an individual who is unsophisticated and cognitively impaired, all of which, in addition to his poor eyesight, would have impacted his academic performance.



*Henry Zelaya Martinez 9th Grade Photo (2013)*

Specifically, in September 2019 a fully bilingual nationally recognized neuropsychologist, who has been both a government and defense expert in criminal cases throughout the United States and who is the former President of the American Psychological Association, evaluated Henry over a three-day period. He indicated that Henry scored 70 or below on four different measures of full-

3

JA6495

scale IQ[4] and also stated that Henry was engaged and that validity scales were within normal limits, ruling out that Henry could have been malingering. The etiology of Henry's deficits suggests that they are organic, stemming from some or all of the following: 1) having been born underweight, 2) being malnourished, 3) suffering from a parasite as a young child, 4) suffering a head injury as a young child, and 5) having an impaired ability to process visual information unrelated to his need to wear glasses.

Socially, those who knew him described Henry as an obedient and rule-adherent youngster who respected teachers and female students and who distanced himself from classroom misbehaviors and antics.  He was described by family as respectful, quiet, and the most timid of his siblings.



*Henry Zelaya Martinez and his siblings*

Henry's vision impairment and his need for glasses had a seriously adverse social impact on him among his schoolmates.   They teased him for needing to wear eyeglasses, and as a result he

---

[4] *See generally*, DSM-V (2013), pp. 33-37 (regarding intellectual disability)

JA6496

largely forwent wearing the glasses to avoid social ostracism.  One family member said that Henry's childhood was not playful and that he simply went to school and came home because his mother protected him due to the problems he suffered with his eyesight.

One bright spot in Henry's childhood was his athleticism.  By all accounts he was a gifted soccer player who played on a youth team that had players who became professional soccer players. He played in a tournament in San Miguel as a teen and was well known in his community for his soccer skills.  Despite his talent for soccer, however, Henry did not spend a lot of time with his teammates outside of structured team practices and competitions.

### The Parental Abandonment and Poverty Henry Suffered

Abandonment is a consistent theme in Henry's life.  When he was six or seven years old, his father left El Salvador for the United States, leaving his mother with Henry, his older and younger brothers, and his younger sister.  Without his father in the household there were times when Henry recalls not having had enough to eat and his mother having had to ask neighbors for food.  Then, five years later, he was bereft of both parents, when his mother moved to the United States, leaving her four children in the care of a paternal aunt, who was only 17 years old at the time, just two years older than Henry's older brother,[5] and approximately five years older than Henry.

---

[5] Henry's younger brother described their older brother as being "a second father" to them.  August 22, 2019, interview with Edwin Zelaya Martinez.  Henry's mother, Erlinda Lissette Portillo Romero, confirmed as much (August 31, 2019, telephone conversation)

JA6497



*Kitchen sink (outdoors) in Zelaya Martinez family home*

The effect on Henry of being without both of his parents was profound.  As both Henry himself, and his younger brother, said, "it was not the same to be raised by aunts as to be raised by one's own parents."[6]  Several family members described how Henry was far more affected by their absence than his siblings were.[7]  Indeed, his girlfriend from the time he was 19 to the time he was 23 recounted hearing Henry crying on the telephone when he spoke to her about how much he missed his mother.[8]

---

[6] August 22, 2019, interview with Edwin Zelaya Martinez; April 14, 2019, telephone interview with Edwin Zelaya Martinez (stating that the children felt lonely without their parents).

[7] August 22, 2019, interview with paternal aunt Noemi (stating that Henry was sadder than his siblings at the absence of his parents and would ask when he would see them again).

[8] August 24, 2019, interview with Keiry Guadalupe Chavez Urrutia.

JA6498



*Kitchen in Zelaya Martinez Home*

Beyond his familial challenges and struggles, Henry suffered a number of health adversities as well. Not only was he born underweight, but he also suffered a head injury when he was just four or five years old that resulted in a loss of consciousness, and since which he has been afflicted with

JA6499

serious vision problems.[9]  In addition, as a toddler Henry had a parasitic infection, causing him to

be unable to walk for several months.[10]  Throughout his childhood, and even now, Henry's eyesight

is severely impaired as evidenced by his inability to see in the dark.  Henry's childhood also was

marked by frequent and severe headaches,[11] and more recently he has developed a kidney ailment,

the latter being something with which both his father and a late paternal uncle were afflicted.

Significantly, since the childhood head injury in which he lost consciousness Henry has had

memory issues.  His younger brother has described them as being as if Henry's memory is "a

cassette tape that was erased," further stating that Henry would study for an exam at school and then

---

[9] August 29, 2019, interview with Erlinda Lissette Portillo Romero (Henry's mother) (describing head injury Henry suffered when another child pushed him and he hit his head on the sidewalk); August 22, 2019, interview with paternal aunt Flor Carmen (describing Henry's loss of consciousness after he was pushed by another child and fell and hit his head at age 4-5)

[10] August 29, 2019, interview with Erlinda Lisette Portillo Romero (Henry's mother) (describing a parasitic infection Henry suffered at about age 2-3 resulting in a fever, a distended stomach and Henry's inability to walk for 2-3 months)

[11] August 24, 2019, interview with paternal aunt Letticia (describing Henry's headaches); August 23, 2019, interview with Sergio Solorsano, mayor of Moncagua and Henry's godfather (referencing Henry's headaches); August 22, 2019, interview with paternal aunt Flor Carmen (describing how Henry always had headaches and was more subdued when he was in pain)

JA6500

forget things on the exam and be sent to the store in Moncagua and sometimes forget what he had been asked to get.[12]



*Moncagua, El Salvador*

<u>**Abandonment**</u>

A hospital stay that lasted a week after his birth, a father who left the family in El Salvador when Henry was six or seven years old, and the absence of both parents from the time he was about

---

[12] August 22, 2019, interview with Edwin Zelaya Martinez.  Henry's mother, Erlinda Lisette Portillo Romero also stated that Henry had trouble remembering things, such as where he had put something (August 31, 2019, telephone conversation with Erlinda Lisette Portillo Romero).

JA6501

ten or twelve years old, abandonment characterized Henry's formative years, and had a deep effect on him. It was not until he was 17 years old, in 2010, that Henry's father returned to El Salvador from the United States. By that time, Henry had lived without either of his parents for seven or eight years, clearly extremely formative years in his development.

Moreover, by 2010, when Henry was 17 years old, his older brother, who had served a parental role for Henry after their mother moved to the United States, himself, already had moved to the United States. His older brother's move to the United States was yet another abandonment by a parental figure. As a result, Henry's father, with whom he had not lived in ten years, was left to care for him and his two younger siblings. Upon his return to Moncagua from the United States Henry's father worked in the fields harvesting corn and beans, and Henry helped him with that work. Indeed teachers, the Mayor of Moncagua (who is Henry's godfather), and his then-girlfriend recounted that the only times Henry would miss school were when he was either sick or helping his father in the fields.[13]

---

[13] August 24, 2019, interview with Keiry Guadalupe Chavez Urrutia (stating that Henry attended school unless he was sick or working with his father); August 23, 2019, interview with Sergio Solorsano (mayor of Moncagua and Henry's godfather) (recounting that Henry liked to work with his father).

JA6502



*Beans harvested and drying outside Zelaya Martinez home*

JA6503



*Beans harvested and drying outside Zelaya Martinez home*

### Henry's Youth

By all accounts Henry was an obedient and rule-adherent youngster. His teachers said as much, describing him as unlike some of the other students in his school,[14] and his family members

---

[14] August 23, 2019, interview with Sr. Don Juan Lobos (Henry was attentive, obedient, and responsible); August 23, 2019, interview with Don Edwin (Henry had excellent behavior, unlike the other students some of whom were poorly behaved); August 23, 2019, interview with Nia Marta (Henry had very good character

JA6504

echoed that description of him.[15]  In a similar vein, a former long-term girlfriend described Henry as

unlike the students in school who did not respect the teachers or the female students, saying that he

respected both and distanced himself from classroom misbehaviors and antics.[16]  Henry's godfather,

the mayor of Moncagua, also described Henry as tranquil, respectful and honest.[17]  Given that

obedience and his companion timidity as described by many, were hallmark characteristics of

Henry, it stands to reason that he was especially susceptible to pressure from others to engage in

acts that were clearly antithetical to his nature.  Indeed, Henry, himself, admitted that he did not

receive "*correctivos*" from the gang because he always followed the rules and did good as that was

what was required to "save oneself."  Moreover, the threats Henry's family had received from the

gang when he was living in El Salvador,[18] and the friends he had lost to gang wars in El Salvador,

gave him reason to be fearful.  At least one teacher described Henry trying to avoid bad

influences.[19]

   Seemingly for Henry the path out of the impoverished and violent environment in which he

was raised would have been through sports.  By his own account, as well as the accounts of adults

---

and was respectful); August 23, 2019, interview with Sr. Wilfredo Galleas (Henry was respectful); August
23, 2019, interview with Sr. Marvin Osael Rodriguez Machuca (Henry was always respectful).

[15] August 22, 2019, interview with paternal Aunt Merlin (describing Henry as obedient); August 22, 2019,
interview with paternal aunt Noemi (describing Henry as never lacking respect).

[16] August 24, 2019, interview with Keiry Guadalupe Chavez Urrutia.

[17] August 23, 2019, interview with Sergio Solorsano (mayor of Moncagua and Henry's godfather)

[18] April 14, 2019, phone interview with Edwin Zelaya Martinez (describing paternal aunt Flor Carmen's
attempted kidnapping and her receipt of threatening letters in 2003-2004); March 22, 2019, interview with
Rena Zelaya Martinez, Henry's younger sister (describing problems with the gangs; gang members hiding in
the family's outdoor bathroom when the police chased them; and an incident in which, while chasing gang
members through their home, the police shot two of them, causing Rena Zelaya Martinez to be so upset, that,
pregnant, she had to be admitted to the hospital).

[19] August 23, 2019, interview with Sr. Don Juan Lobos (stating that Henry tried to avoid and separate himself
from bad influences and seemed scared)

who knew him during his youth, he was a phenomenal soccer player, who could have had a professional career in that arena.[20] (Henry was number one in soccer, went to a tournament at the stadium in San Miguel when he was 16-17 years old, and was on a youth team that was a feeder to a professional team.)   That said, other than when he played soccer with his teammates, he preferred to be apart from them.

### Henry is a Profoundly Sensitive and Sentient Person with Tremendous Capacity for Positive Emotions and Human Kindness

There was "a sadness in his eyes, but he did not like to share his feelings."[21]  This description of Henry from his younger brother obtains as much today, as it did when the two of them were living together in the small town where they were raised, *i.e.*, Moncagua, El Salvador.  In a similar vein, his boss at the construction job he held in Lansing, Michigan described Henry as introverted and quiet.[22]  It is uncontroverted that Henry never liked to talk to people, and that he "did not share [his] feelings or [his] fears with anyone."  He has acknowledged that his problem was that he did not talk to anyone, fearing that no one could be trusted to be a true friend.  His inner sadness has been a pernicious force in his life since he was a teenager, indeed, being so severe that he questioned the value of his own life.

---

[20] August 23, 2019, interview with Don Edwin (Henry was in the Dragon Club, the 2nd Division); August 23, 2019, interview with Nia Marta (Henry had a magnificent ability in sports, and ran 100 meters in 11.42 seconds); August 23, 2019, interview with Sr. Wilfredo Galleas (Henry liked sports more than anything); August 23, 2019, interview with Sr. Marvin Osael Rodriguez Machuca (Henry was one of the 11 or 12 best sports players); March 22, 2019, interview with Rena Zelaya Martinez (describing that Sr. Zelaya Martinez played on the soccer team coached by his godfather, the mayor of Moncagua, Sergio Solorsano).

[21] August 22, 2019, interview with Edwin Zelaya Martinez; August 22, 2019, interview with paternal aunt Merlin (describing Sr. Zelaya Martinez as sad and very quiet, not talking much); August 22, 2019, interview with paternal aunt Flor Carmen (describing Henry as the most timid of the four siblings and as being very quiet); August 22, 2019, interview with Romolo Jesus Zelaya (Henry's father) (stating that Henry was quiet and did not talk much).

[22] August 27, 2019, interview of Jeff Marsh by Henry J. O'Donoghue

JA6506

Henry's sentient nature also has been evident from the descriptions others have provided of his being solicitous.  With respect to examples of his altruism toward others, even in detention, where visits from his mother are his lifeline, Henry selflessly viewed it as more important that his mother attend one of his very young nephew's birthday celebrations than that she come to visit him on a given Saturday.  Likewise, when Henry's mother had to miss a Saturday visit with him to visit his older brother in detention a long distance away, he understandingly recognized that his older brother had not seen his mother in a long time, and so it was only right that she go visit his brother, even if that meant Henry, himself, went without seeing her.  Similarly, demonstrating his deep concern for his mother's well-being, he does not want his mother to be disabused of her belief that he will be released someday, as he thinks her mistaken belief is what "keeps her going."

Other examples of Henry's altruism are reflected by the money he sent a paternal aunt in El Salvador, when he was working in Michigan.[23]  That aunt recounted how he sent her money, including when her husband died so that she could bury him properly.[24]  Similarly, Henry's younger brother also said that when he was working in the United States Henry sent money back to his family in El Salvador.[25]  In the small town where he lived in El Salvador Henry did favors for others such as carrying heavy water jugs for them, bringing them wood for fires, and taking their clothes to the river to be washed.

---

[23] August 24, 2019, meeting with paternal aunt Letticia.

[24] August 24, 2019, meeting with paternal aunt Letticia.

[25] August 22, 2019, interview with Edwin Zelaya Martinez.

JA6507



*Moncagua, El Salvador*

  One of his paternal aunts described the profound love and attachment Henry had for his late

paternal grandmother.[26]  His aunt recounted how attentive and loving Henry was in caring for his

grandmother, and how he cried endlessly upon her death.[27]  Henry recalled how his paternal

grandmother was declining in her room for a month before she died and remembered being with her

when she died.  Although his siblings were also there when their grandmother died, Henry was far

---

[26]August 22, 2019, interview with paternal aunt Merlin (describing how Henry was her mother's favorite grandchild).  *See also*, August 22, 2019 interview with paternal cousin Carina (describing how loving Henry was with their grandmother)

[27]August 22, 2019, interview with paternal Aunt Merlin (describing how Henry took care of her mother).

JA6508

more profoundly affected by her death as his grandmother had always told him that he was her favorite grandchild. The immense attachment he did have, and still has, for his paternal grandmother, continues to manifest itself in his feeling a constant "inner sadness" and feeling that he is alone. Indeed, to this day Henry has dreams of his paternal grandmother, including nightmares that began in January 2019 involving his late grandmother in which she is calling him and touches him and in which Henry carries his niece to his grandmother who returns from the dead, at which time the two of them disappear. Even more poignantly Henry has spoken of dying and being able to be reunited with his paternal grandmother. In 2019, upon seeing a photograph of her with him and his siblings, for an extended period of time Henry stared intently at the photograph, his eyes welling up with tears, and ultimately stated "there is no going back to what was."

Arguably related to his deeply sensitive nature, many have described Henry's nervousness. Several have said that he becomes so scared and nervous that he shakes.[28] Clearly Henry's sensitivity bespeaks someone who is extremely affected by the actions of others and is therefore directly pertinent to his involvement in the offenses of which he was convicted.

Henry's very sentient nature also was reflected in his response to having been raised largely without his parents. It is ineluctable that the absence of his mother and father played a major role in his life's course. Although his aunt, Flor Carmen, tried her best, being raised by her was not the same as being raised by a parent. Even after he had come to the United States but was living in Michigan while his mother remained in Virginia, Henry missed his mother tremendously.[29]

---

[28] August 22, 2019, interview with paternal Aunt Merlin (stating that when Henry was nervous he would shake); August 22, 2019, interview with paternal Aunt Noemi (describing that Henry got nervous and shook); August 22, 2019, interview with father Romolo Jesus Zelaya (stating that Henry always has been nervous and that "things scare him" causing him to shake); August 29, 2019, interview with Erlinda Lisette Portillo Romero (Henry's mother) (describing that after his head injury, if Henry was nervous, he would shake).

[29] August 27, 2019, interview of Jeff Marsh by Henry J. O'Donoghue (describing that Henry told his boss, Mr. Marsh, that he "missed his mother a lot")

17

JA6509

**<u>Henry's Severely Impaired Eyesight Is A Frailty That Has Markedly Influenced Him</u>**

The impact of Henry's severely impaired eyesight cannot be overstated. He referenced it during his statement to law enforcement officials upon his arrest, as bearing on what he could recount about the offense,[30] and his very limited eyesight has had a profound impact throughout his life. Arguably, as he and others have stated, his impaired eyesight is the reason Henry discontinued his studies after ninth grade, despite an ardent interest in science. Moreover, his need for glasses had a seriously adverse social impact on Henry among his schoolmates, as both he and teachers at Escolar Maria Luisa have explained.[31] Henry was teased by his schoolmates for needing to wear eyeglasses, and therefore, solely to avoid the social ostracism, largely did not wear the glasses he so

---

[30] *See e.g.*, 32'44" ("It was dark; I couldn't see anything . . . I have problems with my eyesight"); 1h 10' ("That night, I went there, but I couldn't see anything. I have problems with my vision.")

[31] August 23, 2019 interview with Sr. Don Juan Lobos (stating that Henry was teased by the other children about his need to wear glasses)

seriously needed.[32]



*Henry Zelaya Martinez's School in Moncagua, El Salvador*

Relatedly, one paternal aunt said that Henry's childhood was not playful and that he simply

went to school and came home because his mother protected him due to the problems he suffered

---

[32] *See* August 24, 2019, interview with Keiry Guadalupe Chavez Urrutia (describing that Henry needed glasses but would not wear them because the other students teased him about it).

JA6511

with his eyesight.[33]   Henry was treated for his vision problems at the Bloom Hospital in San

Salvador.[34]   For Henry to be treated there exacted a tremendous toll as it required him to travel

about five hours each way by bus, or ten hours round-trip from Moncagua.

### The Forces At Play Leading to Henry's Involvement in the Offenses of Which He Was Convicted

Against the foregoing backdrop the question of what explains, without excusing, Henry's

involvement in the offenses of which he was convicted is paramount.  Independent of any frailties

born of his serious health issues, indisputably the absence of both parents during critical years of his

development is significant.[35]   Importantly, Henry' involvement with the gang began at about the

time his mother left for the United States.

The role of surrogate family played by a gang is well recognized.[36]   Given the absence of

Henry's parents from the time he entered early adolescence, it stands to reason that his involvement

---

[33] August 22, 2019, interview with paternal aunt Merlin.

[34]Even in August 2019, Bloom Hospital was a facility in disrepair, with little light, no air conditioning, peeling paint, and ward-like rooms with four or five patients in each, none of whom were separated by any sort of partition from the other.  Children were on stretchers in the halls with their mothers holding their intravenous bags in their hands and above their heads because there were no poles on which to hang them above the stretchers. The hospital harkened back to a facility in the United States from the 19th or early 20th century.

[35]*See* James C. Howell, *Youth Gangs: An Overview*, at p. 6  (listing "lack of adult male role models" as "risk factors" in the "family domain" that contribute to gang involvement of youth) available at **https://www.ncjrs.gov/pdffiles/167249.pdf** *See also* **https://www.cdc.gov/violenceprevention/acestudy/index.html** ("Childhood experiences, both positive and negative, have a tremendous impact on future violence victimization and perpetration, and lifelong health and opportunity.") (last visited August 7, 2018)

[36]Phelan A. Wyrick and James C. Howell, *Strategic Risk-Based Response To Youth Gangs*, JUVENILE JUSTICE JOURNAL, VOL. IX, NO. 1, p. 24 (September 2004) ("Key family risk factors for gang membership include the family structure (*e.g.* broken home), family poverty, . .[ and p]oor family management, including poor parental supervision (monitoring) and control of children, has been shown to be a strong predictor of gang membership") (citation omitted).  available at **www.ncjrs.gov/html/ojjdp/203555/jj3.html** *See also* OJJDP MODEL PROGRAMS GUIDE: *Gang Prevention* available at **www.ojjdp.gov/mpg/progTypesGangPrevention** ("social, economic and cultural forces push many young people into gangs") *See also*, Phelan A. Wyrick and James C. Howell, *Strategic Risk-Based Response To Youth Gangs*, JUVENILE JUSTICE JOURNAL, VOL. IX, NO. 1, p. 22 (September 2004) (" . . . [T]he accumulation of risk factors greatly increases the likelihood of gang involvement . . .[and] . . .the presence of

JA6512

with a gang filled a void for him.  In addition, gang membership has been acknowledged as a means

to compensate for many of the adjustment problems young people encounter,[37] and Henry clearly

had had some significant and very intense struggles with being teased in school.

It is also highly relevant that at the time of the offenses, *i.e.*, in August and September, 2016,

chronologically Henry was just 22 years old.[38]  Neuroscientists have recognized a person's early

20's as a time of "emerging adulthood" before the brain has been fully formed, and therefore not an

age at which someone should be deemed a full-fledged adult.[39]  This is particularly germane in

---

risk factors in multiple domains appears to increase the likelihood of gang involvement even more than the
general accumulation of risk factors."),  available at **www.ncjrs.gov/html/ojjdp/203555/jj3.html**

[37] James C. Howell, *Youth Gangs: An Overview*, p. 5 (August 1998) ("Feeling marginal, adolescents join
gangs for social relationships that give them a sense of identity.  For some youth, gangs provide a way of
solving social adjustment problems, particularly the trials and tribulations of adolescence") (citations
omitted), available at **https://www.ncjrs.gov/pdffiles/167249.pdf** *See also Id.*, at 6 (listing "desire for
group rewards such as status, identity, self-esteem, companionship, and protection" as "risk factors" in the
"individual domain" that contribute to gang involvement of youth)  available at
**https://www.ncjrs.gov/pdffiles/167249.pdf.;** J. Weston Phippin, *What Trump Doesn't Understand About
MS-13*, THE ATLANTIC (June 26, 2017) ("Remember, this is after all a youth gang," said José Miguel Cruz, a
Central American gang-research specialist at Florida International University. "These are kids—15 or 17
years old—who join a gang perhaps because they feel threatened, or they're the only peer group in the
community."); Carl S. Taylor and Pamela R. Smith, *The Attraction of Gangs: How Can We Reduce It?* in
CHANGING COURSE: PREVENTING GANG MEMBERSHIP (2013), available at
**https://www.justice.gov/sites/default/files/usao-sdoh/legacy/2013/10/24/Changing%20Course%20-
%20Preventing%20Gang%20Membership.pdf#page=9&zoom=auto,-64,792** p. 27 ("Youth can perceive
that gangs offer empowerment — and the attraction of gangs to some youth is enhanced if they feel that gang
members recognize and listen to them. Gangs can fill the void left by dysfunctional families and poor
education, and some youth see them as providing protection, support, excitement, money and status. When
all else in society fails at the time in their lives when they are willing to take risks, young people can regard a
gang as providing an alternative to just accepting the socioeconomic challenges in their environment.");
FOCUS ADOLESCENT SERVICES *Gangs: Awareness, Prevention, Intervention*, (outlining some of the reasons
for joining a gang as including, *inter alia*, "a search for love, structure and discipline," "a sense of belonging
and commitment," "companionship, training excitement and activities," "a sense of self-worth and status," a
place of acceptance," and "the need for physical safety and protection"), available at
**www.focusas.com/Gangs.html**

[38]It remains an open question whether Henry's maturity and development were actually consistent with his
chronological age. *See* pp. 3-4, *supra*. He did not graduate from 9th grade until 2013, when he was 20 years
old.  Moreover, according to his then-girlfriend he was in the 7th grade in 2011, when he was 18 years old.
Interview with Keiry Guadalupe Chavez Urrutia (August 24, 2019).

[39] *See* Lucy C. Ferguson, "*The Implications of Developmental Cognitive Research On 'Evolving Standards of
Decency' and the Imposition of the Death Penalty on Juveniles*," 54 AM.U. L. REV. 441, 442 (2004) ("Since
2000, numerous brain-scan studies have established that the human brain does not fully mature until an

Henry's case because it makes pertinent the Supreme Court's recognition, in a trilogy of cases

between 2005 and 2015, of the frailties of young adulthood. *See generally*, *Roper v. Simmons*, 543

U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 132 S.Ct. 2455

(2012). Perhaps most applicable to Henry's case is the Supreme Court's observation that among

the characteristics distinguishing young people from fully matured adults is their susceptibility to

peer pressure. *See Roper*, *supra*, 543 U.S. at 569-570 (discussing young people's "greater

vulnerability and susceptibility 'to negative influences and outside pressures, including peer

pressure'") (citations omitted).

The role of peer pressure in Henry's involvement in the offenses of which he was convicted

is highly relevant. Given the observations of his former teacher, Don Juan Lobos, that Henry had

previously battled feeling pressured by negative influences,[40] and given his family members' prior

---

individual is in his or her early to mid-twenties."). *See also*
https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051 (last
visited August 14, 2018) ("**The rational part of a teen's brain isn't fully developed and won't be until
age 25 or so**."); MacArthur Foundation Research Network on Law and Neuroscience, Law and Neuroscience
Bibliography, available at http://www.lawneuro.org/files/adol_dev_brief.pdf (last visited August 14, 2018) (
"evidence . . . suggests that **young adulthood is a distinct developmental period**, and that young adults are
different both from adolescents and from somewhat older adults . . . .Researchers have found that **in young
adulthood, as in adolescence, areas of the brain that regulate functions like judgment and self-control
are still not fully mature**. In certain emotionally charged situations, the capacity of young adults to regulate
their actions and emotions appears more like that of teens than adults in their mid 20s or older."); Richard
Restak, M.D., THE SECRET LIFE OF THE BRAIN at 76 (The Dana Press and The John Henry Press,
2001) ("the prefrontal lobes **aren't fully mature until the 20's or even later**"); Barry C. Feld,
"*Competence, Culpability and Punishment: Implications of Atkins for Executing and Sentencing
Adolescents*," 32 HOFSTRA L. REV. 463, 515 (2003) (citations omitted) ("[n]eurobiological evidence
suggests **that the human brain does not achieve physiological maturity until the early twenties** and that
adolescents simply do not have the same physiologic capability as adults to make mature decisions or to
control impulsive behavior"), *citing* Elizabeth S. Scott & Laurence Steinberg, "*Blaming Youth*," 81 TEX. L.
REV. 799, 816 (2003); "*Brain Immaturity Could Explain Teen Crash Rate*," THE WASHINGTON POST, p.
A-1 (February 1, 2005) (explaining that "an international effort led by [the] NIH's Institute of Mental Health
and UCLA's Laboratory of Neuro-Imaging" has demonstrated that "the point of intellectual maturity, the
'age of reason'" does not occur until age 25; and quoting Jay Giedd, pediatric psychiatrist at the National
Institute of Health as saying that "'[t]eenagers' brains are not broken; they're just still under construction'");
Gur, Ruben C., "*Brain Maturation and the Execution of Juveniles: Some reflections on science and the law*,"
THE PENNSYLVANIA GAZETTE (January/February 2005) at 14 ("some brain regions do not reach
maturity in humans until adulthood . . [as has] . . . been confirmed by more recent neuroimaging studies").

[40] *See* Note 19, *supra*

JA6514

adverse experiences with gang members,[41] Henry was all the more vulnerable to feeling pressured. Indeed, his supervisor at a job at which he worked in 2017 described Henry as having a "good heart" and as someone with whom he would trust his own children and further posited that, based on the Henry Zelaya Martinez he knew, Henry must have been forced or threatened to participate in the charged offenses.[42]

### <u>Conclusion: Henry Zelaya Martinez Is Better Than The Worst Thing He Ever Has Done</u>

In his slightly more than two-and-a-half short decades on this planet, Henry has demonstrated qualities that reveal him to be more than his worst moments. By no means was he destined to become either a member of MS-13 or an inmate in a correctional institution. Indeed, quite to the contrary, from an early age, and to this day, Henry's positive qualities did, and continue to, manifest themselves.

We are all better than the worst thing we ever have done,[43] and Henry Zelaya Martinez is no exception to that truism. He is not defined by his illegal actions, nor by his association with MS-13. Rather, those who have seen and interacted with him over the years and on a daily basis can attest to his many positive and redeeming qualities. In the words of his supervisor in Michigan, Jeff Marsh, Henry was "definitely a hard worker with a good work ethic."[44]

Moreover, Henry himself has evidenced considerable introspection stating that if he could turn back time and change things he would "do something productive, have a career, and continue

---

[41] *See* Note 18, *supra.*

[42] August 27, 2019, interview of Jeff Marsh by Henry J. O'Donoghue.

[43] *See* Note 1, *supra.*

[44] Letter from Jeff Marsh, Owner of JM Consulting (March 4, 2019) (appended hereto as Exhibit A)

23

[his] studies." He acknowledged that he was an outstanding soccer player who had been in a soccer championship, "had the opportunity [to be a soccer player] and lost it."



*Classroom in Henry Zelaya Martinez's School in Moncagua, El Salvador*

Henry is also very interested in science and fascinated by the mechanisms that make things work. He has demonstrated this since he has been incarcerated. Since his incarceration he also has made efforts to learn English. In short, he has a curiosity and thirst for knowledge that bespeak his multi-dimensional nature.

The foregoing summary of Henry's short life and the forces at play reveal several mitigating factors that demonstrate the profound adversities he has endured. Those factors include Henry's limited education, the separation from his own parents that he experienced, the impoverished and

JA6516

financially difficult circumstances in which he was raised, and the impoverished neighborhood where he grew up and where he was exposed to violence.

In addition, the indications regarding Henry's neurological impairments that should have been identified and treated when he was younger, and the indications that he suffered an insult to his central nervous system resulting in cognitive and neurological deficits made it more likely that he would act impulsively without insight or judgment.

Moreover, Henry's illegal behavior all occurred while he was involved with MS-13, a gang that provided him with a sense of belonging and acceptance for which he yearned so strongly after both his parents had left El Salvador for the United States. All indications are that Henry was an otherwise law-abiding, and indeed, very rule-adherent youngster, thereby suggesting that his illegal behavior was born of a combination of wanting to be accepted, and a fear of what might befall him had he failed to participate in the offenses at issue in this case.

Beyond the factors mitigating any criminal behavior, are Henry's positive traits that speak powerfully to dimensions beyond his involvement in the offenses of which he was convicted. Those positive qualities include that he helped support family members, demonstrated an excellent work ethic, participated in acts of kindness, generosity and selflessness, and expressed remorse for his involvement in the charged offenses when he was interviewed by law enforcement agents. In short, as is true of us all, Henry is not defined by his worst moments and is a multi-dimensional individual with many redeeming qualities.

## REQUEST FOR MEDICAL ATTENTION

Mr. Henry Zelaya Martinez has a serious issue with his corneas that requires evaluation by an ophthalmologist. Since this condition may further advance, it is requested that it be evaluated as soon as possible at a Federal Bureau of Prisons (FBP) medical facility with facilities able to evaluate his eye condition and treatment such as FBP FMC Butner.

.

25

JA6517

## SUGGESTED LOCATION OF INCARCERATION

After his medical condition is evaluated and treated, if possible, Mr. Henry Zelaya Martinez asks to be

incarcerated as close as possible to Alexandria, Virginia where his family is located.

Dated: September 21, 2022                              Respectfully submitted,

*s/ Charles Russell Twist*_____

Charles Russell Twist (VSB: 35483)
Counsel for Henry Zelaya Martinez
Charles Russell Twist, PLC
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Phone: (202) 321-3100
Email: charlesrussell.twist@verizon.net


*s/ David Joseph Kiyonaga*

David Joseph Kiyonaga (VSB: 15026)
Counsel for Henry Zelaya Martinez
510 King Street, Suite 400
Alexandria, Virginia 22314
(703) 549-7576
Email: david@kiyolaw.com


*s/ Santha Sonenberg*

Santha Sonenberg (D.C. Bar No. 376-188)
Mitigation specialist
c/o Charles Russell Twist, PLC
(202) 494-7083
Email: santhasonenberg@yahoo.com

JA6518

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 21st day of September 2022, I electronically filed the foregoing Memorandum in Aid of Sentencing with the Clerk of Court using the CM/ECF system which will send a notification of such filing to:

Rebeca H. Bellows, Esq. (becky.bellows@usdoj.gov)
Alexander Blanchard, Esq. (alexander.blanchard @usdoj.gov)
Cristina C. Stam, Esq. (cristina.stam@usdoj.gov

U.S. Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3954

*s/ Charles Russell Twist*_____
Charles Russell Twist (VSB: 35483)
Charles Russell Twist, PLC
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Phone: (202) 321-3100
Email: charlesrussell.twist@verizon.net

JA6519

## JM CONSULTING LLC.    *Specializing in exterior remodels*
### 4406 Doncaster Ave. Holt, MI. 48842
### Owner: Jeff Marsh PH# (517)-862-8662

To whom it may concern,                                        03-04-19

      This letter is regarding Henery Da Jesus Zelaya Martinez. My name is Jeffrey Marsh and I'm the owner of JM Consulting.  I do exterior sales and project management for an exterior renovation company. I have known Henry for approximately three years. I do believe it was the end of the 2016 season that I met him. He occasionally worked as an extra hand for a couple of the installation crews that I deal with on a daily basis. I personally am a sales representative and manage exterior renovation projects from start to finish. Henry always had a smile on his face and seemed up beat. He was definitely a hard worker with a good work ethic. I had several clients complement his Constitution. There was a language barrier between the two of us, but anytime I came to the job site and I needed a hand, he was always willing to help. Part of my responsibilities was documenting and taking pictures of any kind of unforeseen damage/cost that might reveal itself on projects. I was recently made aware of Henry's current situation, when I inquired about his whereabouts. When finding out I wanted to help him seeing how he was always there to give me a hand. I went through my Google photos where my pictures are saved and back up to. When taking these pictures there is documentation of date, time and location. In these pictures you will see

*United States v. Henry Zelaya Martinez*
Docket No. 18-CR-00123-006 (RDA)
EXHIBIT A

JA6520

Henry de Jesus Zelaya Martinez working. I just thought that information might be pertinent to his current situation. Any questions feel free to call. Thanks for hearing me out.

Thank you,  Jeff Marsh

JA6521

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-123-RDA-6 |
| | ) | |
| HENRY ZELAYA MARTINEZ, | ) | The Honorable Rossie D. Alston, Jr. |
| | ) | |
| Defendant. | ) | Sentencing: September 28, 2022 |
| | ) | |

**POSITION OF THE UNITED STATES**
**WITH RESPECT TO SENTENCING**

The defendant, Henry Zelaya Martinez, comes before the Court for sentencing after having been convicted at trial on eight counts[1] in connection with the brutal murders of two teenage boys—Edvin Eduardo Escobar Mendez and Sergio Anthony Arita Triminio—at the hands of MS-13, the violent transnational gang of which the defendant was a member. The government has reviewed the Presentence Investigation Report (the "PSR"), which correctly calculates the total offense level to be 43 and the defendant's criminal history category to be I, and concurs with the findings of the Probation Office, including that the defendant must be sentenced to life imprisonment by statute for committing murder in aid of racketeering activity and kidnapping resulting in death. The United States respectfully asks that the Court impose sentences of 10 years for Counts 1 and 2, to run consecutively to one another, and life imprisonment for Counts 3 through 8, to run concurrently with one another and with the sentences imposed for Counts 1 and 2. Such sentences not only take into account the Sentencing Guidelines, the 18 U.S.C. § 3553(a) factors,

---

[1] A jury convicted the defendant of two counts of Conspiracy to Commit Kidnapping and Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. § 1959(a)(5) (Counts 1 and 2); two counts of Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c) (Counts 3 and 4); two counts of Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; and two counts of Kidnapping Resulting in Death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Counts 7 and 8).

JA6522

and the relevant statutory provisions, they will also bring long-awaited justice on behalf of Edvin, Sergio, and their families.

## I.  FACTUAL BACKGROUND

Having presided over a lengthy trial earlier this year, the Court is well aware of the facts of this case.  The government provides the following brief summary.

### A.  The Kidnapping and Murder of Edvin Eduardo Escobar Mendez

Edvin Eduardo Escobar Mendez ("Edvin") immigrated to the United States from Guatemala, where he was born.  In the summer of 2016, when Edvin was 17 years old, he was introduced by his friend, Sergio Anthony Arita Triminio ("Sergio"), who was then 13 years old, to members and associates of the Park View Locos Salvatrucha ("PVLS") clique of MS-13.  Sergio was a prospective member of the clique who wanted Edvin to join the gang, too.

At the time, the defendant, who was 22 years old and went by the nickname "Kakarra," was an associate of MS-13's PVLS clique who held the position of *chequeo*, a term used to describe a prospective member of MS-13 who associates with the gang's members, known as homeboys, and is required to do whatever the homeboys request in order eventually to be promoted to a homeboy in the gang.  The defendant associated with other members and associates of the PVLS clique, including his brother, Elmer Zelaya Martinez ("Elmer Zelaya"), Ronald Herrera Contreras ("Herrera"), Josue Vigil Mejia ("Vigil"), Erick Palacios Ruiz ("Palacios"), Francisco Avila Avalos ("Avila"), Anderson Villatoro Rivera ("Villatoro"), Yonathan Melgar Martinez ("Melgar"), Pablo Velasco Barrera ("Velasco"), Duglas Ramirez Ferrera ("Ramirez"), Edwin Orellana Caballero ("Orellana"), Oscar Contreras Aguilar ("Contreras"), Edenilson Misael Alfaro ("Alfaro"), Fredys Baires Abarca ("Baires"), O.S.R., and Moris Castro Coreas ("Castro").

In early August 2016, Sergio learned that Edvin had posted on his Facebook page a photograph depicting a man wearing a mask with the numbers "666" superimposed around his

2

head and the words "Black Metal" typed below.  The photograph was then circulated among PVLS members who concluded—based on that photograph alone—that Edvin was actually a member of the rival 18th Street gang.[2]  Because, under MS-13's rules, all rival gang members (who are referred to as *chavalas*) must be attacked and killed, PVLS leadership in Virginia arranged to have Edvin lured to a park where he could be murdered.

On August 28, 2016, Edvin was advised that a gang meeting would be taking place that night and was directed to take a bus to Alexandria, Virginia, that evening.  Edvin did so and was met by Vigil, Avila, and Palacios, all of whom rode a bus to Alexandria.  Once they arrived in Alexandria, Edvin, Vigil, Avila, and Palacios walked to the vicinity of Holmes Run Stream Valley Park ("Holmes Run Park") in Fairfax County, Virginia, and joined several members and associates of MS-13 who were already there, including the defendant.

The group then walked to Homes Run Park.  Thereafter, in a wooded area in the park, the defendant and others attacked Edvin.  The defendant and the rest of the group stabbed Edvin with knives and also struck him with a machete and a pickaxe until he was dead.  Some of those who participated in the murder also buried Edvin's body in the park that night.  Edvin's remains, after they were exhumed approximately six months later, were autopsied.  During her examination, the medical examiner counted 111 stab or chop wounds visible in what remained of Edvin's soft tissue.  Edvin left behind his parents and three siblings, all of whom are devastated by Edvin's murder.

For participating in Edvin's murder, the defendant was promoted from *chequeo* to *pase a homeboy*, which is the title given to a gang member who has earned the status of homeboy but who has yet to be "jumped" into the gang.  In mid-September 2016, the defendant, along with

---

[2] To date, law enforcement has not uncovered any evidence to suggest that Edvin was a member or associate of a rival gang.

Elmer Zelaya and Vigil, traveled to New York, where all three men were "jumped in" as homeboys.  The defendant also changed his gang moniker to "Certero."

### B.  The Kidnapping and Murder of Sergio Anthony Arita Triminio

Edvin's friend, Sergio, was born in Honduras.  On the night that Edvin was murdered, Sergio, who had turned 14 approximately one week earlier, was in juvenile detention.  Upon his release, and after learning of Edvin's disappearance, Sergio asked Elmer Zelaya whether Edvin had been given "court" for "the photo."  Elmer Zelaya, Vigil, and the defendant already suspected that Sergio was cooperating with police based on information relayed by Herrera and a member of another clique.  Based on Sergio's inquiry about Edvin and the fact that Sergio was already suspected of cooperating with law enforcement, the defendant and others within PVLS's leadership concluded (erroneously) that Sergio was a snitch and should be killed as a result.

On the evening of September 26, 2016, Elmer Zelaya asked Sergio to come to a gang meeting that he said would be held later that night.  Sergio walked from his home to the parking lot of a Target store in Falls Church, Virginia, where he met up with several members and associates of MS-13, including Elmer Zelaya, Herrera, Palacios, Velasco, Avila, Villatoro, and Castro, all of whom had arrived in a large SUV.  After picking up Sergio, the group drove to Holmes Run Park, where they met up with the defendant, Ramirez, Orellana, Melgar, Baires, and O.S.R.

There, in the same wooded area of the park where Edvin had been slain, Herrera grabbed Sergio by the neck while others stabbed him to death with knives, machetes, and a pickaxe.  The participants in the assault also recorded the murder on a cell phone.  At trial, one of the government's witnesses testified that he watched the murder video later that night and described how it showed the defendant cutting Sergio's throat.  After Sergio was dead, the killers dug a hole and buried Sergio's body.

4

JA6525

Sergio's remains were also later exhumed and autopsied.  The results of that examination revealed that Sergio sustained myriad sharp-force injuries over virtually every part of his body. So forceful were the blows he suffered that his mandible was bisected and both of his femurs and one of his fibulas were fractured.  Sergio left behind a bereft mother, with whom he lived and who was pregnant at the time of his death, and a younger sister.

### C.  The Defendant's Arrest

Following the return of a Superseding Indictment on May 22, 2018, a warrant issued for the defendant's arrest.  The defendant, however, remained a fugitive for six months until, in November 2018, he was finally arrested at his mother's house in Alexandria.

## II.   OVERVIEW OF APPLICABLE LAW

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.*  Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a).

Although the Guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citation omitted).  Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors

5

because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the Guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

### III.   APPLICATION OF THE § 3553(a) FACTORS

The defendant took the lives of two young boys, luring them and then butchering them to death. For this reason alone, the defendant must be severely punished. But what makes his crimes even more perverse is that he did so to increase his position in MS-13 and to further the gang's repugnant ethos of violence. So despicable is MS-13 that its members, including the defendant, carried out the murders of Edvin and Sergio by gathering a large group of mostly older, stronger[3]

---

[3] The Court may recall that some of the physical evidence that the government presented at trial included the shoes that Mendez had on and the boxer briefs that Sergio wore on the nights they were each killed, highlighting just how small the victims were.

gang members and associates to surround the defenseless, initially unsuspecting victims and proceed to brutally stab and hack them to death.  Evidently, neither their anguished screams nor their looks of horror as the knowledge of their imminent demise dawned upon them dissuaded the defendant from carrying on.  These monstrous crimes, particularly in light of the manner in which they were committed, unquestionably warrant the highest penalties available under the law, including a sentence of life in prison.

Moreover, the defendant is unquestionably a danger to society. He is a longstanding and committed leader of a violent transnational gang.  Indeed, following his participation in Edvin's murder, the defendant became a jumped-in homeboy.  As the evidence presented at trial showed, after Sergio's murder, the defendant even achieved the rank of Second Word for the Virginia Sector of PVLS.  The defendant's association with MS-13 and his participation in Edvin's and Sergio's senseless murders demonstrate his utter contempt for this nation's laws and his total disregard for the sanctity of human life.  A sentence of life imprisonment will serve the necessary purpose of protecting the public from him.

In addition, such a sentence will send a message to other members and associates of MS-13 that there will be severe repercussions for committing violent crimes in furtherance of their gang's illicit activities or to advance within the gang's ranks.  Such gang members, so many of whom are relatively young, must know that a stiff sanction—including, where necessary, incarceration for the rest of their lives—awaits them.  Likewise, they must understand that neither MS-13 nor any other gang will be permitted to operate with impunity in this country.

Last, a life sentence will achieve some measure of justice for the victims and their loved ones, who have suffered unimaginable, never-ending pain at the hands of the defendant and his fellow gangsters.

## IV.   RECOMMENDED SENTENCES

Although a sentence of life imprisonment mandated by statute for four of the eight counts of conviction will ultimately determine the defendant's fate, the Court must impose a sentence for each count.  In light of the considerations discussed above, the government respectfully requests that the Court impose such sentences as follows:

| Count Number | Description | Statutory Provisions | Recommended Sentence |
|---|---|---|---|
| 1 | Conspiracy to Commit Kidnapping and Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 2 | Conspiracy to Commit Kidnapping and Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 3 | Conspiracy to Kidnap Edvin Eduardo Escobar Mendez | Any term of years or Life | Life |
| 4 | Conspiracy to Kidnap Sergio Anthony Arita Triminio | Any term of years or Life | Life |
| 5 | Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Life | Life |
| 6 | Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Life | Life |
| 7 | Kidnapping of Edvin Eduardo Escobar Mendez Resulting in Death | Life | Life |
| 8 | Kidnapping of Sergio Anthony Arita Triminio Resulting in Death | Life | Life |

## V.   CONCLUSION

The defendant's actions senselessly took the lives of two young boys and tore open the lives of their family members, who must forever bear not just the agony of loss but the knowledge that, in dying, Edvin and Sergio endured unfathomable pain and fear.  Sentencing the defendant to

JA6529

life imprisonment would certainly account for the nature of his crimes, protect the public, and serve as a deterrent to other gang members—but perhaps most importantly, it would bring justice on behalf of Edvin and Sergio and their grieving families.   Accordingly, the government respectfully asks that the Court impose sentences of 10 years for Counts 1 and 2, to run consecutively to one another, and life imprisonment for Counts 3 through 8, to run concurrently with one another and with the sentences imposed for Counts 1 and 2.   Additionally, the government recommends that the Court impose a three-year term of supervised release for Counts 1 and 2 and a five-year term of supervised release for each of the remaining counts, all to run concurrently with one another, which the defendant shall serve should he ever be released from the custody of the Bureau or Prisons and return to the United States.[4]

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      _____/s/_____
Alexander E. Blanchard
Cristina C. Stam
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
alexander.blanchard@usdoj.gov
cristina.stam@usdoj.gov

---

[4] Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, application note 5.   However, a court should consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case." *Id.*   Given that the defendant, during his time in this country, murdered two juveniles, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

JA6530

**<u>CERTIFICATE OF SERVICE</u>**

     I certify that on September 21, 2022, I electronically filed a copy of the foregoing with

the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to

all counsel of record.

 

                             _____/s/_____

                             Cristina C. Stam
                             Assistant United States Attorney

JA6531

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   --------------------------------x
                                     :
 4   UNITED STATES OF AMERICA        : Criminal Action No.:
                                     : 1:18-cr-123
 5                                   :
           v.                        :
 6                                   : September 28, 2022
     HENRY ZELAYA MARTINEZ,          :
 7                                   :
                     Defendant.      :
 8   --------------------------------x

 9                 TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
10               UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12    FOR THE GOVERNMENT:     ALEXANDER BLANCHARD, AUSA
                              United States Attorney's Office
13                            2100 Jamieson Avenue
                              Alexandria, VA 22314
14
      FOR THE DEFENDANT:      CHARLES TWIST, ESQ.
15                            Charles Russell Twist PLC
                              2111 Wilson Boulevard
16                            Suite 700
                              Arlington, VA 22201
17
                              DAVID KIYONAGA, ESQ.
18                            510 King St
                              Suite 400
19                            Alexandria, VA 22314

20   OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                      United States District Court
21                                    401 Courthouse Square
                                      Tenth Floor
22                                    Alexandria, VA 22314

23

24

25
```

JA6532

┌─────────────────────United States v. Henry Martinez─────────────────────┐

2

1    (Proceedings commenced at 10:02 a.m.)

2            THE COURTROOM CLERK:  2018-123.  United States of

3    America versus Henry Zelaya Martinez.

4            MR. BLANCHARD:  Good morning, Your Honor.  Alex

5    Blanchard for the United States.

6            THE COURT:  Good morning, sir.

7            MR. TWIST:  Your Honor, good morning.  Russell Twist

8    and David Kiyonaga for the -- Henry Zelaya Martinez.

9            THE COURT:  And Mr. Zelaya Martinez is also present.

10           Ask the clerk to swear the interpreter.

11           (Interpreter sworn.)

12           THE INTERPRETER:  I do.

13           Teresa Roman, federally certified court interpreter.

14   Good morning.

15           THE COURT:  Good morning, ma'am.

16           Mr. Zelaya Martinez, if you are having any

17   difficulty understanding the interpreter provided to you by

18   the Court, simply raise your hand and nudge your lawyers and

19   we will do what we can to make sure that you're understanding

20   the proceeding.

21           Are you having any difficulty understanding the

22   proceeding up until this point, sir?

23           THE DEFENDANT:  No.

24           THE COURT:  Very good.

25           This matter comes on today for sentencing.  Are

EASTERN DISTRICT OF VIRGINIA

JA6533

─────United States v. Henry Martinez─────
3

1   there any corrections, deletions, or modifications to the

2   presentence report?

3           MR. BLANCHARD:  Not from the government, Your Honor.

4           MR. TWIST:  Not from the defense, Your Honor.

5           THE COURT:  Thank you.

6           Is there any evidence offered by the government?

7           MR. BLANCHARD:  No, Your Honor.

8           THE COURT:  Mr. Twist.

9           MR. TWIST:  No, Your Honor.

10          THE COURT:  I'll hear argument from the Government.

11  I'll direct that the presentence report be made a part of the

12  record in this matter.

13          MR. BLANCHARD:  Thank you, Your Honor.

14          Your Honor, this is the tenth time that the

15  government has come before the Court for a sentencing in

16  connection with this case.  Each of the preceding nine times

17  has been difficult in its own way, but, of course, today is

18  different.  This is the first time, in connection with the

19  murders of Edvin and Sergio, that the defendant is appearing

20  for sentencing after refusing to accept responsibility for his

21  heinous crimes.

22          Given the offenses of which the defendant, Henry

23  Zelaya Martinez, has been convicted, this is the rare

24  sentencing where the Court has little discretion.  Congress

25  has decided that the defendant will spend the rest of his life

JA6534

─────United States v. Henry Martinez─────

4

1    behind bars.

2         Because the defendant's sentence is preordained, I

3    could, at this point, just rest on the papers and sit down.

4    But the degree of tragedy and depth of loss underlying this

5    case demands that something more be said.

6         The defendant was a 22-year-old man when he helped

7    slaughter two teenage boys.  And he was no mere lookout who

8    struck the victims' motionless bodies, instead he stabbed at

9    the outset of the attacks when the victims were alive and

10   surely filled with unfathomable degree of dread and pain.

11        He snuffed out those kids' lives.  Indeed, as Your

12   Honor will recall, one of the government's witnesses at trial

13   testified about watching the video of Sergio's murder in its

14   entirety just a few hours after the murder occurred and

15   witnessed the defendant slit Sergio's throat.

16        The defendant and his fellow gangsters killed these

17   two teenagers for reasons not just venal and selfish, but also

18   illusory.  Edvin wasn't a chavala and Sergio wasn't a snitch.

19   Nevertheless, mere proximity and its twisted code cost those

20   two boys their lives.

21        In the wake of the carnage that the defendant helped

22   to sow lie three wrecked families.  The family of Edvin, who

23   was affectionately called Chino, still struggles to cope with

24   the emptiness, sadness, and hatred that Edvin's murder

25   spawned.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6535

─────United States v. Henry Martinez─────

5

1      Sergio's mother, Carla, who was pregnant at the time

2  Sergio disappeared and nearly lost the child she was carrying

3  because of her anguish, has to relive the trauma of her loss

4  every time she looks at her youngest son, the little brother

5  that her first born son, Sergio, was hoping to have.

6  And the defendant's family has been scathe too.  The mother of

7  the defendant and his brother, Elmer Zelaya Martinez, will

8  have to bear the pain of life-long separation from her sons,

9  and the shame that comes of knowing that two of her children

10  are murderers.

11      This is to say nothing of what the defendant

12  deprived Edvin and Sergio of.  Neither had the chance to

13  partake in so many of life's simple pleasures and profound

14  joys.  Neither got to attend the prom, neither got to

15  experience the unique dignity that comes with pursuing a

16  career.  Neither fell in love and got married, and neither

17  brought a baby home from the hospital and placed it in his

18  mother's outstretched arms.

19      In the end, the imposition of a judgment in this

20  case doesn't require the Court to exercise its judgment.  The

21  applicable statutes require the imposition of a life sentence.

22  But here, Your Honor, it's not just the law that compels the

23  outcome, it's also something else, justice.  Justice for

24  Edvin, justice for Sergio, and justice for their families.

25  Thank you.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6536

─────United States v. Henry Martinez─────

6

1          THE COURT:  Thank you, sir.

2          Mr. Twist.

3          MR. TWIST:  Your Honor, this is a very sad day.

4  It's certainly sad for the victims.  It's absolutely tragic

5  and sad for the families and nothing I can say would ever try

6  to detract from that.  What I can say is I think it's helpful

7  for the Court to understand Henry Zelaya Martinez, understand

8  the young man that comes before you for justice.  That helps

9  you understand the path that he had to take in addition to the

10  path that he took.  The path he had to take was where he was

11  reared, his family, his abandonment.  So we've set that

12  forward and I'm sure Your Honor has read it.

13          As for the facts, you were an attentive judge for

14  every single day and every single hour and every single

15  minute.  So you know the facts.  You can tailor those with the

16  government's comments, because your recollection is good at

17  best.

18          What I would say is that it's not often understood

19  that courts at sentencing can also help people.  It isn't

20  always just about punishment.  And in this case, the Court has

21  the opportunity to help Henry and to show the kindness, the

22  loving kindness that the community has for all of the people

23  in it.  He has serious problems with his eyesight, he's had

24  them since he was injured as a very young child.

25  We would ask that the Court consider asking the Federal Bureau

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6537

─United States v. Henry Martinez─

7

1   of Prisons to first send Henry Zelaya Martinez to the federal

2   medical facility at Butner, because it's connected with

3   Duke -- the Duke University Medical Center.  And I think that

4   what they will need to determine is whether any kind of

5   surgery can help Henry.  That's something that we can -- a way

6   that we can help him and a way that we can show that we care

7   about him, even though he's reached this tragic point in his

8   life.  When he is out of the federal medical center at Butner,

9   if you suggest that and it's done, then we would ask that he

10  be detained at the Federal Bureau of Prisons at a

11  classification facility nearest to Alexandria, Virginia where

12  his family is.  We all want justice, Your Honor, so thank you

13  for the opportunity to be here and to represent our client.

14          THE COURT:  Thank you, sir.

15          You may stand, Mr. Zelaya Martinez.  First, sir, I

16  need to ask you, are you entirely satisfied with the services

17  of your lawyers?

18          THE DEFENDANT:  Yes.

19          THE COURT:  All right, sir.  Sir, is there anything

20  you want to say before the Court imposes sentence?

21          THE DEFENDANT:  No.

22          THE COURT:  Well, I was hoping that you would say

23  something, sir.  And I appreciate the fact that you entered

24  pleas of not guilty and so it might be disadvantageous to

25  actually say something in the context of your sentencing

JA6538

─────United States v. Henry Martinez─────

8

1   hearing.  But I was hoping, as I was sitting here this

2   morning, that I would hear something from you regarding some

3   degree of empathy.  That might be a tough term for you to

4   understand, but an understanding and appreciation as to how

5   this terrible situation has affected other people and how you

6   have the death of a 14-year-old boy and a 16 or 17-year-old

7   boy that a jury has found you responsible for taking the life

8   of.

9           So without admitting anything, I was hoping that you

10   would at least say something about how tragic it is that these

11   two young boys died.  And as I recall in your interview with

12   the detectives in this matter, unlike many of the other people

13   who were found to be involved in this, you actually expressed

14   concern for those young people when you spoke with law

15   enforcement.  So I was hoping that I would hear something like

16   that today from you, because it is my responsibility to impose

17   a sentence which reflects the ability to understand the whole

18   person.

19           Your lawyers, Mr. Twist and Mr. Kiyonaga, have done

20   a very good job for you and specifically asked for grace in

21   allowing your medical issue to be resolved, and setting it up

22   where you can be close to your family as you serve your prison

23   sentence.  So again, I was hoping that I would hear something

24   from you that would suggest that you're deserving of the grace

25   that they're asking for.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6539

⎯United States v. Henry Martinez⎯

9

```
 1          So I will ask you again, sir, is there anything you
 2   want to say?
 3          MR. KIYONAGA:  Court's indulgence.
 4          THE COURT:  Yes, sir.
 5          (Counsel and Defendant confers.)
 6          THE COURT:  Yes, sir.
 7          MR. KIYONAGA:  Your Honor, first of all, I've
 8   advised him not to speak because he has an appeal.  I think
 9   that the detectives -- I mean, the agents' statement while
10   under cross does show that he did say some things in his
11   favor, but he will say a few things about how he feels about
12   the families' loss.
13          THE COURT:  And if you, at any point, in his
14   statement you believe he may cross the line which would
15   compromise his appellate ability, then feel free to stop him.
16          THE DEFENDANT: (Through interpreter) I feel a lot of
17   hurt for those -- the families.  I am very sorry, and I
18   apologize to the families.
19          THE COURT:  I think that's sufficient.  Anything
20   else you want to say, sir?
21          THE DEFENDANT:  No, that's fine.
22          THE COURT:  All right, sir.  Well, Mr. Zelaya
23   Martinez, as your lawyer has pointed out and as the government
24   has pointed out, this is a very, very sad situation.  And the
25   brutality and the criminality that came about because of the
```

JA6540

─────United States v. Henry Martinez─────

10

1   jury's finding that you were responsible, that's what I'm

2   relying on at this point, is unsettling to this Court.

3          The way that these boys died was horrific.  Thinking

4   that they were with friends that cared about them and loved

5   them.  And in one instance being brutalized and knowing that

6   they were dying.  And again, the choices that they made might

7   have put them in this situation in the first place, but no one

8   deserved to die the way that those boys died.  It was

9   horrible, it was brutal, and it's unacceptable in society.

10  And while I had the opportunity, as your lawyer indicated, to

11  evaluate misgivings of everyone that was involved in these

12  brutal acts, I did take a moment to think about your

13  situation.  There's some way to believe that the effect that

14  your brother had on you and the limitations that you have, may

15  well have impacted or affected the situation.

16         I'm also aware that things could have turned on you

17  if you did not follow through on what everybody else was

18  doing.  I understand that, but life is about decisions that we

19  make.

20         I read the letters and the information that your

21  lawyers provided to me indicating that you are an excellent

22  soccer player or football player, I guess it would be referred

23  to in your country, and that you had skills and ability.  And

24  that unfortunately during your young life you had

25  circumstances which affected your ability to maybe make better

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6541

─────United States v. Henry Martinez─────

11

1    decisions.  But the decisions that you made on that night and

2    the brutality that you engaged in, and the fact that I was

3    able to observe on the tape that you took a knife and actually

4    slit a person's throat, I just can't fathom why a person would

5    feel that type of brutality should ever be effected on some

6    other human being, and it's sad.

7          I appreciate what you're saying, sir, that you --

8    sorry for the families and for what happened.  And I

9    understand what your lawyer is saying that you want to

10   exercise your right to appeal the decision.  I'm not going to

11   get in the way of that.  But again, out of all of the people

12   that were involved, I thought that you may have been the one

13   who was most compromised out of the situation.  And I thought

14   the strategy that your lawyers used in providing a

15   representation in the sense suggesting that you were an

16   outlier was probably the best strategy that they could have

17   used, because the evidence was overwhelming with regard to

18   your involvement in the matter.

19         So, sir, I don't take any pleasure in sending a

20   young man to prison for the rest of his life.  Don't take any

21   pleasure in that at all, but society directs that I must do

22   that because of what you did.  And I heard the same evidence

23   that the jury had.  And the evidence was overwhelming, sir.

24         Under the sentencing guidelines, the base offense

25   level is 43.  Pursuant to Chapter 5, Part A, comment note 2 of

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6542

─────United States v. Henry Martinez─────

12

1   the guidelines, in those rare instances where the total

2   offense level is calculated in excess of 43, the offense level

3   will be treated as a level 43.  Therefore, the defendant's

4   total offense level is 43.  The criminal history score is zero

5   and the criminal history category is I.

6           Accordingly, the applicable guideline range is life

7   imprisonment.  The supervised release range is three to five

8   years under the guidelines.  The fine range is $50,000 to

9   $250,000.  Pursuant to 18 U.S.C. Section 3553(a) the district

10  court should consider the following:  Number one, the nature

11  and circumstances of the offense and the history and

12  characteristics of the defendant.

13          Two, the need for the sentence imposed to among

14  other things reflect the seriousness of the offense and

15  adequately deter criminal conduct.

16          Three, the kinds of sentences available.

17          Four, the guidelines.

18          Five, policy statements issued by the sentencing

19  commission.

20          Six, the need to avoid unwarranted sentencing

21  disparities among defendants with similar records and found

22  guilty of similar conduct.

23          And seven, the need to provide restitution to the

24  victims of the offense.

25          Ultimately, under the *Booker* standard, the sentence

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6543

United States v. Henry Martinez

13

1   must be a standard of reasonableness.

2           Considering the Section 3553(a) factors, with

3   respect to the nature and circumstances of the offense and the

4   history and characteristics of the defendant, murder,

5   particularly in these circumstances, is a reprehensible crime.

6   The tragic and horrific details of the murder of Edvin Mendez

7   and Sergio Triminio attest to the severity of the defendant's

8   crime.

9           This defendant callously chose to join a large group

10  of gang members and associates who deceived the defenseless

11  victims and proceeded to brutally murder them.  The defendant

12  committed these heinous crimes all so that he could gain

13  advancement for himself within the gang and earn a promotion.

14  These gruesome offenses, particularly in light of the manner

15  in which the defendant and his coconspirators carried them

16  out, warrants a sentence of life imprisonment.

17          The Court next considers the need for the sentence

18  imposed to reflect the seriousness of the offense, to promote

19  respect for the law, and to provide just punishment for the

20  offense, to afford adequate deterrence of criminal conduct, to

21  protect the public from further crimes of the defendant, and

22  to provide the defendant with needed educational, vocational

23  training, medical care, or other correctional treatment in the

24  most effective manner.

25          Applying these factors to the case, the Court finds,

EASTERN DISTRICT OF VIRGINIA

JA6544

─────────────United States v. Henry Martinez─────────────

14

1  again, that a sentence of life imprisonment sufficiently

2  reflects the seriousness of the defendant's offenses and will

3  promote both specific and general deterrence.

4       The guideline range for such an offense is life

5  imprisonment.  A sentence of life imprisonment will not create

6  unwarranted sentencing disparities in this case.  It is also

7  consistent with the sentence imposed for other defendants who

8  have committed similar crimes.

9  Accordingly, on Counts 1 and 2, conspiracy to commit

10  kidnapping and murder, the court imposes a term of 120 months

11  on each count which shall run concurrently.  On Counts 3

12  through 8, the Court imposes a term of life imprisonment on

13  each count, which shall run concurrently.

14       The Court also imposes a period of supervised

15  release to provide an added measure of deterrence and

16  protection based on the facts and circumstances of a

17  particular case consistent with the guidelines in Section

18  5D1.1.  Should the defendant ever be released from

19  incarceration, he will serve a five-year term of supervised

20  release, representing three years as to Counts 1 and 2, and

21  five years as to Counts 3 through 8, all to run, again,

22  concurrently.

23       During his period of incarceration -- excuse me --

24  supervision, the defendant must comply with the standards and

25  conditions that have been adopted by this Court as well as the

JA6545

─────United States v. Henry Martinez─────

15

1  following special conditions.  The defendant is to be

2  surrendered to a duly authorized immigration official of the

3  Department of Homeland Security, United States Immigration and

4  Customs Enforcement for a deportation review in accordance

5  with established procedures provided by the Immigration and

6  Nationality Act.

7         As a further condition of supervised release, if

8  ordered deported, shall remain outside of the United States of

9  America.  If the defendant test positive for controlled

10 substances or shows signs of alcohol abuse, the defendant

11 shall participate in a program approved by the United States

12 Probation Office for substance abuse which program may include

13 residential treatment and testing to determine whether the

14 defendant has reverted to the use of narcotics or substances.

15 Recognizing the defendant is likely not capable of paying the

16 minimum fine prescribed by statute, the Court declines to

17 impose a fine.

18         The Court imposes a special assessment of $800.

19 $100 per felony count pursuant to 18 U.S.C. Section 3013.

20         Mr. Blanchard, has the victims of Mr. Triminio and

21 Mr. Mendez submitted any kind of restitution statements?

22         MR. BLANCHARD:  Your Honor, the government hasn't

23 endeavored yet to come up with a final figure in that regard,

24 but we do anticipate doing so in the coming weeks and will

25 endeavor to submit --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6546

─────United States v. Henry Martinez─────

16

1          THE COURT:  As I understand the statute, there's

2    only a viable or verifiable period of time that I can hold

3    that.  So how long do you need?

4          MR. BLANCHARD:  I believe 30 days, Your Honor.

5          THE COURT:  I think 30 days is the maximum that I

6    can withhold the execution of the sentence.  So it's up to you

7    and the victims to get something to the Court within those 30

8    days.

9          Mr. Twist, do you have any objection to that, sir?

10          MR. TWIST:  Your Honor, I do not.  When we're --

11    when the Court is concluded with this portion, I'd like to

12    talk with you about the appeal in this matter if you permit.

13          THE COURT:  Okay.  Let me finish the sentencing.

14          The defendant is advised that he may appeal any

15    portion of the sentence.  The Court's notice of right to

16    appeal form is inapplicable to this case in which the

17    defendant was convicted by a jury of his peers based upon the

18    information relayed to chambers.

19    Mr. Kiyonaga would, apparently, like to handle the appeal; is

20    that true, sir?

21          MR. KIYONAGA:  That's correct.

22          THE COURT:  I will go ahead and enter the

23    appropriate orders to allow you to pursue the appeal on behalf

24    of your client.  I believe that there's something that the

25    Fourth Circuit must also do.  So I'll rely on you to advise

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6547

─────────United States v. Henry Martinez─────────

17

1   your client of his right to appeal this matter and expect that

2   you will facilitate that through this Court's order and any

3   matters that need to be resolved through the Fourth Circuit.

4           MR. KIYONAGA:  Thank you, Your Honor.

5           THE COURT:  Mr. Zelaya Martinez, Mr. Kiyonaga, who

6   speaks Spanish, will be your lawyer for appeal.  He will

7   advise you as to the nature of what you should appeal or what

8   you can appeal.  He will also advise you as to any time

9   constraints that may relate to any appeal.  Obviously, it is

10  to your advantage to cooperate with Mr. Kiyonaga in the

11  preparation of that appeal, sir.

12          The Court will recommend that the defendant be

13  evaluated by an ophthalmologist in the Bureau of Prisons and

14  will direct and ask that the defendant be first sent to the

15  Butner Bureau of Corrections [sic] facility for this

16  evaluation and ultimately be placed in a facility in the

17  Washington, D.C. metropolitan area.

18          Mr. Zelaya Martinez, that was the grace that I was

19  talking about.  Your lawyers were asking for medical attention

20  for you, because I believe that there is something somewhere

21  deep down inside of you that might be salvageable for some

22  productive purpose.  I'm going to allow you that grace.  But,

23  sir, please do not accept that grace as an indication in any

24  way of the Court not condemning the actions that you were

25  found guilty of, sir.

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

EASTERN DISTRICT OF VIRGINIA

JA6548

──────United States v. Henry Martinez──────
                                                    18
1        Do you have any questions, sir?

2        (The defendant nods head in the negative.)

3        THE COURT:  I remand you to the custody of the

4   United States Marshals.

5        (Defendant excused.)

6        THE COURT:  Mr. Twist, Mr. Kiyonaga, on the record,

7   the Court wants to thank you for your zealous representation

8   of Mr. Zelaya Martinez.  Your professionalism throughout the

9   proceeding and, quite frankly, I compliment you on the

10  strategy that you used for the benefit of Mr. Zelaya Martinez.

11  I know these cases are tough.  I know these cases are time

12  consuming, but unless we had good lawyers like you all who are

13  willing to step forward and take on the tough cases, the

14  administration of justice would suffer.  So I thank you for

15  your participation.

16       MR. KIYONAGA:  Thank you, Your Honor.

17       THE COURT:  And the government, well presented.

18       MR. BLANCHARD:  Thank you, Your Honor.

19       THE COURT:  Off the record.

20       (Discussion off the record.)

21       MR. TWIST:  May I be heard?

22       THE COURT:  You may.

23       MR. TWIST:  Your Honor, well, first of all, you gave

24  the defendants and the lawyers a good trial.  You were

25  thoughtful about the lawyers.  And you took really -- made

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──
            EASTERN DISTRICT OF VIRGINIA

JA6549

─────United States v. Henry Martinez─────

19

1    decisions that helped us do our job, and you were very good in

2    managing the jury, not an easy task that people don't

3    understand.  And so, we thank you for that.

4           I have here the -- filled out notice of appeal for

5    David.  May I file it in court now so we get that done?

6           THE COURT:  I'm going to rely on the deputy clerk.

7    She will give you instructions as to the best way to

8    effectuate that.

9           MR. TWIST:  Fine.  And then, Your Honor, at this

10   point, I would ask to be excused from the case entirely.  I

11   don't want to have --

12          THE COURT:  Mr. Kiyonaga, you still remain

13   responsible for the appeal process.  Are you comfortable with

14   Mr. Twist being relieved of further responsibility?

15          MR. KIYONAGA:  That's fine.

16          THE COURT:  All right, sir.  You are relieved.

17          MR. TWIST:  Thank you.

18          THE COURT:  Thank you.

19          MR. BLANCHARD:  Court's indulgence.

20          THE COURT:  Yes, sir.

21          (Counsel confers.)

22          MR. TWIST:  May we have Mr. Henry Zelaya Martinez

23   back?  Mr. Blanchard has brought up a point, which I think the

24   Court will credit is wise.

25          THE COURT:  Okay.  Is he still back there, ma'am?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6550

─────United States v. Henry Martinez─────

20

1          THE MARSHAL:  Yes, sir.

2          MR. BLANCHARD:  Your Honor, it's just that I thought

3    it would behoove the parties and the Court to have Mr. Zelaya

4    Martinez indicate his agreement on the record with Mr. Twist's

5    excusal from the case and Mr. Kiyonaga's continuing with the

6    appeal, just given his current right to two lawyers.

7          THE COURT:  Yes.

8          MR. BLANCHARD:  Thank you.

9          THE COURT:  Come on back, sir.

10         (Defendant present.)

11         (Counsel and Defendant confers.)

12         THE COURT:  Mr. Zelaya Martinez, are you able to

13    understand, sir?

14         THE DEFENDANT:  Yes.

15         THE COURT:  As was noted during the disposition of

16    the case, you have a right to appeal the matter to the Fourth

17    Circuit and beyond if you choose to do so.  Mr. Twist, who has

18    been representing you in the trial in this matter, has asked

19    permission to withdraw from the case to allow Mr. Kiyonaga to

20    pursue your appeal.

21         Just so you understand, the reason why in this case

22    you had two lawyers was because of the nature of the case as

23    it started out.  Typically, defendants are entitled to one

24    lawyer, particularly in a case such as this, but because of

25    the circumstances, you were given the benefit of two lawyers.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

JA6551

┌─United States v. Henry Martinez─
21

1          Mr. Twist now wants to step aside and allow

2   Mr. Kiyonaga to pursue the appeal for you, and he has

3   suggested indirectly that he didn't believe that you had any

4   problem with that.  We just wanted to make sure on the record

5   and hear it from you that you're comfortable with Mr. Kiyonaga

6   alone handling your appeal.

7          Is that okay with you, sir?

8          THE DEFENDANT:  Yes, it is.

9          THE COURT:  Are you comfortable with Mr. Kiyonaga

10  handling the appeal on his own?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Very good, sir.  Thank you.

13         (Defendant excused.)

14         MR. BLANCHARD:  Thank you, Your Honor.

15         MR. KIYONAGA:  Thank you, Your Honor.

16         THE COURT:  All right.  You're excused.  Thank you.

17

18         **(Proceedings adjourned at 10:32 a.m.)**

19

20

21

22

23

24

25

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

JA6552

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Tonia Harris, an Official Court Reporter for

 4    the Eastern District of Virginia, do hereby certify that I

 5    reported by machine shorthand, in my official capacity, the

 6    proceedings had and testimony adduced upon the Sentencing

 7    hearing in the case of the UNITED STATES OF AMERICA versus

 8    HENRY ZELAYA MARTINEZ, Criminal Action No.: 1:18-cr-123, in

 9    said court on the 28th day of September, 2022.

10            I further certify that the foregoing 22 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15            In witness whereof, I have hereto subscribed my

16    name, this April 19, 2023.

17

18

19

20

21    _____

22    Tonia M. Harris, RPR
      Official Court Reporter

23

24

25

                                                              22
```

JA6553

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,      )
                               )
        v.                     )
                               )      Case No. 1:18-cr-00123 (RDA)
DUGLAS RAMIREZ FERRERA,         )
                    Defendant.  )

<u>NOTICE OF APPEAL</u>

Defendant Duglas Ramirez Ferrera appeals to the United States Court of Appeals

for the Fourth Circuit from the judgment and sentence imposed on October 12, 2022.

Respectfully submitted,

DUGLAS RAMIREZ FERRERA
By Counsel

/s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III, VSB No. 26477
1701 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006
202.462.1100
Email: pleasant.brodnax@gmail.com


/s/ Darwyn L. Easley
Darwyn L. Easley, VSB No. 48250
10521 Judicial Drive, Suite 205
Fairfax, Virginia 22030
703.865.6610
Email: dle@easleyfirm.com


/s/ Laura Kelsey Rhodes
Laura Kelsey Rhodes
U.S. District Court Bar No. 12703 (Maryland)
200-A Monroe Street, Suite 305
Rockville, Maryland 20850
301.424.0094
lkr@lkrhodeslaw.com

JA6554

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed by CM/ECF on the 13th of October 2022, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III

JA6555

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-123-RDA-4 |
| | ) | |
| RONALD HERRERA CONTRERAS, | ) | The Honorable Rossie D. Alston, Jr. |
| | ) | |
| Defendant. | ) | Sentencing: October 20, 2022 |
| | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The defendant, Ronald Herrera Contreras, comes before the Court for sentencing after
having been convicted at trial on eight counts[1] in connection with the brutal murders of two teenage
boys—Edvin Eduardo Escobar Mendez and Sergio Anthony Arita Triminio—at the hands of MS-
13, the violent transnational gang of which the defendant was a member.  The government has
reviewed the Presentence Investigation Report (the "PSR"), which correctly calculates the total
offense level to be 43 and the defendant's criminal history category to be I, and concurs with the
findings of the Probation Office, including that the defendant must be sentenced to life
imprisonment by statute for committing murder in aid of racketeering activity and kidnapping
resulting in death.  The United States respectfully asks that the Court impose sentences of 10 years
for Counts 1 and 2, and life imprisonment for Counts 3 through 8, all to run concurrently with one
another.  Such sentences not only take into account the Sentencing Guidelines, the 18 U.S.C. §

---

[1] A jury convicted the defendant of two counts of Conspiracy to Commit Kidnapping and
Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. § 1959(a)(5) (Counts 1 and 2);
two counts of Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c) (Counts 3 and 4); two
counts of Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2;
and two counts of Kidnapping Resulting in Death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2
(Counts 7 and 8).

JA6556

3553(a) factors, and the relevant statutory provisions, they will also bring long-awaited justice on behalf of Edvin, Sergio, and their families.

## I.   FACTUAL BACKGROUND

Having presided over a lengthy trial earlier this year, the Court is well aware of the facts of this case.  The government provides the following brief summary.

### A.  The Kidnapping and Murder of Edvin Eduardo Escobar Mendez

Edvin Eduardo Escobar Mendez ("Edvin") immigrated to the United States from Guatemala, where he was born.  In the summer of 2016, when Edvin was 17 years old, he was introduced by his friend, Sergio Anthony Arita Triminio ("Sergio"), who was then 13 years old, to members and associates of the Park View Locos Salvatrucha ("PVLS") clique of MS-13.  Sergio was a prospective member of the clique who wanted Edvin to join the gang, too.

At the time, the defendant, who was 18 years old and went by the nickname "Speedy," was an associate of MS-13's Western Locos Salvatrucha clique who held the position of *chequeo*, a term used to describe a prospective member of MS-13 who associates with the gang's members, known as homeboys, and is required to do whatever the homeboys request in order eventually to be promoted to a homeboy in the gang.  The defendant associated with other members and associates of the PVLS clique, including Elmer Zelaya Martinez ("Elmer Zelaya"), Henry Zelaya Martinez ("Henry Zelaya"), Josue Vigil Mejia ("Vigil"), Erick Palacios Ruiz ("Palacios"), Francisco Avila Avalos ("Avila"), Anderson Villatoro Rivera ("Villatoro), Yonathan Melgar Martinez ("Melgar"), Pablo Velasco Barrera ("Velasco"), Duglas Ramirez Ferrera ("Ramirez"), Edwin Orellana Caballero ("Orellana"), Oscar Contreras Aguilar ("Contreras"), Edenilson Misael Alfaro ("Alfaro"), Fredys Baires Abarca ("Baires"), O.S.R., and Moris Castro Coreas ("Castro").

In early August 2016, Sergio learned that Edvin had posted on his Facebook page a photograph depicting a man wearing a mask with the numbers "666" superimposed around his

2

head and the words "Black Metal" typed below.  The photograph was then circulated among PVLS members who concluded—based on that photograph alone—that Edvin was actually a member of the rival 18th Street gang.[2]  Because, under MS-13's rules, all rival gang members (who are referred to as *chavalas*) must be attacked and killed, PVLS leadership in Virginia arranged to have Edvin lured to a park where he could be murdered.

On August 28, 2016, Edvin was advised that a gang meeting would be taking place that night and was directed to take a bus to Alexandria, Virginia, that evening.  Edvin did so and was met by Vigil, Avila, and Palacios, all of whom rode a bus to Alexandria.  Once they arrived in Alexandria, Edvin, Vigil, Avila, and Palacios walked to the vicinity of Holmes Run Stream Valley Park ("Holmes Run Park") in Fairfax County, Virginia, and joined several members and associates of MS-13 who were already there, including the defendant.

The group then walked to Homes Run Park.  Thereafter, in a wooded area in the park, the defendant and others attacked Edvin.  The defendant and the rest of the group stabbed Edvin with knives and also struck him with a machete and a pickaxe until he was dead.  The defendant also took turns with others to record Edvin's murder on a cell phone so that the group could later prove to gang leadership that the murder had been carried out.  Some of those who participated in the murder also buried Edvin's body in the park that night.  Indeed, as one of the government's witnesses testified at trial, the defendant used an ax to break Edvin's legs and then contorted Edvin's body to make it fit into the small hole that had been dug.  Edvin's remains, after they were exhumed approximately six months later, were autopsied.  During her examination, the medical examiner counted 111 stab or chop wounds visible in what remained of Edvin's soft tissue.  Edvin left behind his parents and three siblings, all of whom are devastated by Edvin's murder.

---

[2] To date, law enforcement has not uncovered any evidence to suggest that Edvin was a member or associate of a rival gang.

Following Edvin's murder, the defendant sought a promotion within the gang.  Because he belonged to the Western Locos Salvatrucha clique, PVLS leadership deferred to the leaders of that clique to decide whether Herrera would remain a *chequeo* or be promoted to *pase a homeboy*.

**B.   The Kidnapping and Murder of Sergio Anthony Arita Triminio**

Edvin's friend, Sergio, was born in Honduras.  On the night that Edvin was murdered, Sergio, who had turned 14 approximately one week earlier, was in juvenile detention.  Upon his release, and after learning of Edvin's disappearance, Sergio asked Elmer Zelaya whether Edvin had been given "court" for "the photo."  Elmer Zelaya, Vigil, and the defendant already suspected that Sergio was cooperating with police based on information relayed by the defendant and a member of another clique.  Based on Sergio's inquiry about Edvin and the fact that Sergio was already suspected of cooperating with law enforcement, the defendant and others within PVLS's leadership concluded (erroneously) that Sergio was a snitch and should be killed as a result.

On the evening of September 26, 2016, Elmer Zelaya asked Sergio to come to a gang meeting that he said would be held later that night.  Sergio walked from his home to the parking lot of a Target store in Falls Church, Virginia, where he met up with several members and associates of MS-13, including the defendant, Elmer Zelaya, Palacios, Velasco, Avila, Villatoro, and Castro, all of whom had arrived in a large SUV.  After picking up Sergio, the group drove to Holmes Run Park, where they met up with the Henry Zelaya, Ramirez, Orellana, Melgar, Baires, and O.S.R.

There, in the same wooded area of the park where Edvin had been slain, the defendant grabbed Sergio by the neck while others stabbed him to death with knives, machetes, and a pickaxe.  The defendant and other participants in the assault also recorded the murder on a cell phone.  After Sergio was dead, the killers dug a hole and buried Sergio's body.  Before Sergio's body was buried, the defendant took the shoes that Sergio had been wearing off Sergio's feet and

4

JA6559

took them for himself.  Sergio's remains were also later exhumed and autopsied.  The results of that examination revealed that Sergio sustained myriad sharp-force injuries over virtually every part of his body.  So forceful were the blows he suffered that his mandible was bisected and both of his femurs and one of his fibulas were fractured.  Sergio left behind a bereft mother, with whom he lived and who was pregnant at the time of his death, and a younger sister.

## II.       OVERVIEW OF APPLICABLE LAW

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.*  Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a).

Although the Guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citation omitted).  Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the Guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the

JA6560

offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1).  The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").  Thus, although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

### III.    APPLICATION OF THE § 3553(a) FACTORS

As the evidence presented at trial proved, the defendant was an integral part of the conception, planning, and execution of the murders of Edvin and Sergio.  Indeed, he played a key role in spreading the rumor that Sergio had been cooperating with law enforcement.  And in both instances, he was one of the initial attackers who grabbed and stabbed the defenseless, initially unsuspecting victims and proceed to brutally stab and hack them to death.  Evidently, neither their anguished screams nor their looks of horror as the knowledge of their imminent demise dawned upon them dissuaded the defendant from carrying on.  He also recorded the murders on a cell phone to prove to MS-13 leadership that he and his co-conspirators had carried out the greenlights that had been ordered on the two young boys.  After killing Sergio, but before the group buried his body, the defendant stole a pair of new Nike Cortez shoes that Sergio had been wearing because, as he later told law enforcement officers, "it was a sin to bury that chicken" with them on.  Gov't Tr. Ex. 105-35B.

6

The defendant showed no remorse in the aftermath of the killings, instead bragging about what he had done on Facebook and through text messages to others.  For example, a few weeks after Edvin's death, the defendant posted the following picture of himself standing over Edvin's grave while flashing an MS-13 hand sign:



And approximately four months after the first murder, in a text message to an associate, the defendant, who referred to the victims as "2 little chavala faggots," stated that he had "stabbed [Edvin and Sergio] about 1,000 times" and left "their heads . . . in tatters."  Gov't Tr. Ex. 54-7. These monstrous crimes, particularly in light of the manner in which they were committed,

unquestionably warrant the highest penalties available under the law, including a sentence of life in prison.

Although it was the defendant who eventually led law enforcement officers to the location of the clandestine graves in late February 2017, he only did so to try to help himself, as he had recently been charged with raping a 15-year-old girl. When he was questioned about the murders, the defendant repeatedly lied and minimized his own involvement. But as the evidence adduced at trial proved, the defendant was a key player in Edvin's and Sergio's senseless murders, and his participation demonstrates his utter contempt for this nation's laws and his total disregard for the sanctity of human life. The life sentences that the Court is obligated to impose on him will serve the necessary purpose of protecting the public from him.

Such a sentence will also send a message to other members and associates of MS-13 that there will be severe repercussions for committing violent crimes in furtherance of their gang's illicit activities or to advance within the gang's ranks. Such gang members, so many of whom are relatively young, must know that a stiff sanction—including, where necessary, incarceration for the rest of their lives—awaits them. Likewise, they must understand that neither MS-13 nor any other gang will be permitted to operate with impunity in this country.

Last, a life sentence will achieve some measure of justice for the victims and their loved ones, who have suffered unimaginable, never-ending pain at the hands of the defendant and his fellow gangsters.

### IV.    RECOMMENDED SENTENCES

Although a sentence of life imprisonment mandated by statute for four of the eight counts of conviction will ultimately determine the defendant's fate, the Court must impose a sentence for each count. In light of the considerations discussed above, the government respectfully requests that the Court impose such sentences as follows:

JA6563

| Count Number | Description | Statutory Provisions | Recommended Sentence |
|---|---|---|---|
| 1 | Conspiracy to Commit Kidnapping and Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 2 | Conspiracy to Commit Kidnapping and Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 3 | Conspiracy to Kidnap Edvin Eduardo Escobar Mendez | Any term of years or Life | Life |
| 4 | Conspiracy to Kidnap Sergio Anthony Arita Triminio | Any term of years or Life | Life |
| 5 | Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Life | Life |
| 6 | Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Life | Life |
| 7 | Kidnapping of Edvin Eduardo Escobar Mendez Resulting in Death | Life | Life |
| 8 | Kidnapping of Sergio Anthony Arita Triminio Resulting in Death | Life | Life |

## V.    CONCLUSION

The defendant snuffed the life out of two young boys and tore open the lives of their family members, who must forever bear not just the agony of loss but the knowledge that, in dying, Edvin and Sergio endured unfathomable pain and fear.  Sentencing the defendant to life imprisonment would certainly account for the nature of his crimes, protect the public, and serve as a deterrent to other gang members—but perhaps most importantly, it would bring justice on behalf of Edvin and Sergio and their grieving families.  Accordingly, the government respectfully asks that the Court impose sentences of 10 years for Counts 1 and 2, and life imprisonment for Counts 3 through 8, all to run concurrently with one another.  Additionally, the government recommends that the Court

JA6564

impose a three-year term of supervised release for Counts 1 and 2 and a five-year term of supervised release for each of the remaining counts, all to run concurrently with one another, which the defendant shall serve should he ever be released from the custody of the Bureau or Prisons and return to the United States.[3]  Finally, the government will be seeking restitution on behalf of Edvin's and Sergio's family members and asks that, pursuant to 18 U.S.C. § 3664(d)(5), the Court allow the government to arrive at a final determination of the victims' losses no later than November 28, 2022 (that is, 60 days after the sentencing of Henry Zelaya, the first of the defendant's co-defendants to be sentenced).  *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable . . . prior to sentencing, . . . the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    _____/s/_____
Alexander E. Blanchard
Cristina C. Stam
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
alexander.blanchard@usdoj.gov
cristina.stam@usdoj.gov

---

[3] Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, application note 5.  However, a court should consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case." *Id.*  Given that the defendant, during his time in this country, murdered two juveniles, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

10

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 13, 2022, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all

counsel of record.


_____/s/_____
Cristina C. Stam
Assistant United States Attorney

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18CR123 |
| | ) | The Hon. Rossie D. Alston |
| RONALD HERRERA CONTRERAS, | ) | Sentencing: 10/20/2022 @ 11 am |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DEFENDANT'S POSITION ON SENTENCING</u>

COMES NOW, the Defendant, Ronald Herrera Contreras ("Mr. Herrera"), by and through counsel, and pursuant to Rule 32 of the *Federal Rules of Criminal Procedure*, section 6A1.3 of the advisory *United States Sentencing Guidelines* ("the Guidelines"), and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, hereby states that he has received and reviewed the Presentence Investigation Report ("PSR") and has no objections thereto.  Mr. Herrera does, however, object on constitutional grounds to the mandatory sentence prescribed by law, as it violates his right, guaranteed by the 8th Amendment to the United States Constitution, to be free from cruel and unusual punishment.

## <u>THE LAW OF SENTENCING</u>

Were the sentence in this case not mandatory, this Court would begin the process of sentencing Mr. Herrera by determining the advisory sentencing range pursuant to the Guidelines. *See, e.g., Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007).  The Guidelines certainly offer no leniency by design, and shall not be presumed to be reasonable, so this advisory range is usually well above what a defendant ultimately requests. *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v.*

1

JA6567

*United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009).  More important than the commonality of the position taken by defendants, however, is the fact that the sentencing Courts often and in ever-increasing numbers *agree* that the Guideline range is "greater than necessary." 18 U.S.C. 3553(a) ("3553(a)").

For example, in FY 2021, United States District Courts in the Fourth Circuit imposed sentences below the advisory Guidelines in 47% of cases.[1]  Nearly half of these were *not* government-sponsored.[2]  Nationwide, during the same period, 54.7% of sentences imposed were below-guidelines, with well less than half of those being government-sponsored departures, reductions, or variances.[3]  In both the 4th Circuit and nationally, the majority of below-guidelines sentences variant sentences based on the 3553(a) considerations.[4]

In this case, were the Court permitted to consider departures under the guidelines or a variant sentence in consideration of the factors and mandate of 3553(a) to impose a sentence no greater than necessary, a sentence of a term of years would absolutely be appropriate even in light of the severity of the offenses of conviction, based on a number of factors to be explored further below. Even in state court, Mr. Herrera would likely have been offered a plea to a term of years in the 30–40-year range; no such option exists for him here.

Unfortunately, the Guidelines, 3553(a), and this Court's discretion are trumped by the mandatory minimums even though Mr. Herrera was only eighteen years old at time of the offense, experienced significant trauma at a young age, and was a daily drug user.

---

[1] United States Sentencing Commission Statistical Information Packet, Fiscal Year 2021, Fourth Circuit" at 12. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/4c21.pdf
[2] *Id.*
[3] *Id.*
[4] *Id.*

JA6568

## THE MANDATORY MINIMUM VIOLATES THE 8TH AMENDMENT

Offenders *under* the age of 18 have long been treated differently by the criminal justice system for reasons that have been articulated by the Supreme Court in several opinions addressing the 8th Amendment and youth offenders, and best summarized in *Miller v. Alabama*, 132 S. Ct. 2455 (2012). Youth have a "lack of maturity and an underdeveloped sense of responsibility," have characters that are not as "well formed" as those of adults (and so are more open to rehabilitation and "changing their ways"); they "'are more vulnerable . . . to negative influences and outside pressures," and usually lack control over their surroundings and circumstances, rendering them unable to "remove themselves from crime-producing settings. *Miller,* 132 S. Ct. at 2464, citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005).

In recognition of these differences, the Supreme Court in *Roper* prohibited the death penalty for offenders under the age of eighteen. With *Graham v. Florida* in 2010 and *Miller* in 2012, the Court likewise found life without parole for youth offenders (even in murder cases) to be unconstitutional. *See Graham v. Florida,* 560 U.S. 48 (2010); *Miller*, *supra*. Key to the *Graham* holding was the common-sense conclusion that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole," *Miller,* 567 U.S. at 573. *Miller* went on to hold that "a judge or jury must be afforded the opportunity to consider all mitigating circumstances before imposing the harshest available penalty on youth offenders. Excluding "age-related characteristics" from that consideration via mandatory sentencing schemes violates the 8th Amendment.

Thus, clearly, the Supreme Court has already held that "age-related characteristics"— not simply *age*—*must* be available for consideration by a sentencing Judge, and that "criminal procedure laws that fail to take defendants' *youthfulness* into account at all would be flawed."

3

JA6569

*Id.* (emphasis added).  Recognition that the same applies to offenders—like Mr. Herrera—who are just over 18 but are still youthful offenders—is the logical next step from the Supreme Court's holdings in *Roper, Graham* and *Miller.* Certainly, many (if not all) young men have the same characteristics of youth sufficiently present to warrant consideration a few months after their 18th birthday as they do they day prior.

Even, hypothetically, if Mr. Herrera had not witnessed horrific violence as a child, resulting in anxiety and bouts with depression throughout his teenage years and today, and even had he not engaged in years of heavy drug use, at the time of the offenses he still at an adolescent level at best in his intellectual and emotional development. What we do know for sure is that his brain was not fully developed.

> It doesn't matter how smart teens are or how well they scored on the SAT or ACT. Good judgment isn't something they can excel in, at least not yet. The rational part of a teen's brain isn't fully developed and won't be until age 25 or so. In fact, recent research has found that adult and teen brains work differently. Adults think with the prefrontal cortex, the brain's rational part. This is the part of the brain that responds to situations with good judgment and an awareness of long-term consequences. Teens process information with the amygdala. This is the emotional part. In teens' brains, the connections between the emotional part of the brain and the decision-making center are still developing— and not always at the same rate. That's why when teens have overwhelming emotional input, they can't explain later what they were thinking. They weren't thinking as much as they were feeling.

University of Rochester Medical Encyclopedia, "Understanding the Teen Brain,"

*https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051* (2021).

In *Roper,* the Supreme Court acknowledged that a nineteen- or twenty-year-old could be similarly situated to an eighteen-year-old, but nonetheless upheld "drawing . . . the line" at eighteen because the converse might also be true: that some eighteen-year-olds possess significant maturity.  *See Roper*, 543 U.S. at 574.  Implicitly acknowledging that this purported

4

JA6570

rationale only confirms the arbitrariness of the cutoff age, the Court declared "a line must be drawn" and "eighteen is point where society draws the line for many purposes between childhood and adulthood." *Id.* Precisely so. But what this means is that there is *no* valid reason to presume—and no reasonable basis under law to hold—that failing to consider Mr. Herrera's youth in sentencing him is not a violation of the 8th Amendment.

The fact remains that the arbitrary line drawn at 18 violates the rights of every single defendant for whom age *is* a factor, and that class is far broader than "under 18." Actuaries recognize the difference, hence the higher cost of insurance and even the inability to rent a car, in some areas, until age 25. Why? Because not only common sense or anecdotal evidence, but statistical analysis, proves that younger people engage in higher risk behaviors because their judgment is flawed due to an underdeveloped brain. They don't assess situations, the variables, the potential pitfalls and consequences at the level of an adult with a fully developed brain. To remove this from the court's consideration in fashioning a sentence, especially in a case like Mr. Herrera's where a youthful defendant 1) engaged in offense activity with many others, 2) became involved in the offenses of conviction under the influence of drugs, 3) was under threat of retribution if he did not participate, 4) experienced trauma, 5) has mental health issues and 6) engaged in years of self-medication with marijuana, is an affront to our system and sense of justice and fairness.

## APPLICABLE ADVISORY GUIDELINE RANGE

I.   *The Guideline Range is Properly Calculated and the Mandatory Minimum Sentence as Dictated by Statute is Accurately Stated*

As previously noted, Mr. Herrera has no objection to the advisory range as calculated by Probation nor the statement as to the mandatory minimum sentences as set forth in the relevant statutes. His sole objection is to the mandate of a cruel and unusual punishment.

JA6571

## 3553(a) CONSIDERATIONS

I.     *The nature and circumstances of the offense and the history and characteristics of the Defendant*

The consolidation in18 U.S.C. 3553(a) of these two considerations into one "factor" is especially appropriate in Mr. Herrera's case because but for his history, he would not have committed these offenses. In fact, it was as if his life story was written when he was eleven years old, and even the little adult guidance he received pointed him in this direction.  Mr. Herrera is an intelligent young man, but since the age of eleven he has been mentally broken by repeated, significant trauma.

Exhibit A, filed Under Seal, expands upon Mr. Herrera's uniquely traumatic childhood, which begins in abject poverty, continues with the abandonment by his father followed *at age two*, by his mother, and finally at age nine, by his aunt. He was raised without supervision or even basic sustenance at times and was therefore ripe for the picking when recruited and indoctrinated into MS-13 by age 11 by his only father figure—a gang member who was later "arrested" in front of Ronald and killed the very same day. Ronald recalls finding his head in the street. Ronald's uncle was shot in the back while Ronald was with him, and within a year a childhood friend was also killed. Ultimately, his father too was a victim of gang violence. Seeing all of this at a young age "breaks" an already unformed child's brain. Violence is ingrained; it is a part of life. As a young adult, Ronald has suffered anxiety, depression, and nightmares. All of this, however, could be addressed through mental health treatment and therapy and does not render Ronald "a lost cause."

6

JA6572

II.   *The Kind of Sentences Available and Sentencing Objectives*

    a.   <u>The sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from defendant.</u>

There is only one sentence more severe than life in prison without the possibility of parole. Arguably, there is none more difficult to serve. Not only because it is *forever*, which in Mr. Herrera's case could be 60+ years, but because it is not served easily. Mr. Herrera will spend his life in a high to maximum security federal prison, populated by those with similar offenses and similar sentences.

    b.   <u>The court should also consider the defendant's need for treatment, medical care or training.</u>

It will be necessary for Mr. Herrera to have, at a minimum, a mental health assessment and very likely treatment to follow up on the diagnoses he has received in the past. But breaking the ingrained desensitization to and acceptance of violence as "normal," is also necessary.  He should also undergo drug treatment.

## <u>CONCLUSION</u>

Although the applicable statute dictates that this Court has no discretion in imposing its sentence as to the majority of the offenses of conviction, were it permissible the Court could and should give weight to mitigating factors, most notably "age related factors" and mental illness.

Age itself (i.e., the number) is not all that should be considered. *Age-related factors,* which would include the Defendant's mental and emotional development, level and quality of education, family support and relationships, and any significant societal factors that more markedly affect younger, less mature offenders.  Significant mental health issues, self-medicated

JA6573

with drugs, should also be considered as mitigating, warranting a sentence of a term of years,

that is "no greater than necessary," as dictated by 3553(a).

Respectfully Submitted,
RONALD HERRERA CONTRERAS
By Counsel

THE LAW OFFICE OF LANA MANITTA, PLLC

By:_____/s/_____.
Lana Manitta, VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
(703) 705-4428 FAX (703) 705-4429
Lmanitta@ManittaLaw.com

THE LAW OFFICE OF JESSE WINOGRAD, PLLC

By:_____/s/_____.
Jesse Winograd
5335 Wisconsin Ave., N.W.
Suite 440, Box 4035
Washington, DC 20015
(202) 302-7429
jwinograd@winogradlaw.com
Counsel for Defendant Ronald Herrera Contreras

## CERTIFICATE OF ELECTRONIC FILING

I HEREBY CERTIFY THAT on this the 13th day of October 2022, I filed the foregoing
with the Clerk of the Court, served a copy on the United States Attorney via hand-delivery and
sent copies via electronic mail to all defense counsel.

THE LAW OFFICE OF LANA MANITTA, PLLC

By: _____/s/_____.
Lana Manitta, Esq. VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
Phone: (703) 705-4428
Fax: (703) 705-4429
LManitta@ManittaLaw.com
Counsel for Ronald Herrera Contreras

JA6574

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-123-RDA-8 |
| | ) | |
| PABLO VELASCO BARRERA, | ) | The Honorable Rossie D. Alston, Jr. |
| | ) | |
| Defendant. | ) | Sentencing: October 26, 2022 |
| | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The defendant, Pablo Velasco Barrera, comes before the Court for sentencing after having been convicted at trial on eight counts[1] in connection with the brutal murders of two teenage boys—Edvin Eduardo Escobar Mendez and Sergio Anthony Arita Triminio—at the hands of MS-13, the violent transnational gang of which the defendant was a member. The government has reviewed the Presentence Investigation Report (the "PSR"), which correctly calculates the total offense level to be 43 and the defendant's criminal history category to be I, and concurs with the findings of the Probation Office, including that the defendant must be sentenced to life imprisonment by statute for committing murder in aid of racketeering activity and kidnapping resulting in death. The United States respectfully asks that the Court impose sentences of 10 years for Counts 1 and 2, and life imprisonment for Counts 3 through 8, all to run concurrently with one another. Such sentences not only take into account the Sentencing Guidelines, the 18 U.S.C.

---

[1] A jury convicted the defendant of two counts of Conspiracy to Commit Kidnapping and Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. § 1959(a)(5) (Counts 1 and 2); two counts of Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c) (Counts 3 and 4); two counts of Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Counts 5 and 6); and two counts of Kidnapping Resulting in Death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Counts 7 and 8).

JA6575

§ 3553(a) factors, and the relevant statutory provisions, they will also bring long-awaited justice

on behalf of Edvin, Sergio, and their families.

## I.  FACTUAL BACKGROUND

Having presided over a lengthy trial earlier this year, the Court is well aware of the facts

of this case.  The government provides the following brief summary.

### A.  The Kidnapping and Murder of Edvin Eduardo Escobar Mendez

Edvin Eduardo Escobar Mendez ("Edvin") immigrated to the United States from

Guatemala, where he was born.  In the summer of 2016, when Edvin was 17 years old, he was

introduced by his friend, Sergio Anthony Arita Triminio ("Sergio"), who was then 13 years old,

to members and associates of the Park View Locos Salvatrucha ("PVLS") clique of MS-13.  Sergio

was a prospective member of the clique who wanted Edvin to join the gang, too.

At the time, the defendant was an associate of MS-13's PVLS clique who held the position

of *paro*, a term used to describe a low-ranking position within the gang's hierarchy. The defendant

associated with other members and associates of the PVLS clique, including Elmer Zelaya

Martinez ("Elmer Zelaya"), Henry Zelaya Martinez ("Henry Zelaya"), Josue Vigil Mejia ("Vigil"),

Ronald Herrera Contreras ("Herrera"), Erick Palacios Ruiz ("Palacios"), Francisco Avila Avalos

("Avila"), Anderson Villatoro Rivera ("Villatoro"), Yonathan Melgar Martinez ("Melgar"), Duglas

Ramirez Ferrera ("Ramirez"), Edwin Orellana Caballero ("Orellana"), Oscar Contreras Aguilar

("Contreras"), Edenilson Misael Alfaro ("Alfaro"), Fredys Baires Abarca ("Baires"), O.S.R., and

Moris Castro Coreas ("Castro").

In early August 2016, Sergio learned that Edvin had posted on his Facebook page a

photograph depicting a man wearing a mask with the numbers "666" superimposed around his

head and the words "Black Metal" typed below.  The photograph was then circulated among PVLS

members who concluded—based on that photograph alone—that Edvin was actually a member of

JA6576

the rival 18th Street gang.[2]  Because, under MS-13's rules, all rival gang members (who are referred to as *chavalas*) must be attacked and killed, PVLS leadership in Virginia arranged to have Edvin lured to a park where he could be murdered.

On August 28, 2016, Edvin was advised that a gang meeting would be taking place that night and was directed to take a bus to Alexandria, Virginia, that evening.  Edvin did so and was met by Vigil, Avila, and Palacios, all of whom rode a bus to Alexandria.  Once they arrived in Alexandria, Edvin, Vigil, Avila, and Palacios walked to the vicinity of Holmes Run Stream Valley Park ("Holmes Run Park") in Fairfax County, Virginia, and joined several members and associates of MS-13 who were already there, including the defendant.

The group then walked to Homes Run Park.  Thereafter, in a wooded area in the park, some of those present began attacking Edvin.  The defendant went to serve as a lookout so that he could alert the group if he saw law enforcement officers or anyone else who could come upon them while they were killing Edvin.  The group stabbed Edvin with knives and also struck him with a machete and a pickaxe until he was dead.  Some of those who participated in the murder also buried Edvin's body in the park that night.  Edvin's remains, after they were exhumed approximately six months later, were autopsied.  During her examination, the medical examiner counted 111 stab or chop wounds visible in what remained of Edvin's soft tissue.  Edvin left behind his parents and three siblings, all of whom are devastated by Edvin's murder.

Following Edvin's murder, the defendant received a promotion to *observación*, a term used to describe a prospective member of MS-13 who associates with the gang's members, known as homeboys, and is required to do whatever the homeboys request.

---

[2] To date, law enforcement has not uncovered any evidence to suggest that Edvin was a member or associate of a rival gang.

**B. The Kidnapping and Murder of Sergio Anthony Arita Triminio**

Edvin's friend, Sergio, was born in Honduras.  On the night that Edvin was murdered, Sergio, who had turned 14 approximately one week earlier, was in juvenile detention.  Upon his release, and after learning of Edvin's disappearance, Sergio asked Elmer Zelaya whether Edvin had been given "court" for "the photo."  Elmer Zelaya, Vigil, and others in the clique already suspected that Sergio was cooperating with police based on information relayed by Herrera and a member of another clique.  Based on Sergio's inquiry about Edvin and the fact that Sergio was already suspected of cooperating with law enforcement, PVLS's leadership concluded (erroneously) that Sergio was a snitch and should be killed as a result.

On the evening of September 26, 2016, Elmer Zelaya asked Sergio to come to a gang meeting that he said would be held later that night.  Sergio walked from his home to the parking lot of a Target store in Falls Church, Virginia, where he met up with several members and associates of MS-13, including the defendant, Elmer Zelaya, Palacios, Herrera, Avila, Villatoro, and Castro, all of whom had arrived in a large SUV.  After picking up Sergio, the group drove to Holmes Run Park, where they met up with the Henry Zelaya, Ramirez, Orellana, Melgar, Baires, and O.S.R.

There, in the same wooded area of the park where Edvin had been slain, Herrera grabbed Sergio by the neck while others stabbed him to death with knives, machetes, and a pickaxe.  The defendant initially served as a lookout, but he eventually joined the rest of the group in attacking Sergio.  The participants in the assault also recorded the murder on a cell phone.  As the evidence adduced at trial showed, one of the attackers who was visible in the murder video was the defendant, who can be seen violently and repeatedly striking Sergio's body with a machete until Elmer Zelaya directed him to stop.  After Sergio was dead, the killers dug a hole and buried Sergio's body.

4

JA6578

Sergio's remains were also later exhumed and autopsied. The results of that examination revealed that Sergio sustained myriad sharp-force injuries over virtually every part of his body. So forceful were the blows he suffered that his mandible was bisected and both of his femurs and one of his fibulas were fractured. Sergio left behind a bereft mother, with whom he lived and who was pregnant at the time of his death, and a younger sister.

For participating in Sergio's murder, the defendant was promoted from *observación* to *chequeo*. The defendant also received the gang moniker "Oscuro."

## II.     OVERVIEW OF APPLICABLE LAW

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the Guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citation omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the Guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

## III.   APPLICATION OF THE § 3553(a) FACTORS

The defendant took the lives of two young boys in a heinous way. For this reason alone, the defendant must be severely punished. But what makes his crimes even more perverse is that he did so to increase his position in MS-13 and to further the gang's repugnant ethos of violence. So despicable is MS-13 that its members, including the defendant, carried out the murders of Edvin and Sergio by gathering a large group of mostly older, stronger[3] gang members and associates to surround the defenseless, initially unsuspecting victims and proceed to brutally stab and hack them to death. Evidently, neither their anguished screams nor their looks of horror as the knowledge of

---

[3] The Court may recall that some of the physical evidence that the government presented at trial included the shoes that Mendez had on and the boxer briefs that Sergio wore on the nights they were each killed, highlighting just how small the victims were.

6

their imminent demise dawned upon them dissuaded the defendant from carrying on.  These monstrous crimes, particularly in light of the manner in which they were committed, unquestionably warrant the highest penalties available under the law, including a sentence of life in prison.

To this day, the defendant has shown no remorse for his actions.  When he was questioned by law enforcement officers after being arrested in connection with the murders, he stated that he did not care about the suffering of the victims' mothers or about his own mother, maintaining that he "[did not] have a heart for anyone."  Gov't Tr. Ex. 107-4B.  When an agent asked him if he wanted people to know him as a murderer, he answered: "I don't give a damn. . . . I don't have a heart, like I'm telling you.  I don't feel sorry for anyone, anything."  Gov't Tr. Ex. 107-7B.

Moreover, the defendant is unquestionably a danger to society.  Not only did he associate with MS-13 for years and participate in Edvin's and Sergio's heinous murders, he also engaged in other gang-related criminal activity.  The Court may recall trial testimony describing the attempted murder of "Lil Navaja," an associate of the Virginia Sector of PVLS, in August of 2016.  Shortly before Edvin's murder, the defendant, along with other MS-13 members and associates, lured "Lil Navaja" to Holmes Run Park so that the gang could kill him.  The defendant's job was to be a lookout at the entrance of the park while others attacked "Lil Navaja." Ultimately, "Lil Navaja" was able to escape death by running away from the defendant and his associates.

In the years following Edvin's and Sergio's murders, he continued his association with the PVLS clique, identifying himself to others by his gang moniker and rank.  *See, e.g.*, Gov't Tr. Ex. 59-6 (claiming to be "Oscuro, *chequeo* from PVLS, brother.").  The defendant's association with MS-13 and his extensive participation in criminal activity, including in Edvin's and Sergio's senseless murders, demonstrate his utter contempt for this nation's laws and his total disregard for

7

the sanctity of human life.  A sentence of life imprisonment will serve the necessary purpose of protecting the public from him.

In addition, such a sentence will send a message to other members and associates of MS-13 that there will be severe repercussions for committing violent crimes in furtherance of their gang's illicit activities or to advance within the gang's ranks.  Such gang members, so many of whom are relatively young, must know that a stiff sanction—including, where necessary, incarceration for the rest of their lives—awaits them.  Likewise, they must understand that neither MS-13 nor any other gang will be permitted to operate with impunity in this country.

Last, a life sentence will achieve some measure of justice for the victims and their loved ones, who have suffered unimaginable, never-ending pain at the hands of the defendant and his fellow gangsters.

## IV.   RECOMMENDED SENTENCES

Although a sentence of life imprisonment mandated by statute for four of the eight counts of conviction will ultimately determine the defendant's fate, the Court must impose a sentence for each count.  In light of the considerations discussed above, the government respectfully requests that the Court impose such sentences as follows:

| Count Number | Description | Statutory Provisions | Recommended Sentence |
|---|---|---|---|
| 1 | Conspiracy to Commit Kidnapping and Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 2 | Conspiracy to Commit Kidnapping and Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Up to 10 years | 10 years |
| 3 | Conspiracy to Kidnap Edvin Eduardo Escobar Mendez | Any term of years or Life | Life |

8

JA6582

| 4 | Conspiracy to Kidnap Sergio Anthony Arita Triminio | Any term of years or Life | Life |
| 5 | Murder of Edvin Eduardo Escobar Mendez in Aid of Racketeering Activity | Life | Life |
| 6 | Murder of Sergio Anthony Arita Triminio in Aid of Racketeering Activity | Life | Life |
| 7 | Kidnapping of Edvin Eduardo Escobar Mendez Resulting in Death | Life | Life |
| 8 | Kidnapping of Sergio Anthony Arita Triminio Resulting in Death | Life | Life |

## V.    CONCLUSION

The defendant took the lives of two young boys and tore open the lives of their family members, who must forever bear not just the agony of loss but the knowledge that, in dying, Edvin and Sergio endured unfathomable pain and fear.  Sentencing the defendant to life imprisonment would certainly account for the nature of his crimes, protect the public, and serve as a deterrent to other gang members—but perhaps most importantly, it would bring justice on behalf of Edvin and Sergio and their grieving families.  Accordingly, the government respectfully asks that the Court impose sentences of 10 years for Counts 1 and 2, and life imprisonment for Counts 3 through 8, all to run concurrently with one another.  Additionally, the government recommends that the Court impose a three-year term of supervised release for Counts 1 and 2 and a five-year term of supervised release for each of the remaining counts, all to run concurrently with one another, which the defendant shall serve should he ever be released from the custody of the Bureau or Prisons and return to the United States.[4]  Finally, the government will be seeking restitution on behalf of

---

[4] Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, application note 5.  However, a court should consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case."

9

JA6583

Edvin's and Sergio's family members and asks that, pursuant to 18 U.S.C. § 3664(d)(5), the Court allow the government to arrive at a final determination of the victims' losses no later than November 28, 2022 (that is, 60 days after the sentencing of Henry Zelaya, the first of the defendant's co-defendants to be sentenced).  *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable . . . prior to sentencing, . . . the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:   _____/s/_____
Alexander E. Blanchard
Cristina C. Stam
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
alexander.blanchard@usdoj.gov
cristina.stam@usdoj.gov

---

*Id.*  Given that the defendant, during his time in this country, murdered two juveniles, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

JA6584

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 19, 2022, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all

counsel of record.

_____/s/_____
Cristina C. Stam
Assistant United States Attorney

JA6585

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No: 1:18-CR-00123-08 |
| | ) | The Honorable Rossie D. Alston |
| PABLO MIGUEL VELASCO BARRERA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

The defendant, Pablo Miguel Velasco Barrera, by and through undersigned counsel,

pursuant to 18 U.S.C. §3553(a) and §6A1.3 of the United States Sentencing Guidelines

(hereinafter U.S.S.G. or Commission), submits the following Position with Respect to

Sentencing. In accordance with U.S.S.G. §6A1.2, Counsel certifies that he reviewed the

Presentence Investigation Report (hereinafter PSR) with Mr. Velasco Barrera. Mr. Velasco

Barrera objects the recitation of the facts of the case contained in the PSR and the mandatory life

sentences prescribed by law for Counts Five through Eight. Otherwise, Mr. Velasco Barrera

agrees that the Sentencing Guidelines are properly calculated. Notwithstanding the mandatory

life sentences, this guideline range does not adequately address certain specific characteristics of

Mr. Velasco Barrera, or the considerations set forth in 18 U.S.C. §3553(a) and is not an

appropriate measure of his culpability in the present case. Instead, a sentence of some term of

years is sufficient but not greater than necessary to address the §3553(a) factors.

## I.    Objections

Pursuant to §6A1.3 of the Sentencing Guidelines, the Court shall resolve disputed

sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P. When

any factor is reasonably in dispute, the parties shall be given an adequate opportunity to present

JA6586

information to the Court regarding that factor. The government bears the burden of proving the applicability of a sentencing enhancement. *See, e.g., United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

**A.    Recitation of Facts**

On May 9, 2022, a jury trial commenced before this Court as to Mr. Velasco Barrera and certain other co-defendants. On July 1, 2022, a jury found the defendants guilty of all eight counts of the superseding indictment. Mr. Velasco Barrera intends to timely note his appeal and objects to the recitation of the facts of the case contained in the PSR. This objection includes, but is not limited to the following:

- Page 3: Mr. Velasco Barrera allegedly belonged to the Silvas clique prior to the Park View clique, not the Westerns clique;

- Page 8 ¶30: Triminio, on his own, turned over the "666" picture to Mejia;

- Page 10 ¶41: Triminio was aware that a murder would take place that evening and wanted to participate in it to advance his position in the gang. Triminio was deceased when Mr. Velasco Barrera arrived at the scene;

- Page 12 ¶52: Triminio sent the "666" picture on his own and not after being asked;

- Page 15 ¶63: Mr. Velasco Barrera did not participate in the murder of Mendez;

- Page 15 ¶64: While Mr. Velasco Barrera was a passenger in the vehicle, he did not "bring" Mendez to the park.

**B.    Mandatory Life Sentence**

Counts Five through Eight carry mandatory life sentences for Mr. Velasco Barrera who had just turned 18 years old at the time of the alleged offense conduct. Mr. Velasco Barrera objects to the imposition of a life sentence in this matter as it violates his rights under the 8th

JA6587

Amendment of the United States Constitution that prohibits cruel and unusual punishment. Under the most recent Social Security Period Life Table, 2019, as used in the 2022 Social Security Trustees Report, Mr. Velasco Barrera has a current life-expectancy of approximately 53.35 years. For a young person of Mr. Velasco Barrera's age to serve that much time in prison is inherently cruel and unusual.

Mr. Velasco Barrera hereby adopts and conforms similar arguments made by his fellow co-defendants. See ECF 1285, p. 3-5 and ECF 1286, p. 3-4. Mr. Velasco Barrera supplements those arguments with the following.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court relied on neuroscience in holding that sentencing people to mandatory life without parole for crimes committed as juveniles violated the Eighth Amendment. *Id.* at 471-72. The Court held that individuals under age eighteen have the possibility to reform as they grew older. *Id.* The Supreme Court has also recognized that youth is a profound mitigating factor when considering crimes committed by a teenager. *See Montgomery v. Louisiana*, 134 S. Ct. 718, 734 (2016) (stating that only in the rarest cases will the transient immaturity defining "youth" fail to decisively mitigate against life imprisonment for murder). "Perhaps the important reason that adolescent crime merits less punishment is that 'the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" *Ramsay*, 2021 U.S. Dist. LEXIS 89741, at *35-36 (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005))).

Courts have found that "an offender's youth, combined with society's evolving understanding of the adolescent brain, constitute[s]" an extraordinary and compelling reason for reducing a sentence. *See United States v. Ramsay*, 2021 U.S. Dist. LEXIS 89741, at *2

JA6588

(S.D.N.Y. May 11, 2021) (granting compassionate release to defendant serving life for murder in aid of racketeering, which he committed at the age of eighteen); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) (affirming district court's consideration of defendant's young age as a factor in finding extraordinary and compelling reasons).

In 2017, the U.S. Sentencing Commission acknowledged the growing consensus in neuroscience and case law that a person's decision-making and emotional control faculties may not be fully developed until age 25.[1]  The Commission acknowledged that the prefrontal cortex is the last part of the brain to fully develop and is not mature until a person's mid-20s.[2]  Maturation of the prefrontal cortex leads to increased capacity to control one's behavior and impulses, to increased resistance to antisocial peer influence, and ultimately to fully adult levels of judgment.[3] In 2010, the U.S. Sentencing Guidelines policy statement concerning age was amended to encourage courts to consider a defendant's youth as a mitigating factor in sentencing more frequently.[4]  See Also, Scientific Support for Raising the Age of Criminal Responsibility, by Scientist Action and Advocacy Network (ScAAN.net), last updated and attached hereto and incorporated herein as Exhibit 2.

---

[1] U.S. Sentencing Commission, *Youthful Offenders in the Federal System*, at 5 (May 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf ("The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.") (last visited Aug. 10, 2021).
[2] U.S. Sentencing Commission, *Youthful Offenders in the Federal System*, at 6-7; Robert Sapolsky, *Dude, Where's My Frontal Cortex?* 15 Nautilus (July 24, 2014), http://nautil.us/issue/15/turbulence/dude-wheres-my-frontal-cortex (last visited Aug. 10, 2021); Alan Greenblatt, *What is the Age of Responsibility?*, Governing (Mar. 24, 2010), http://www.governing.com/topics/public-justice-safety/What-is-the-Age.html (last visited Aug. 10, 2021).
[3] Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 16:3 Ann. Rev. Clinical Psychol. 47, 54–56 (2009), https://pdfs.semanticscholar.org/dc04/89039ea816b4814d1166b7075804213ff3e9.pdf (last visited Aug. 10, 2021). *See* Brief for the American Medical Ass'n et al. as Amici Curiae in Support of Neither Party at 19–24, *Graham v. Florida*, 560 U.S. 48 (2010) (Nos. 08-7412, 08-7621), for an in-depth discussion of development in the prefrontal cortex through adolescence and young adulthood.
[4] U.S.S.G. § 5H1.1 ("Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").

**II.     Considerations Under §3553(a)**

It is well settled that the Sentencing Guidelines are advisory following the Supreme

Court's decision in *United States v. Booker*, 125 S.Ct. 738, 757 (2005); see also *United States v.*

*Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (the court shall consider the sentencing guidelines

range as well as other relevant factors set forth in 18 U.S.C. §3553(a) before imposing sentence).

As a result, this Court may consider permissible statutory factors such as:

i.  the nature and circumstances of the offense;

ii.  the history and characteristics of the defendant;

iii.  the need for the sentence to reflect the seriousness of the offense, to promote respect

for the law, provide just punishment for the offense, to afford adequate deterrence to criminal

conduct, to protect the public from future crimes of the defendant, and to provide the defendant

with reasonable rehabilitative opportunities;

iv.  the kinds of sentences available;

v.  the guideline range;

vi.  the need to avoid unwanted sentencing disparities;

vii.  and the need for restitution.

Upon consideration of these factors, a sentencing court may find that a case falls outside

the "heartland" contemplated by the guidelines, that "the guidelines sentence itself fails properly

to reflect the §3553(a) considerations", or that "the case warrants a different sentence

regardless." *Rita v. United States*, 551 U.S. 338, 345-46 (2007).

Therefore, if this Court considers Mr. Velasco Barrera's offense conduct in the context of

these factors, it is appropriate to impose a variant sentence of some term of years

notwithstanding the mandatory life sentences mandated by statute. *See, e.g., Pepper v. United*

5

JA6590

*States 131 S.Ct. 1229 (2011); Spears v. United States, 555 U.S. 261 (2009); Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Williams v. New York 337 U.S. 241 (1949); United States v. Pauley, 511 F.3d 468 (4th Cir. 2007).*

Mr. Velasco Barrera asks this Court to consider his upbringing and background when considering his sentence. Though the PSR details his upbringing, it is important to reiterate here given its likely influence on Mr. Velasco Barrera's future. Mr. Velasco Barrera had a childhood nothing short of difficult. He was raised in a very poor, rural community in El Salvador and his father was not involved in his life at all. Mr. Velasco Barrera's life in El Salvador is described in detail in the psychological evaluation and Mitigation Position attached to the PSR. "El Salvador is among the most dangerous places in the world for a child or adolescent to live. El Salvador is known internationally for its very high level of violence" which "disproportionately impacts El Salvador's youth and children." Mr. Velasco Barrera hereby adopts the sworn Declaration by Dr. Roberto Rodriguez Meléndez, an attorney and human rights specialist (Ph.D.), that co-defendant Ramirez Ferrera referenced as Exhibit 1 of his Position on Sentencing. ECF 1273, Exhibit 1.

Beginning at age seven, Mr. Velasco Barrera attended school and worked on the family farm simultaneously. However, at age 12, he quit school to work full time on the farm and help support his family. When he was nine years old, Mr. Velasco Barrera's brother, who lived in the United States, sent the family money so they could afford a new home with relative luxuries such as electricity and indoor plumbing – luxuries most take for granted. Despite this upgrade to his living conditions, the family needed to use rainwater to wash their clothes. Needless to say, Mr. Velasco Barrera grew up in poverty.

Growing up, Mr. Velasco Barrera was not a healthy child. He suffered from headaches, convulsions, and fainting spells. His poor health caused him to be antisocial. In 2012, when he

JA6591

was 14 years old, Mr. Velasco Barrera was diagnosed with "idiopathic epilepsy syndrome." Mr. Velasco Barrera worked in dangerous, steep, mountainous conditions planting crops. While working in such conditions, he would fall and did not have the motor skills to brace himself with his arms. As a result, he hit his head frequently. He suffered so many concussive injuries that even his own mother cannot remember the number of incidents or the order in which they occurred.

Not only does Mr. Velasco Barrera struggle with his physical health, but he also suffers from mental health issues as well. When he was 11 years old, Mr. Velasco Barrera attempted suicide for the first time. In 2019, Mr. Velasco Barrera underwent a forensic psychiatric evaluation which highlighted the impact that his frequent head injures likely had on his personality. As discussed in the PSR, the head injuries Mr. Velasco Barrera experience coincided with him experiencing behavioral symptoms consistent with a diagnosis of a "Major Neurological Disorder due to Multiple Etiologies and Bipolar and Related Disorder due to Another Medical Condition (atypical epilepsy and recurrent traumatic brain injury)." That evaluation noted that in the absence of treatment for his seizures, "Velasco Barrera exhibited evidence of personality change and mood dysregulation" further supporting his diagnosis.

Mr. Velasco Barrera never let these imperfections stop him for working hard at his jobs. This is demonstrated by the review he received from his manager at the Silver Diner. In that review, his manager notes how quick of a learner Mr. Velasco Barrera is and his efforts to practice English. His manager believed that Mr. Velasco Barrera "was exceptional in many respects." In addition to working, Mr. Velasco Barrera attended school in the United States from August 2014 to March 2016. Although he dropped out of school in the 10th grade, he has taken full advantage of the educational opportunities available to him while incarcerated.

7

JA6592

It is imperative that Mr. Velasco Barrera's health struggles are highlighted, specifically his head injuries, and that his conduct in this case is not considered in a vacuum. These injuries likely had an influence over Mr. Velasco Barrera's decision-making abilities. In order to address the ongoing symptoms that Mr. Velasco Barrera experiences due to these injuries, the psychologist who prepared the psychological evaluation that is attached to the PSR recently prepared an addendum that describes what testing and interventions are necessary for Mr. Velasco Barrera to receive appropriate care in the Bureau of Prisons. (Exhibit 1)  Counsel also requested disclosure of his Alexandria Adult Detention Facility medical history so they may be included with his records that are transmitted to the BOP for the same purpose. (Exhibit 3)

## III.    **Conclusion**

For the foregoing reasons and recognizing the statutory mandate that this Court impose life sentences, Mr. Velasco Barrera nevertheless respectfully requests that this Court impose a sentence of some term of years less than his natural life. Mr. Velasco Barrera further requests that this Court order the BOP to follow the treatment recommendations described in Exhibit 1.


Date:  October 20, 2022.                          Respectfully submitted,

                                                  Pablo Velasco Barrera

                                                  By:  /s/ *Andrew M. Stewart*            .
                                                  Andrew M. Stewart
                                                  Virginia State Bar No. 68683
                                                  Dennis, Stewart & Krischer PLLC
                                                  2007 15th Street North, Suite 201
                                                  Arlington, Virginia 22201
                                                  Telephone: 703-248-0626
                                                  Facsimile: 703-248-8971
                                                  andrew.m.stewart.esq@gmail.com

                                                  and

JA6593

By:  /s/ *Paul P. Vangellow*                .
Paul P. Vangellow, Esq.
Virginia State Bar No. 23488
Paul P. Vangellow, P.C.
6109A Arlington Boulevard
Falls Church, Virginia 22044
Phone: (703) 241-0506
Fax: (703) 241-0886
pvangellow@gmail.com

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 19th day of October 2022, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to all counsel of record.

By:  /s/ *Andrew M. Stewart*                .
Andrew M. Stewart
Virginia State Bar No. 68683
Dennis, Stewart & Krischer PLLC
2111 Wilson Boulevard, 8th Floor
Arlington, Virginia 22201
Telephone: 703-248-0626
Facsimile: 703-248-8971
andrew.m.stewart.esq@gmail.com

JA6594

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION

 3   --------------------------------x
                                     :
 4   UNITED STATES OF AMERICA        : Criminal Action No.:
                                     : 1:18-cr-123
 5                                   :
            v.                       :
 6                                   : October 20, 2022
     RONALD HERRERA CONTRERAS,       :
 7                                   :
                     Defendant.      :
 8   --------------------------------x

 9            TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
10            UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12    FOR THE GOVERNMENT:      ALEXANDER BLANCHARD, AUSA
                               CRISTINA STAM, AUSA
13                             United States Attorney's Office
                               2100 Jamieson Avenue
14                             Alexandria, VA 22314

15    FOR THE DEFENDANT:       LANA MANITTA, ESQ.
                               The Law Office of Lana Manitta, PLLC
16                             140B Purcellville Gateway Drive
                               #511
17                             Purcellville, VA 20132

18                             JESSE WINOGRAD, ESQ.
                               The Law Office of Jesse Winograd
19                             PLLC
                               5335 Wisconsin Ave., NW
20                             Suite 440 Box 4035
                               Washington, DC 20015

21

22   OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                      United States District Court
23                                    401 Courthouse Square
                                      Tenth Floor
24                                    Alexandria, VA 22314

25
```

JA6595

1    (Proceedings commenced at 11:06 a.m.)

2              THE DEPUTY CLERK:  Criminal No. 2018-123.  United

3    States of America versus Ronald Herrera Contreras.

4              Counsel, please note your appearances for the

5    record.

6              MS. STAM:  Good morning, Your Honor.  Cristina Stam

7    and Alex Blanchard on behalf of the United States.

8              THE COURT:  Good morning.

9              MS. MANITTA:  Good morning.  Lana Manitta and Jesse

10   Winograd for Ronald Herrera Contreras, who is present.

11             THE COURT:  Good morning.

12             Ms. Bellows, you can have a seat in the jury box.

13             MS. BELLOWS:  Thank you, Your Honor.

14             THE DEPUTY CLERK:  I was just going to go ahead and

15   swear you in.

16             THE COURT:  Yes.

17             (Interpreter sworn.)

18             THE INTERPRETER:  I do.  Teresa Roman, federally

19   certified Spanish interpreter.

20             Good morning, Your Honor.

21             THE COURT:  Good morning, ma'am.

22             This matter comes on today for report and

23   sentencing.  Are there any corrections, deletions, or

24   modifications to the presentence report in this matter?

25             MS. STAM:  Not from the government, Your Honor.

JA6596

1    MS. MANITTA:  Not from the defense.

2    THE COURT:  The presentence report will be made a

3    part of the record in this matter.

4    Is there any evidence from the government?

5    MS. STAM:  Your Honor, Ms. Karla Triminio, the

6    mother of Sergio Triminio, and his aunt are present in the

7    courtroom.  Ms. Triminio had expressed an interest in perhaps

8    addressing the Court, but if I could check with her if she

9    would like to do that at this time.

10   (Counsel confers.)

11   THE COURT:  Yes, ma'am.  She does want to make a

12   statement?

13   MS. STAM:  She does, Your Honor.

14   THE COURT:  Pursuant to statute, victims are

15   entitled to make a statement to the Court during the

16   sentencing proceeding.  The Court has previously authorized

17   the court clerk to provide an oath to the person who wants to

18   address the Court.  As far as I know, the person's native

19   language is Spanish, and we've provided a court certified

20   interpreter to assist her in the presentation of her remarks.

21   (Statements made through the Spanish interpreter.)

22   MS. TRIMINIO:  Good morning, Your Honor.

23   THE COURT:  Good morning, ma'am.

24   MS. TRIMINIO:  I am Karla Triminio.  I am the mother

25   of Sergio.  I am here today so that I can hear and see what

1   would be said, and what sentence will be imposed of the young

2   man who is accused.  And as always, I come here to ask for

3   justice for my son, and to thank everyone who has worked on

4   this case.  And I just come here to, again, ask for justice

5   and so that the death of my son does not go unpunished, that

6   all the suffering I have gone through these years, and I

7   continue to go through, because of the absence of my son, the

8   change that it had on my life, all of this did.

9          Again, I ask for justice and this person to be

10  punished as he deserves.  That is all, Your Honor.  Thank you

11  very much.

12         THE COURT:  Thank you, ma'am.  I am very sorry for

13  your loss.  I have heard you both in written form and in

14  addressing the Court.  You've expressed the loss that you feel

15  because of these circumstances.  The Court will consider what

16  you have to say in an attempt to, as you say, achieve justice.

17         MS. TRIMINIO:  Thank you.

18         THE COURT:  Thank you.  Any additional evidence from

19  the government?

20         MS. STAM:  No, Your Honor, just argument.

21         THE COURT:  Any evidence from the defendant?

22         MS. MANITTA:  No, Your Honor.

23         THE COURT:  Argument from the government?

24         MS. STAM:  Thank you, Your Honor.

25         Your Honor, as I was reflecting about the

1  sentencing, it occurred to me that we may not be here today if

2  it weren't for the defendant, Ronald Herrera Contreras, or as

3  he was known within the MS-13 gang, Speedy.  And that's

4  because, as we learned during the eight-week trial we had

5  earlier this year, it was the defendant who took Detective

6  Betts to the graves in Holmes Run Park, in early March 2017,

7  where law enforcement then found the remains belonging to

8  Edvin and Sergio, the two boys who were brutally murdered by

9  MS-13 in August and September of 2016.

10         But as we know, also from the evidence adduced at

11  trial, the defendant did not lead Detective Betts to Holmes

12  Run Park because he wanted to take responsibility, or because

13  he wanted to assist law enforcement in solving the missing

14  persons case that had been opened for Edvin and Sergio.  He

15  wanted to help himself.  He had been recently arrested in

16  Fairfax County for raping a 15-year-old girl and he thought he

17  could get something in return if he gave law enforcement

18  something useful.

19         THE COURT:  Isn't his desire to help himself, in

20  many ways, no different than other persons who testified in

21  support of their desire to get a consideration under Rule 35?

22         MS. STAM:  Certainly, Your Honor.  I think that, you

23  know, those people also want to help themselves, but I think

24  that what's different here is that from the very beginning

25  this defendant never told the truth and he repeatedly, and

JA6599

1  consistently, minimized his own involvement.  And he spun this

2  web of lies where he was changing a story -- minimizing his

3  role.  But we know what his role was and that was that he,

4  along with the PVLS members -- the PVLS clique, helped to

5  plan, first, Edvin's murder, then he attacked and killed

6  Edvin.  He filmed the murder on his cell phone, and he even

7  broke his legs with an ax so that his body would fit in the

8  hole that had been dug.

9       And then with Sergio, it was the defendant who

10  helped spread a rumor that Sergio was a police informant,

11  which, of course, he was not.  And he urged PVLS leaders to

12  green light Sergio.  He then was involved in helping to lure

13  Sergio -- very actively involved in helping to lure Sergio to

14  Holmes Run Park.  He was the first person to grab Sergio from

15  behind, from the neck -- by the neck, so that the others who

16  were present could attack him.  And before he buried Sergio,

17  he tied up his body with pajama pants that he had been

18  wearing, and he stole the shoes off of his feet.  The shoes

19  that his mother had just bought for him, but for his 14th

20  birthday.

21       And, Your Honor, I think also the difference is that

22  he, up to this date, has shown no remorse.  He bragged about

23  the murders in the aftermath, he took pictures on top of one

24  of the graves flashing MS-13 signs.  And even two years later,

25  when he was arrested on federal charges for this case, he said

JA6600

1  some of the following things to Detective Betts.  When asked

2  if Edvin had fought back during the attack the defendant

3  called Edvin "stupid" and he said, "he didn't even last

4  two-minutes, that chicken."  He then laughed as he described

5  how Edvin had been stabbed about 20 times in less than one

6  minute.

7          And when the agents asked him and confronted him

8  about taking Sergio's shoes, the defendant admitted that he

9  had taken them because, quote, It was a sin to bury that

10 chicken, end quote, with those new shoes.

11         And so, Your Honor, those words are not of someone

12 who made poor choices, or only made poor choices and put

13 himself -- finds himself in this position, they're also the

14 words of someone who has no respect for human life, has no

15 respect for the law, and who, frankly, has nothing but

16 darkness inside of them.  And that's who the defendant has

17 proven to be.

18         And so, even if a life sentence was not required by

19 statute here, there's no other sentence that would be just.

20 The defendant, for his actions, deserves to spend the rest of

21 his life in prison and his sentence should also be a warning

22 to his gang that violence against young, vulnerable boys will

23 not be tolerated.

24         And so, Your Honor, for that reason, we'd ask that

25 the Court sentence the defendant to life for the -- Counts 3

JA6601

1   to 8, and that the Court sentence him to the ten-year maximum

2   penalties for Counts 1 and 2, which are the five-part

3   conspiracy counts.

4         We ask that you also order that he be placed on

5   supervised release for five years should he ever be released

6   from the Bureau of Prisons custody.  And as I mentioned, I

7   believe at our last sentencing, Your Honor, we're working

8   closely with the family members, including Ms. Triminio, to

9   arrive at restitution.  So we would ask for that same

10   November 28, 2022 deadline to get all the restitution numbers

11   and submit an order to the Court.

12         THE COURT:  Thank you.

13         MS. STAM:  Thank you.

14         THE COURT:  The Court is aware of everyone who is in

15   the courtroom.  Two other people came into the courtroom after

16   the matter was started.  I want to make sure that you're not

17   potential witnesses in the case, either for the government or

18   for Mr. Herrera Contreras.

19         Sir, what is your name, sir?  Right over here.  Sir,

20   with the glasses, what's your name, sir?

21         SPEAKER:  Jeremy.

22         THE COURT:  Jeremy what, sir?

23         SPEAKER:  Didios, D-i-d-i-o-s.

24         THE COURT:  Are you here as a witness for someone?

25         SPEAKER:  No.

JA6602

1          THE COURT:  Ma'am, what is your name?

2          SPEAKER:  Danielle Delsi (ph).

3          THE COURT:  Okay.  Are you a witness for someone,

4  ma'am?

5          SPEAKER:  No.

6          THE COURT:  Okay.  Just making sure.  Had an

7  opportunity for the government and both the defendant to

8  present witnesses and I saw that you all walked in late, so I

9  want to make sure you weren't potential witnesses in the case.

10          All right.  Ms. Manitta.

11          MS. MANITTA:  Thank you, Your Honor.

12          Mr. Herrera Contreras is a bit more complicated, I

13  think, than the government has described.  As we've seen over

14  the last, I think, almost four years of this case that's been

15  going on, he's a pretty conflicted young man.  He's beholden

16  to the gang.  They have been family since age 11, but he's

17  also willing to turn on them.

18          THE COURT:  He has been probably, out of all of the

19  individuals that have been before the Court, the most

20  troubling.  And let me explain to you why I believe he is the

21  most troubling.  As counsel for the government pointed out,

22  but for his assistance, they probably would not have been able

23  to find the bodies.  But for his involvement and other things,

24  we would not have been aware of certain things that are going

25  on.  But for his representations as to him feeling for the

JA6603

1  victim before he was killed that's compelling.

2          But on the other hand, he's involved in all of the

3  other things, as the fact-finder found, as far as taking the

4  lives of these two young men, and it actually presents, as far

5  as this Court is concerned, a dichotomy in what a person could

6  be in something as serious as this.  And, obviously, the jury

7  found that he's responsible and the Court needs to do what it

8  needs to do.  But the bottom line is he presents quite the

9  dilemma for the Court as to what kind of person he really is

10 deep down inside, because in some respects it could be argued

11 that the information that he provided was more helpful than

12 the Rule 35 context than what other people did.

13         MS. MANITTA:  And, Your Honor, you've taken almost

14 all the words right out of my mouth.  He is a dichotomy.

15 Mr. Winograd and I have struggled with that since the very

16 beginning of representing him.  I mean even on the night of

17 Sergio's murder he warned him to run, and then he

18 participated.  So really there is a struggle going on within

19 him.  It has been going on since he's 11.  The best I can say

20 based on some of the work we have done with him

21 pre-authorization with Michelle Quiroga, and having talked to

22 a traumatologist that I was trying to enlist as part of the

23 defense, is that a lot of this, sort of, two people in one is

24 most likely a product of the brutality that he witnessed at a

25 very young age.  And what that does to any man's brain, but,

JA6604

1   especially, a young man with no guidance, no parents, he's

2   taken in by the gang, and, I mean, we're talking about finding

3   heads in the street, standing next to people who are getting

4   shot.  It's unbelievable -- unbelievably brutal what he saw

5   between the ages of 11 and 15.  He came here very shortly

6   thereafter, and all of this happened shortly thereafter.

7           Were there available to us a mental-health-related

8   defense, short of insanity, we were preparing to make it.

9   There is definitely a study that has been done with child

10  soldiers over in Africa that tracks very similarly with what

11  we see with these young men being recruited in Central America

12  to gangs.  The targeted age is 11 to 14.  They're exposed to

13  brutal violence very early and what that does to them is sort

14  of break their brain so that when faced with situations of

15  violence, they are unable to make the decision that a normal

16  member of society would make.  They are -- they cannot do it.

17  They will not make the right decision.  This is something that

18  I wish we could have explored more with Ronald.  It would not

19  have been a defense in his case, but I absolutely think it

20  would have been applicable.  It's very, very sad.

21          A couple of things that we didn't mention, but are

22  in the PSR, also is that his IQ with Dr. Quiroga was found to

23  be a maximum of 70.  And so we have an individual with such a

24  traumatic history, a very low IQ, extensive cooperation.  The

25  agent -- I think I had asked if it was case breaking, and the

1  answer was, yes.  So it is by far the most substantial

2  information that was given during this investigation.  And

3  make no mistake, the others did not cooperate until they had a

4  deal, and until they had a lawyer.  So all of these interviews

5  that Ronald gave where he might have minimized and the story

6  evolved and changed, he didn't have an attorney at one of

7  those interviews or advising him before the interview.  And a

8  lot of them he reached out to an officer in the jail and said,

9  Hey, I'd like to have a meeting.  And this was without

10  representation.  And he did that without a deal.  Nobody put

11  anything in front of him to say, Hey, you're going to get a

12  Rule 35 if you tell us.  Until those others got that they

13  didn't say a word.  And who knows if everything they said was

14  100 percent.

15          So this is really a very sad situation.  He did not

16  have a deal; he did not have an offer.  And he'll spend the

17  rest of his life in prison.  But we're hoping to make the

18  record and what we've submitted under seal, what we've said in

19  our paper, what we're saying here in court today, that, you

20  know, hopefully someday there will be some alternative.

21          THE COURT:  All right.  Thank you, ma'am.

22  Mr. Herrera Contreras, you may stand, sir.

23          Is there anything you want to say to the Court

24  before the Court imposes a sentence in this matter?

25          MS. MANITTA:  Your Honor, because we will be noting

1   an appeal, he's not going to allocute.

2          THE COURT:  Okay.  All right.  Obviously, you're

3   entitled not to allocute.

4          Did you want to say anything to Ms. Triminio?

5          THE DEFENDANT:  No.

6          THE COURT:  All right, sir.  You may have a seat.

7          The combined adjusted offense level is 45 pursuant

8   to Chapter 5, Part A, comment number 2 of the guidelines, in

9   those rare instances where the total offense level is

10  calculated in excess of 43, the offense level will be treated

11  as 43.  Therefore, the defendant's total offense level is 43.

12         The criminal history score is 1 and the criminal

13  history category is Roman numeral I.  Accordingly, the

14  applicable guideline range is life in prison.  Supervised

15  release range is three to five years under the guidelines and

16  the fine range is $50,000 to $250,000.  Pursuant to 18 U.S.C.

17  Section 3553(a), the Court should consider the following:

18         The nature and circumstances of the offense and the

19  history and characteristics of the defendant, the need for the

20  sentence imposed to, among other things, reflect the

21  seriousness of the offense and adequately deter criminal

22  conduct, the kinds of sentences available, the guidelines,

23  policy statements issued by the sentencing commission, the

24  need to avoid unwarranted sentencing disparities among

25  defendants with similar records found guilty of similar

JA6607

1   conduct; and finally, the need to provide restitution to the

2   victims.  Ultimately, under the *Booker* standard, the sentence

3   must be a standard of reasonableness.

4          With respect to the 3553(a) factors, the history and

5   characteristics of the defendant, the Court has considered the

6   defendant's specific circumstances, including his difficult

7   childhood in El Salvador, and the resulting trauma he has

8   experienced.

9          As to the nature and circumstances of the offense,

10  suffice it to say that murder is a reprehensible crime.  The

11  tragic details, as heard by this Court and found by the jury,

12  the defendant's participation in the murders of Edvin Mendez

13  and Sergio Triminio attest to the severity of the defendant's

14  crime.

15         The defendant, based upon what the jury found,

16  callously chose to join a large group of gang members and

17  associates to deceive two defenseless victims and proceeded to

18  brutally murder them.  What is more, the Court considers the

19  fact that the defendant committed these heinous crimes all so

20  that he could advance himself in the gang and earn a

21  promotion.  And although the defendant indeed led

22  investigators to the location of the victims' bodies, his

23  reason for doing so were at best self-serving.  And even then

24  he attempted to cover up his own involvement when questioned,

25  his harmful offenses, and particularly in light of the manner

JA6608

1  in which the defendant and his coconspirators carried them

2  out, warrants a sentence of life imprisonment.

3         The Court next considers the need for the sentence

4  imposed to reflect the seriousness of the crime, promote

5  respect for the law and to provide just punishment for the

6  offense, to afford adequate deterrence from criminal conduct,

7  to protect the public from further crimes of the defendant,

8  and to provide the defendant with needed educational,

9  vocational training, medical care, or other correctional

10  treatment in the most effective matter.

11         Applying these factors to this case, the Court finds

12  that a sentence of life imprisonment sufficiently promotes the

13  seriousness -- reflects the seriousness of the offense and

14  will promote both specific and general deterrence.  As

15  mentioned by both parties, the guideline range for such an

16  offense is life imprisonment.  A sentence of life imprisonment

17  on Count 3 and 8 [sic] will not create unwarranted sentencing

18  disparities in this case or others.  And the sentence is also

19  consistent with sentences imposed for other defendants who

20  committed similar offenses, including his similarly situated

21  codefendants who have been previously sentenced by the Court.

22         Accordingly, on Counts 1 and 2, conspiracy to commit

23  kidnapping and murder, the Court imposes a term of 120 months

24  on each count, which shall run concurrently.

25         On Counts 3 through 8, the Court imposes a term of

JA6609

1  life imprisonment on each count, which shall also run

2  concurrently.  In imposing a life sentence based on the

3  prevailing precedent, the Court does not find any 8th

4  Amendment considerations.

5          The Court also imposes a period of supervised

6  release to provide an added measure of deterrence and

7  protection based upon the facts and circumstances of this

8  particular case, consistent with the guidelines under Section

9  5D1.1.  Should the defendant ever be released from

10 incarceration, he will serve a term of five years of

11 supervised release representing three years as to Count 1 and

12 2, and five years as to Count 3 through 8.  All, again, to run

13 concurrently.

14         During the supervised period -- during this period

15 of supervision, the defendant must comply with the standard

16 conditions that have been adopted by this Court as well as the

17 following special conditions:

18         The defendant is to be surrendered to a duly

19 authorized immigration official of the Department of Homeland

20 Security for deportation review in accordance with the

21 established procedures provided by the Immigration Nationality

22 Act.  As a further condition of supervised release, if ordered

23 deported, the defendant shall remain outside of the United

24 States of America.

25         If the defendant tests positive for controlled

1    substance or shows signs of alcohol abuse, the defendant shall

2    participate in a program approved by the United States

3    Probation Office for substance abuse, which the program may

4    include residential treatment and testing to determine whether

5    the defendant has reverted to the use of drugs or alcohol with

6    partial costs to be paid by the defendant, all, again, as

7    directed by the probation officer.

8            The defendant shall not use marijuana or cannabis in

9    any form and shall not associate with any known or suspected

10   gang members.  The defendant shall participate in a program of

11   mental health and counseling as directed by the probation

12   officer.

13           Recognizing the defendant is not capable of paying a

14   fine, the Court declines to impose such a fine.  The Court

15   will impose a special assessment of $800.  $100 per felony

16   count pursuant to 18 U.S.C. Section 13 -- Section 3013.

17           The Court is going to request that the government

18   postpone the determination of the victim's restitution amount

19   to November 28, 2022, pursuant to 18 U.S.C. 3664(d)(5).  And

20   if the victim's losses are not ascertainable prior to

21   sentencing, the Court shall set a final date for determination

22   of victim's losses not to exceed 90 days after this date.

23           Ms. Manitta, I believe you've indicated that the

24   defendant is going to exercise his right of appeal.  Will you

25   be representing him on that appeal?

JA6611

1    MS. MANITTA:  Actually, we were going to ask that

2    Mr. Winograd take the lead on that appeal.  As the Court

3    knows, we had two and I'm going to take the lead on the other.

4    We will be working on it together, but this way he's the lead

5    on the one and I'm the lead on the other.

6         THE COURT:  Mr. Herrera Contreras, Ms. Manitta is

7    well-respected by this Court and will advise you of the

8    substance of how you can take your matter up to the Fourth

9    Circuit of the United States Supreme Court.  The Court will

10   appoint Mr. Winograd to be your primary advocate responsible

11   for advancing your appeal.

12        Do you have any questions, sir?

13        THE DEFENDANT:  No.

14        THE COURT:  I'm sorry.

15        (Counsel confers.)

16        MS. MANITTA:  Your Honor, there is one additional

17   thing.  We would request designation not in the DMV or

18   Virginia area.

19        THE COURT:  Why don't we do this, why don't you get

20   together with the United States Marshal Service and figure out

21   with them the best place for your client to be placed, and

22   then the Court will recommend that that placement take place.

23        MS. MANITTA:  Okay.  That's fine.

24        THE COURT:  Mr. Herrera Contreras, what Ms. Manitta

25   is trying to do is make sure that you're not put in danger or

JA6612

1  compromised and is trying to arrange a facility that will not

2  put you in conflict with other people who may not have your

3  best interest at heart.  We'll take a look in trying to find

4  the best place for you, sir.

5          I remand you to the custody of the United States

6  Marshals.

7          For the record, I want to thank Ms. Manitta and

8  Mr. Winograd for their zealous representation on behalf of

9  Mr. Herrera Contreras and their professionalism during the

10 entire course of the proceeding.

11         MS. MANITTA:  Thank you, Your Honor.

12         MR. WINOGRAD:  Thank you, Your Honor.

13

14     **(Proceedings adjourned at 11:30 a.m.)**

15

16

17

18

19

20

21

22

23

24

25

JA6613

```
 1                     CERTIFICATE OF REPORTER

 2

 3          I, Tonia Harris, an Official Court Reporter for

 4   the Eastern District of Virginia, do hereby certify that I

 5   reported by machine shorthand, in my official capacity, the

 6   proceedings had and testimony adduced upon the Sentencing

 7   hearing in the case of the **UNITED STATES OF AMERICA versus**

 8   **RONALD HERRERA CONTRERAS,** Criminal Action No.: 1:18-cr-123,

 9   in said court on the 20th day of October, 2022.

10          I further certify that the foregoing 20 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this April 19, 2023.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                              20
```

```
                                                                    1
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3     -------------------------------x
                                     :
4     UNITED STATES OF AMERICA       : Criminal Action No.:
                                     : 1:18-cr-123
5                                    :
          v.                         :
6                                    :
      PABLO MIGUEL VELASCO BARRERA,  : October 26, 2022
7                                    :
                      Defendant.     :
8     -------------------------------x

9              TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
10             UNITED STATES DISTRICT COURT JUDGE

11                  A P P E A R A N C E S

12    FOR THE GOVERNMENT:   ALEXANDER BLANCHARD, AUSA
                            CRISTINA STAM, AUSA
13                          United States Attorney's Office
                            2100 Jamieson Avenue
14                          Alexandria, VA 22314
      FOR THE DEFENDANT:    PAUL VANGELLOW, ESQ.
15                          ADDISON GAMLIEL, ESQ.
                            Paul P. Vangellow, PC
16                          6109A Arlington Blvd
                            Falls Church, VA 22044
17
                            ANDREW STEWART, ESQ.
18                          Dennis Stewart & Krischer PLLC
                            2007 15th Street N
19                          Suite 201
                            Arlington, VA 22201
20

21

22
      OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
23                                    United States District Court
                                      401 Courthouse Square
24                                    Tenth Floor
                                      Alexandria, VA 22314
25
```

-Tonia M. Harris OCR-USDC/EDVA 703-646-1438-

EASTERN DISTRICT OF VIRGINIA

JA6615

United States v. P. Barrera

2

1           **P R O C E E D I N G S**

2     (Court proceedings commenced at 11:02 a.m.)

3           THE COURTROOM CLERK:  Criminal No. 2018-123.  United

4     States of America versus Pablo Miguel Velasco Barrera.

5           Counsel, please note your appearances for the

6     record.

7           MS. STAM:  Good morning, Your Honor.  Cristina Stam

8     and Alex Blanchard on behalf of the United States.

9           THE COURT:  Good morning.

10          MR. STEWART:  Good morning, Your Honor.  Andrew

11    Stewart on behalf of Pablo Velasco Barrera, and along with me

12    is Paul Vangellow and Addison Gamliel.

13          THE COURT:  Good morning.

14          Let's go ahead and swear the interpreter.

15          (Interpreter sworn.)

16          THE INTERPRETER:  I do.  For the record Miriam

17    Deutsch.

18          THE COURT:  Mr. Velasco Barrera, if at any time you

19    are having difficulty understanding the interpreter or if the

20    equipment malfunctions, simply let your lawyer know and we'll

21    take steps to make sure that you're able to participate in the

22    proceeding.

23          THE DEFENDANT:  Okay.

24          THE COURT:  Are you having any difficulty

25    understanding the interpreter provided to you by the Court?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6616

United States v. P. Barrera

3

1          THE DEFENDANT:  (In English) No.

2          THE COURT:  This matter comes on today for report

3     and sentencing.

4          Are there any corrections, deletions, or

5     modifications to the presentence report?

6          I noticed that in the filings by Mr. Velasco Barrera

7     there were some factual disputes.  The Court takes judicial

8     notice of the factual disputes that you have, but other than

9     that, are there any corrections, deletions, or modifications?

10          MR. STEWART:  No, Your Honor.

11          THE COURT:  Very good.  Anything from the

12     government?

13          MS. STAM:  No, Your Honor.  I'm happy to respond to

14     the factual objections that the defense has.

15          THE COURT:  Why don't you go ahead and make your

16     record.

17          MS. STAM:  Your Honor, thank you.  The defense

18     stated that at page 3 Mr. Velasco Barrera belonged to the

19     Silvas clique.  We have no objection to that.  Before he

20     joined the Park View clique, and not the Westerns clique.

21          As to the objection on page 8 and page 12, where

22     they said that Sergio Triminio on his own turned over the 666

23     picture to Josue Vigil Mejia.  I'm not sure exactly what "on

24     his own" means.  Vigil Mejia asked for the picture to be sent

25     and Sergio sent the picture, which is what the PSR says, so to

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6617

─────United States v. P. Barrera─────

4

1   the extent they would like it to say anything else, we'd

2   object to that.

3          On page 10, they said, "Triminio was aware that a

4   murder would take place that evening and wanted to participate

5   in it to advance his position in the gang."  We do not agree

6   with that, Your Honor.  There may have been a theory of the

7   defense that that was the case, that Sergio knew that there

8   would be a murder, but that was not substantiated by the

9   evidence adduced at trial.  And as to --

10         THE COURT:  I think a fair interpretation of the

11   evidence would at least put that issue in dispute.  I don't

12   know what the fact-finder did with that particular fact.  It

13   doesn't necessarily become salient to anything that we need to

14   resolve today.  But I think there is a reasonable dispute as

15   to what Mr. Triminio did or did not know was going on that

16   day.

17         MS. STAM:  Fair enough, Your Honor, and we agree

18   it's not relevant to sentencing.

19         As to their objections saying that Triminio was

20   deceased when the defendant arrived at the scene, as the trial

21   evidence showed, you know, no one was taking Sergio's pulse.

22   No one can say exactly, neither those present, nor the medical

23   examiner, or the anthropological doctor, can say the time that

24   Triminio was deceased.  So we can't say whether it was before

25   or after the defendant arrived at the scene.

JA6618

─────United States v. P. Barrera─────

5

1          Your Honor, at page 15 they said that Mr. Velasco

2    Barrera did not participate in the murder of Mendez.  Of

3    course that is one of his convictions, and so I'm not sure

4    exactly what they are getting at there.  We contended, you

5    know, that he was a lookout at that murder, which is what the

6    fact-finders found.

7          And then the last one, Your Honor, is that they said

8    "While Mr. Velasco Barrera was a passenger in the vehicle, he

9    did not bring Mendez to the park."  I think they mean

10   "Triminio" since the evidence at trial showed that it was

11   Triminio who was picked up by the group and then driven to the

12   park.

13          THE COURT:  Do you agree with that factual

14   distinction, Counsel?

15          MR. STEWART:  We would, Your Honor.

16          MS. STAM:  As to whether the defendant brought him

17   to the park, he was in the car.  The PSR does not say that he

18   was driving the car, so we don't think there is any need to

19   correct the PSR paragraph that talks about when Sergio

20   Triminio was brought to the park.

21          THE COURT:  Very good.  Counsel, did you want to say

22   anything in response to the government's suggestions?

23          MR. STEWART:  Your Honor, I think it is correct to

24   characterize these objections as more in line with our theory

25   of defense.  Obviously, there were convictions on all counts,

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6619

United States v. P. Barrera

6

1   so I understand that the way that the facts are described in

2   the PSR are going to adopt that point of view.  Generally, due

3   to the procedural posture of the case and our intention to

4   note an appeal, we felt it necessary to object, or enter a

5   blanket objection, to the recitation of the offense conduct

6   and then no certain specific objections that were more in line

7   with our theory of the defense.  So we just wanted to create

8   our record in that.

9          THE COURT:  That's fine.  Counsel, you also filed

10  certain constitutional objections to the sentencing

11  responsibility of the Court citing the 8th Amendment and other

12  specific provisions.

13         Did you want to say anything other than what is in

14  your papers, sir?

15         MR. STEWART:  No, Your Honor.  We also, again,

16  recognizing what the current law is, wanted to ensure that we

17  noted that objection for the record.

18         THE COURT:  They are preserved for the record and

19  for purposes of the Court's determination on saying the Court

20  relies on the arguments and authorities cited by the

21  government in support of the constitutionality of the Court

22  being able to go forward today.

23         Does the government have any evidence that it wants

24  to present?

25         MS. STAM:  Your Honor, Ms. Triminio is present in

EASTERN DISTRICT OF VIRGINIA

JA6620

United States v. P. Barrera

7

1  the courtroom today, and the Court has heard from her before.

2  As you might imagine, it's always difficult for her to decide

3  whether she wants to address the Court, so if I could check

4  with her to see if she would like to do that.

5          THE COURT:  Counsel for the defense, I'll let you

6  know that I've heard from Ms. Triminio several times and,

7  obviously, her anguish is what it is.  If you want to hear

8  from her specifically, obviously, that is your prerogative, if

9  she takes the stand.  But I'm aware of her position, I'm aware

10 of her anguish, and I'm aware of her loss, and that is what

11 she is going to stress to the Court.  She has several times

12 said that what she wants to seek in this case is justice.  And

13 justice is defined by her perspective.  And obviously the

14 Court will take that into consideration, but it will do its

15 due diligence doing what this Court's responsibility is.

16          Do you want to hear from her?

17          MR. STEWART:  Based on that proffer, Your Honor, no,

18 it's not necessary.

19          THE COURT:  Ms. Stam, if you want to make a specific

20 proffer, as opposed to Ms. Triminio stating her position in

21 the matter, I'll accept that.

22          MS. STAM:  Thank you, Your Honor.  Can I just check

23 with her?

24          THE COURT:  Sure.

25          (A pause in the proceedings.)

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6621

─────United States v. P. Barrera─────

8

1      MS. STAM:  Your Honor characterized Ms. Triminio's

2   anguish and pain correctly earlier.  She has come, time and

3   time again, before this Court to express her loss, and so we

4   ask that the Court take that into consideration in sentencing.

5      THE COURT:  Ms. Triminio, I have heard you speak to

6   this Court several times regarding the hurt, pain, and anguish

7   that you're suffering because of the loss of your son.  The

8   Court takes the statements of victims, and you are a victim

9   here as much as anyone else, into consideration when it does

10  what it needs to do as far as an appropriate sentence is

11  concerned.  I welcome your comments, but I am aware of how you

12  feel.

13      Is there anything else you want to say, ma'am?

14      MS. TRIMINIO:  No.

15      THE COURT:  Thank you, ma'am.

16      Counsel for Mr. Velasco Barrera, I am aware of the

17  filings that you have put before the Court, specifically,

18  those dealing with the -- I guess the sociology, for lack of a

19  better way of putting it, involved in Mr. Velasco Barrera

20  specifically.  In addition, I've had an opportunity to read

21  the reports that have been filed in support of his position

22  and his -- I'm using this term loosely "cognitive

23  disabilities" I guess is the best way of putting it, and the

24  Court has digested those and read those and has taken them

25  into consideration.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6622

─────United States v. P. Barrera─────

9

1      Is there any other evidence that you want to

2 present?

3      MR. STEWART:  Your Honor, I think that's all the

4 evidence that we wanted the Court to consider.  One thing --

5 and I can address this at the end if it's easier.  We wanted

6 to ensure that some of those -- well all of that material was

7 sent to the Bureau of Prisons for whatever facility he's

8 ultimately designated to.

9      In my experience -- well, obviously, I'll defer to

10 the Court -- and the easiest way to accomplish that is to

11 attach it to the PSR just because of the other protections

12 that are put on the PSR.

13      THE COURT:  I don't think the government is going to

14 have any problem with that.

15      MR. STEWART:  Very well.  Thank you.

16      THE COURT:  Is there any objection?

17      MS. STAM:  No, Your Honor.

18      THE COURT:  Also, with regard to the medical

19 information that is provided for purposes of public

20 consumption, the Court is going to place those matters under

21 seal.

22      MR. STEWART:  Very well.  And we had requested that

23 as well, so we'd appreciate that order.

24      Your Honor, the specific documents, I guess, would

25 be the -- I guess there's a sociology report, an addendum that

JA6623

United States v. P. Barrera

10

1    was recently submitted.  There's a mitigation report that was

2    prepared by Mr. Vangellow in the much earlier stages in the

3    addendum that was provided to the probation office in

4    preparation -- or in assistance of preparation of the PSR.

5    We'd ask that that be included.  There's jail medical records,

6    and there's also medical records from El Salvador.  So all of

7    those documents could be included.

8              (Counsel confers.)

9              MR. STEWART:  We'd ask that all those documents be

10   included, and I'd be happy to submit those, however the Court

11   wants.  If you want to consolidate it into one submission.

12             THE COURT:  For purposes -- because, I guess, one of

13   the things that you're really advocating on behalf of your

14   client is that -- that the Bureau of Prisons be made aware of

15   whatever circumstances he may present, and so, we can include

16   those.  I will make them a part of the record and place the

17   particular medical and psychological documents under seal.

18   But if there's something specific that you want to go to the

19   Bureau of Prisons, if you could file it with Ms. Drill, and

20   she will take the appropriate steps, along with

21   Ms. Armentrout, to make sure those items go down to the Bureau

22   of Prisons.

23             MR. STEWART:  Absolutely, Your Honor.

24             What I've done previously is to communicate with the

25   probation office.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6624

United States v. P. Barrera

11

1          THE COURT:  That's fine.

2          MR. STEWART:  Thank you, Your Honor.  I'll ensure

3    that all those documents are included.  The only other

4    argument that I would have is --

5          THE COURT:  What I want to do, as far as

6    procedurally, let me hear from the government then I'll come

7    back to you in your argument.

8          MR. STEWART:  Very well, Your Honor.  Thank you.

9          THE COURT:  For the government.

10         MS. STAM:  Thank you, Your Honor.  Your Honor, today

11   the Court will sentence the fourth of five defendants who were

12   found guilty, by a jury, of kidnapping and murdering two young

13   boys for the MS-13 gang.  And there are a few things that

14   stand out to me about this defendant, Pablo Miguel Velasco

15   Barrera, who was also known as Oscuro within the gang.

16         Your Honor, first, his attorneys have submitted

17   letters of support from former teachers and employers who all

18   praise the defendant for being a kind and hard worker.  And I

19   realize that this is his sentencing and so it makes sense for

20   his attorneys to submit those materials, but I'd like to focus

21   a little bit on the victims of this case, Edvin and Sergio.

22         Edvin was 17 years old when he was killed.  He and

23   his siblings immigrated to the United States from Guatemala.

24   His friends and his family knew him as Chino.  His sister has

25   described his loss to her family as leaving pain, emptiness,

JA6625

─────United States v. P. Barrera─────

12

1    sadness, and a profound hate in their hearts.  They, frankly,

2    are still having trouble accepting that Edvin is not coming

3    back.  And they are so afraid of what the gang might do to

4    their family that, despite wanting to be here at this

5    sentencing and the other sentencings that the Court has had,

6    they feel it would be more prudent for them and safer if they

7    do not attend.  So I wanted to make sure that the Court knows

8    that just because they are not here does not mean that they do

9    not care.

10          Your Honor, Sergio had just turned 14 when he was

11   killed.  He and his mother came to the United States from

12   Honduras with dreams of starting over.  He was a loving son

13   and an older brother to his sister.  He was also excited to

14   meet the sibling that his mother was carrying at the time of

15   his death.  Of course, he never got that opportunity.  He was

16   a soccer fan.  He had dreams of buying a house for his mother

17   and for his sister.  The Court has heard from Ms. Triminio

18   previously and -- about the deep pain that she'll continue to

19   feel for the rest of her life because of her son's loss.  Your

20   Honor, no parent deserves to go through what Sergio's and

21   Edvin's parents have gone through.

22          And as Your Honor recognized, the defense has also

23   submitted a number of medical and mental health assessment

24   reports on behalf of their client, and it may be true that the

25   defendant has some medical conditions that have caused him to

JA6626

─────United States v. P. Barrera─────

13

1   really have seizures throughout his life or have head

2   injuries, but, Your Honor, what I don't see in any of these

3   reports is anything saying that the defendant did not have a

4   certain degree of choice as to how his life would go.  And I

5   think that's what life is all about.  It's about the choices

6   that we make, and the defendant chose to be part of an

7   incredibly violent gang, MS-13, whose sole purpose is to

8   commit violence for violence sake, and he chose to be in these

9   situations that led him to be involved in these murders.

10          And, Your Honor, I think it bears noting that these

11  murders were not the first time that he participated in

12  criminal activity with the gang.  Shortly before Edvin's

13  murder, he participated in the attempted murder of a gang

14  associate named Lil Navaja.  He was a lookout there.  That

15  attempted murder took place with the same members of PVLS in

16  the same park, Holmes Run Park.  And shortly thereafter he

17  went to that same place, the park, with the same people, the

18  PVLS associates that he was friends with, to be a lookout in

19  Edvin's murder.  He knew what the gang was going to do that

20  day.  The same thing that they had just tried to do with Lil

21  Navaja weeks earlier.  And then a month later he went back to

22  the same place, with the same people, Holmes Run Park, with

23  the PVLS members and associates that he was friends with for

24  Sergio's murder.

25          At that point, Your Honor, he knew exactly what the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6627

─────United States v. P. Barrera─────

14

1  gang would be doing, and he chose to go to the park anyway.

2  And this time he wasn't just a lookout.  This time he went to

3  the top of the hill where Sergio was being butchered to death

4  and struck Sergio with a machete.  In fact, he was caught on

5  video striking Sergio.  At trial, as the Court may recall,

6  several witnesses recognized that it was the defendant who was

7  seen in the murder video striking Sergio's body, and the Court

8  and the jury was able to hear on that video the defendant's

9  name as his co-defendant, Elmer Zelaya, told him "that's

10  enough, that's enough, Pablo."

11        And despite all that evidence, the defendant has

12  never taken responsibility for his actions or shown any

13  remorse.  When he was interviewed after being arrested by

14  Special Agent Dubravetz, he told Special Agent Dubravetz that

15  he would take everything he knew to his grave because "He had

16  nothing but darkness in his heart."

17        Your Honor, it may be true that, as his counsel

18  points out, he was young.  He was 18 at the time of these

19  offenses.  And they claimed that that is so young that he

20  perhaps shouldn't even be criminally responsible.  And it's

21  true that 18 may be young, Your Honor, but 14, which is how

22  old Sergio was when he was killed by this defendant, that's a

23  child, Your Honor.

24        And so, because of that we are asking for justice on

25  behalf of Edvin, on behalf of Sergio, and ask that the

JA6628

United States v. P. Barrera

15

1   defendant be sentenced to life.  Of course, Your Honor, there

2   are eight counts, and so we'd ask that the Court sentence the

3   defendant to ten years on Counts 1 and 2, which are the VICAR

4   conspiracy counts, to life on Counts 3 to 4, and all of those

5   run concurrently to each other.  That the Court impose a term

6   of supervised release.  Three years for Counts 1 and 2 and

7   five years for the remaining counts.

8           And then, Your Honor, as I represented to the Court

9   before, we are working on restitution and ask until

10  November 28th to submit a consent order, and I believe we will

11  have no problem doing that and probably submitting it sooner

12  than then.  Thank you.

13          THE COURT:  Thank you, Counsel.

14          MR. STEWART:  Thank you, Your Honor.  I guess the

15  first thing I'd like to call to the Court's attention is that

16  our 3553(a) arguments, on behalf of Mr. Velasco Barrera,

17  certainly aren't to minimize the experience that the victims'

18  families have gone through in this case.  But, again, the

19  Court is required to take those factors into consideration.

20          I think to say that Mr. Velasco Barrera had a choice

21  in all of these -- all of this conduct that he is convicted of

22  engaging in, is really an oversimplification of what his

23  experience in life is.  Certainly he didn't have a choice in

24  where he was born, he didn't have a choice in the poverty that

25  he grew up in, he didn't have a choice with -- other counsel,

JA6629

─────United States v. P. Barrera─────

16

1   I think, has done a very good job of explaining what the

2   experience is of young people growing up in El Salvador.

3          THE COURT:  But doesn't that argument, in a lot of

4   ways, discount the fact that there are a lot of people who

5   grow up in poverty, both in El Salvador and in the United

6   States, who overcome?  That argument, if stretched to its

7   unnatural conclusion, would suggest that anybody that is a boy

8   born in El Salvador is inherently bad and he's going to turn

9   out to be a murderer, and I don't believe that's the case.

10         MR. STEWART:  I don't believe that's the case

11   either, Your Honor.  And we are not asking the Court to take

12   that information to its illogical conclusion.  What we're

13   asking the Court to -- the purpose of that is to explain to

14   the Court the many different ways that an individual can

15   potentially be influenced and end up in a situation where they

16   make a bad choice.

17         THE COURT:  Let's take a look at your own client's

18   circumstances or situation, and, obviously, there's a

19   suggestion and allegation by the government that your client

20   was in the process of setting up this Lil Navaja also, and

21   that went south, fortunately, for Lil Navaja.  But it seems to

22   me that a person who doesn't have that cold heart that your

23   client actually referenced himself as having would say, you

24   know, Wow, do I really want to continue to be involved in

25   things like this?  Do I really want to be involved in the

JA6630

─────────────United States v. P. Barrera─────────────

17

1  killing of a 17-year old boy or a 14-year old boy?  Maybe I'm

2  getting some sort of message that I should choose another

3  course in life, maybe I just need to leave, which apparently

4  some of the people who are associated with the gang, who have

5  been found, did.

6      Why wasn't that part of his process?

7      MR. STEWART:  I don't know.  Your Honor, I think

8  that there are any number of things going on in society right

9  now where you could look and say it just doesn't make sense

10 why this person made that choice.  Without having context to

11 understand who that person is, it doesn't make any sense.

12 Even if you do understand who the person is sometimes, it

13 doesn't make sense.  But what I think -- what I've discovered

14 anyway, that representing clients who have dramatically

15 different ideologies than I do, you know -- not even

16 Mr. Velasco Barrera -- what I've understood is that it is a

17 process.  It's something that gradually builds until you get

18 to a point where you are making a decision that is irrational,

19 right?  I can't point to one thing in Mr. Velasco Barrera's

20 background that is the cause of this.

21      THE COURT:  I think there's a pretty good

22 explanation, and that is because -- as you pointed out, well,

23 he's got some cognitive disabilities.  He's had some issues in

24 his life that maybe some of the other people involved in this

25 case did not have.  And he has taken advantage of it to a

JA6631

─────United States v. P. Barrera─────

18

1  large degree, because of his cognitive disabilities.  I get

2  that, but that still does not negate a cold heart, which is

3  what I see in your client.

4       MR. STEWART:  Well, anyone who is convicted of this

5  sort of crime, I think, a Court or any individual can look at

6  and say they have a cold heart.  And, you know, at the same

7  time, the question is what really -- at its core, the question

8  is balancing what the offense conduct is, and who this person

9  is, you know, is -- what is the appropriate sentence for this

10 person to receive.  We're not saying that -- we're not saying

11 that, you know -- we're not suggesting that because of his age

12 or his experience that after being convicted he should not be

13 held criminally responsible, right?  That's, based on his

14 conviction, that's not what our argument is.  Okay.

15       Our argument is that the term of life that is

16 mandatory, or the terms of life that are mandatory in this

17 case, does not reflect the 3553(a) factors that the Court also

18 required --

19       THE COURT:  I read in your filings that the average

20 age of a person in your client's position, who is incarcerated

21 for which you call a life sentence, has a natural life span

22 of, I believe, was 55.3 years or something close to that.

23       MR. STEWART:  Yeah, right around in there.  And so,

24 that's -- that's 30 years.  That's another 30 years.  So I

25 guess the other point that I wanted to make is that the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6632

United States v. P. Barrera

19

```
 1   government suggested that Mr. Velasco Barrera has never taken
 2   responsibility and has never shown any remorse.  I think it's
 3   important to also point out that the -- there wasn't ever an
 4   opportunity -- there wasn't ever a plea offer extended in this
 5   case, other than plead guilty.
 6           THE COURT:  What I will suggest, and obviously I
 7   want you to counsel with your client, is that every single
 8   defendant who has been found guilty of this, and who this
 9   Court has had an opportunity to sentence, has been given an
10   occasion, not to admit to what they did, but rather to express
11   to Ms. Triminio their sorrow for what she has had to go
12   through.  Even assuming that your client did not do this,
13   assume for the sake of discussion, it would seem to me that
14   that is an opportunity to at least, maybe, give this lady some
15   degree of closure where she hears from somebody that they
16   understand her hurt and her pain, and this can be done without
17   admitting anything.  You can say -- I can say that I'm sorry
18   for a person that I don't know because I have empathy.  I have
19   not heard any empathy from one of these individuals that's
20   been before the Court, and, quite frankly, it's been
21   disappointing.
22           MR. STEWART:  Right.  And I understand that, Your
23   Honor.  And I -- I understand your concern.  I guess one of
24   the -- as defense counsel, we are overly protective of our
25   clients.
```

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6633

—United States v. P. Barrera—

20

1        THE COURT:  Sure.

2        MR. STEWART:  And oftentimes law enforcement uses

3   the suggestion that someone expressed empathy or remorse, as a

4   tactic or a tool, to elicit a confession.  And so, just as a

5   general rule as defense counsel, we don't let our clients even

6   go anywhere near that, just because any moderate slip up

7   could, you know, spell disaster for a potential defense.  And

8   again, because of the posture of this case, and our intention

9   to pursue an appeal, we've advised him, maybe contrary to his

10  own initial thoughts, we've advised him to not make any

11  statements.

12       THE COURT:  I get what you're saying, as far as your

13  professional responsibility is concerned, but, obviously, the

14  perspective that you have as an advocate on behalf of your

15  client -- and you're doing a fine job, I'm not discounting

16  that in any way.  It still does not address something that

17  this Court has, and that is the ability for a person who has

18  been portrayed as having a cold heart to simply say that "I'm

19  sorry about this.  Without accepting responsibility, I'm sorry

20  for your pain."  That doesn't in any way, that I can

21  understand, implicate any appeal rights that this man might

22  have.

23       MR. STEWART:  I understand.  I mean the -- I guess

24  the other side of the coin -- I don't want to --

25       THE COURT:  Sure.

JA6634

United States v. P. Barrera

21

1          MR. STEWART:  The other side of the coin is even

2     what was expressed as an example of his lack of remorse or

3     cold heart, were the statements that he made initially upon

4     arrest, which was basically "I don't care, I don't want to

5     talk."

6          THE COURT:  "I have a dark heart."

7          MR. STEWART:  Right.  So, you know, it's -- even in

8     not making a statement there is -- or, you know, indicating

9     that you don't want to make a statement, there is a spin or

10    bent that can be used to interpret that.

11         All of this being said, Your Honor, we're -- and as

12    you expressed in the position, we're asking for a sentence of

13    some term of years not to exceed his natural life, just to put

14    a point on it for the record.  Also, we're asking for him to

15    serve his sentence or for him to be -- we're asking for the

16    Court to recommend that he be designated to a facility that is

17    local and that is able to accommodate and comply with the --

18    the recommendations that appear in that --

19         THE COURT:  Do you have a suggested BOP facility?

20         MR. STEWART:  We don't have a suggested facility.  I

21    think the question is going to be who can -- because I'm not

22    familiar enough with who can accommodate both recommendations

23    in Dr. Kahlid's (ph) addendum.

24         THE COURT:  From what I understand, and I'm not as

25    attuned to the different facilities that exist in the Bureau

JA6635

─────United States v. P. Barrera─────

22

1   of Prisons.  I've been around long enough where I know where

2   some of them are.  It seems to me that maybe the closest one

3   would be the one somewhere up in Maryland or Butner down in

4   Raleigh, North Carolina.

5           MR. STEWART:  May I have the Court's indulgence?

6           THE COURT:  Sure.

7           (Counsel confers.)

8           MR. STEWART:  We concur that Butner would be --

9           THE COURT:  Butner would not be local.

10          MR. STEWART:  Well, I think local is considered the

11  300-mile radius from -- but that's probably still not local.

12  But Butner or some other facility that's reasonably close.

13          We're also asking the Court to recommend that he

14  participate in the RDAP program with some of the information

15  disclosed in the PSR.  Obviously, some of the benefits of the

16  RDAP program, like early release, that's not going to be an

17  issue here, but certainly that treatment program would be a

18  benefit to Mr. Velasco Barrera.  And then we're also asking

19  for the Court to consider ending the protective order that's

20  in place for -- that accompanies the discovery order.  I guess

21  now that the case is in a different posture, and he's not

22  going to be, you know, within a few hours of this courthouse,

23  in preparing the appeal, it's going to be more challenging to

24  review material.

25          THE COURT:  What protective order are you referring

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6636

─────United States v. P. Barrera─────

23

1    to?

2         MR. STEWART:  It's the protective order that

3    restricts our ability to share material with the -- with

4    Mr. Velasco Barrera.  So it would have been entered with

5    the --

6         THE COURT:  Okay.

7         MR. STEWART:  It's before my time in the case, but

8    it would have been entered near in time to, if not

9    simultaneously with, the discovery order that limits counsel's

10   ability to share material.

11        THE COURT:  What's the government's position on

12   that?  I will tell you this, there is still, as far as I can

13   recollect, at least one other defendant who is implicated, to

14   some degree, in these circumstances, so.

15        MS. STAM:  Your Honor, we would strongly oppose

16   removing or doing anything with the protective order.

17   Everything that was produced in discovery --

18        THE COURT:  Just a moment.  Just a moment.

19        THE INTERPRETER:  Something is happening that you

20   come in -- you get cut off.  I can't hear you anymore.

21        THE COURT:  Who can't you hear, ma'am?

22        Off the record.

23        (Discussion off the record.)

24        THE COURT:  Thank you.

25        MS. STAM:  Thank you, Your Honor.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6637

────United States v. P. Barrera────

24

1        As I was saying, the government strongly opposes

2   terminating or relaxing the protective order, which was

3   entered a long time ago along with the discovery order.

4   Everything that was produced in discovery was produced

5   pursuant to the protective order, and we have all the same

6   safety concerns and concerns that we've expressed before, even

7   though we're now in a different posture as to this defendant

8   and some of his co-defendants.

9        As the Court alluded to we, as you know, have

10  recently indicted another participant in Sergio's murder and

11  we still have a defendant, Edenilson Misael Alfaro, who is

12  under the same case and the case has been stayed against -- as

13  to him, as he is prosecuted in California, but we do expect

14  that he will come to the Eastern District of Virginia for

15  prosecution here.  And so, we would strongly object to the

16  protective order being terminated or relaxed.

17        THE COURT:  Request to terminate the protective

18  order is denied.  Obviously, Counsel, you can take it up with

19  the Fourth Circuit if you believe that the Court is in error

20  in that respect.

21        MR. STEWART:  Thank you, Your Honor.

22        THE COURT:  Anything else, sir?

23        MR. STEWART:  No, Your Honor.

24        THE COURT:  Very good.

25        Does your client want to allocute or say anything?

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

JA6638

United States v. P. Barrera

25

1           (Counsel and Defendant confers.)

2           MR. STEWART:  No, thank you, Your Honor.

3           THE COURT:  You may stand, sir.

4           Again, just for the record, and I know your answer,

5   is there anything you want to say to the Court before the

6   Court imposes sentence in this matter?

7           THE DEFENDANT:  No.

8           THE COURT:  All right, sir.

9           Under the sentencing guidelines --

10          You may have a seat.  It's pretty long.

11          -- the base offense level is 43.  The combined

12  adjusted offense level is 45.  Pursuant to Chapter 5, Part A

13  of the guidelines, and note 2, in those rare instances where

14  the total offense level is calculated in excess of 43, the

15  offense level will be treated as a level 43.  Therefore, the

16  defendant's total offense level is 43.  Criminal history score

17  is zero, and the criminal history category is Roman numeral I.

18          Accordingly, the applicable guideline range is life

19  imprisonment.  The supervised release range is three to

20  five years under the guidelines.  The fine range is $50,000 to

21  $250,000.  Pursuant to 18 U.S.C. 3553(a), the Court should

22  consider the following:  The nature and circumstances of the

23  offense and the history and characteristics of the defendant.

24  The need for the sentence imposed to, among other things,

25  reflect the seriousness of the offense and adequately deter

EASTERN DISTRICT OF VIRGINIA

JA6639

─────United States v. P. Barrera─────

26

1   criminal conduct, the kinds of sentences available, the

2   guidelines, policy statements issued by the sentencing

3   commission, the need to avoid unwarranted sentence disparities

4   among defendants with similar records found guilty of similar

5   conduct, and finally, the need to provide restitution to the

6   victims of the offense.

7        Under the *Booker* standard, the sentence must meet a

8   standard of reasonableness.  With respect to the history and

9   characteristics of this defendant, the Court has considered

10   the defendant's specific circumstances, including his

11   difficult childhood in El Salvador, and his health struggles.

12        As for the nature and circumstances of the offense,

13   suffice it to say that murder is a reprehensible crime.  The

14   tragic detail was found by the jury of the defendant's

15   participation in the murders of Edvin Mendez and Sergio

16   Triminio, reflect the severity of the defendant's crime.

17        The defendant callously chose to join a large group

18   of gang members and associates, who deceived the two

19   defenseless victims and proceeded to brutally murder them.

20   What is more, the Court considers that the defendant committed

21   these heinous crimes all so that he could advance himself

22   within the gang and earn a promotion.  These horrible

23   offenses, particularly in light of the manner in which the

24   defendant and his co-conspirators have carried them out,

25   indeed, warrant a sentence of life imprisonment.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA6640

United States v. P. Barrera

27

1        The Court next considers the need of the sentence

2   imposed, to reflect the seriousness of the offense, to promote

3   respect for the law, and to provide just punishment for the

4   offense, to afford adequate deterrence to criminal conduct, to

5   protect the public from further crimes of the defendant, and

6   to provide the defendant with needed educational, vocational

7   training, medical care, or other correctional treatment in the

8   matter most effective.

9        Applying these factors to this case, the Court finds

10  that a sentence of life imprisonment sufficiently reflects the

11  seriousness of the defendant's offenses and will promote both

12  specific and general deterrence.  As previously noted, the

13  guideline range for this offense is life imprisonment.

14       A sentence of life imprisonment on Counts 3

15  through 8 will not create unwarranted sentence disparities in

16  this case and is also consistent with the sentences imposed

17  for other defendants who have committed similar offenses,

18  including the similarly situated co-defendants who have been

19  sentenced by this Court.

20       Accordingly, on Counts 1 and 2, conspiracy to commit

21  kidnapping and murder, the Court imposes a term of 120 months

22  on each count, which shall run concurrently.  On Counts 3

23  through 8, the Court imposes a term of life imprisonment on

24  each count, again, which shall run concurrently.  Should the

25  defendant ever be released from prison, the Court also imposes

EASTERN DISTRICT OF VIRGINIA

JA6641

United States v. P. Barrera

28

1    a period of supervised release to provide an added measure of

2    deterrence and protection based on the facts and circumstances

3    of this case, consistent with the guideline Section 5D1.1.

4           Should the defendant be released from incarceration,

5    he will serve a five-year term of supervised release,

6    representing three years as to Counts 1 and 2, and 5 years as

7    to Counts 3 through 8, all to run concurrently.

8           During this period of supervision, the defendant

9    must comply with the standard conditions of probation that

10   have been adopted by this Court, as well as the following

11   special conditions:

12          One, the defendant is to be surrendered to a duly

13   authorized immigration official of the Department of Homeland

14   Security, United States Immigration and Customs Enforcement

15   for a deportation review in accordance with established

16   procedures provided by the Immigration and Nationality Act.

17          As a further condition of supervised release, if

18   ordered deported, the defendant shall remain outside of the

19   United States of America.  If the defendant tests positive for

20   controlled substances or shows signs of alcohol abuse, the

21   defendant shall participate in a program approved by the

22   United States Probation Office for substance abuse, which the

23   program may include residential treatment and testing to

24   determine whether the defendant has reverted to the use of

25   drugs or alcohol with partial cost to be paid by the defendant

JA6642

United States v. P. Barrera

29

1    as directed by the probation officer.

2            In addition, during the defendant's period of

3    incarceration, the defendant is suggested for participation,

4    or recommended for participation, in the RDAP program

5    authorized by the Bureau of Prisons.

6            The Court recommends, and has no objection, to the

7    defendant being placed in a facility which will address his

8    medical and psychological needs, with a specific

9    recommendation that that occur at the Butner Bureau of Prisons

10   facility in Raleigh, North Carolina.

11           The defendant shall not use marijuana or cannabis in

12   any form.  He shall not associate with any known or suspected

13   gang members, and he shall participate in a program of mental

14   health counseling as directed by the probation department.

15           Recognizing that the defendant is likely not capable

16   of paying the minimum fine prescribed by statute, the Court

17   declines to impose a fine.  Pursuant to statute, the Court

18   imposes a special assessment of $800.  $100 per count on the

19   eight counts that shall be paid by the defendant.  As

20   indicated by counsel for the government, the government will

21   be seeking, on behalf of the victims in this case,

22   restitution.  The Court will direct that the government

23   provide this information so that the Court can come up with an

24   appropriate restitution plan by no later than November 28,

25   2023.

JA6643

United States v. P. Barrera

30

1          The defendant is advised that he has a right to

2   appeal any determinations made by the Court.  Counsel, are you

3   going to take on the appeal?

4          MR. STEWART:  Yes, Your Honor.

5          THE COURT:  All right.  The Court will appoint

6   present counsel to pursue any appeal that the defendant may

7   choose to pursue.  And, Counsel, I will expect you to advise

8   the defendant of any appeal rights that he has and take

9   appropriate steps that these notices be provided.

10          MR. STEWART:  Yes, sir.

11          THE COURT:  Finally, Mr. Velasco Barrera, I have

12   been impressed by the zealous advocacy and representation that

13   you've been provided by your team of lawyers in this case.

14   They zealously advocated your position, taken on issues that

15   other defendants have not taken on, and have represented you

16   as well as they could.  So I need to ask you, sir, are you

17   entirely satisfied with the services of your lawyers?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Thank you, sir.  And I am also impressed

20   by the representation that you've provided Mr. Velasco Barrera

21   in this case.

22          MR. STEWART:  Thank you, Your Honor.

23          MR. VANGELLOW:  Thank you, Your Honor.

24          MS. GAMLIEL:  Thank you, Your Honor.

25          THE COURT:  Is there anything else we need to do?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA6644

United States v. P. Barrera

31

```
 1            MR. STEWART:  No, sir.

 2            MS. STAM:  No, Your Honor.

 3            THE COURT:  Mr. Velasco Barrera, I've put you in a

 4    position to get as much help as you can get in the Bureau of

 5    Prisons.  I hope that you take advantage of these things in a

 6    positive way.  There have been some people that have said nice

 7    things about you.  So I would hope that you would follow that

 8    part of your heart that is not cold, but rather that part of

 9    your heart that is productive, sir.  Yes, sir.  I remand you

10    to the custody of the United States Marshals.

11            MR. STEWART:  Thank you, Your Honor.

12            MR. VANGELLOW:  Thank you, Your Honor.

13            THE COURT:  Let the record reflect that Mr. Velasco

14    thanked his lawyers for their hard work in the case, shaking

15    their hands as he left the courtroom.

16            All right.  Anything else?

17            MS. STAM:  No, Your Honor.  Thank you.

18            THE COURT:  Ms. Triminio, once again, thank you for

19    being here today.  I know that these particular proceedings

20    are tough for you because it brings back bad memories, but

21    your presence here is appreciated and noted, ma'am.

22

23            **(Proceedings adjourned at 11:45 a.m.)**

24

25
```

JA6645

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Tonia Harris, an Official Court Reporter for

 4   the Eastern District of Virginia, do hereby certify that I

 5   reported by machine shorthand, in my official capacity, the

 6   proceedings had and testimony adduced upon the Sentencing

 7   hearing in the case of the UNITED STATES OF AMERICA versus

 8   PABLO MIGUEL VELASCO BARRERA, Criminal Action No.:

 9   1:18-cr-123, in said court on the 26th day of October,

10   2022.

11          I further certify that the foregoing 32 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16          In witness whereof, I have hereto subscribed my

17   name, this April 20, 2023.

18

19

20

21          _____
            Tonia M. Harris, RPR
22          Official Court Reporter

23

24

25
```

32

JA6646

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**UNITED STATES OF AMERICA,**

**v.**                                                  **Case No. 1:18-cr-123-RMA**

**PABLO MIGUEL VELASCO BARRERA,**

    **Defendant.**

**NOTICE OF APPEAL**

    COMES NOW the Defendant, Pablo Miguel Velasco Barrera, by counsel, and under

Rule 4 of the Federal Rules of Appellate Procedure, files this as his Notice of Appeal of the

Judgment of Conviction and Sentence entered by this Court on or about October 26, 2022.


Respectfully submitted,
Pablo Miguel Velasco Barrera
By Counsel

_____/s/_____
PAUL P. VANGELLOW, ESQ.
VSB#23488
Paul P. Vangellow, P.C.
Attorney for Pablo Miguel Velasco Barrera
6109A Arlington Blvd.
Falls Church, VA  22044
(703) 241-0506
fx: (703) 241-0886
pvangellow@gmail.com

1

JA6647

_____/s/_____
ANDREW M. STEWART, ESQ.
VSB#68683
Attorney for the Pablo Miguel Velasco Barrera
Dennis, Stewart, & Krischer, PLLC
2007 N 15th St. Ste. 201
Arlington, VA 22201
Phone: 703-248-0626
Fax: 703-524-5283
Email: astewart@dskvalaw.com

## CERTIFICATE OF SERVICE

THIS IS to certify that true copies of the foregoing were served by ECF upon:

> Christina Stam, Esq.
> Alex Blanchard, Esq.
> Asst. U.S. Attorney
> 2110 Jamieson Street
> Alexandria, VA  22314

Date:  November 2, 2022              _____/s/_____
Paul P. Vangellow, Esq.
VSB#23488
Paul P. Vangellow, PC
Attorney for Pablo M. Velasco Barrera
6109A Arlington Blvd.
Falls Church, VA  22044
(703) 241-0506
fx: (703) 241-0886
pvangellow@gmail.com

2

JA6648

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES,** | |
| **v.** | **Case No.: 1:18CR123-RDA** |
| **RONALD HERRERA CONTRERAS,** | |
| *Defendant.* | **The Hon. Rossie D. Alston** |

<u>**NOTICE OF APPEAL**</u>

Comes now Ronald Herrera Contreras, by counsel, and under Rule 4 of the Federal Rules of Appellate Procedure, files this Notice of Appeal of the Judgement of Conviction and Sentence of this Court announced on October 20, 2022.

Respectfully Submitted,

The Law Office of Jesse Winograd

Date:  November 3, 2022

/s/ Jesse Winograd
Jesse Winograd
Va Bar #79778
5335 Wisconsin Ave. NW, Suite 440
Washington, DC 20015
Phone: (202) 302-7429
jwinograd@jwinogradlaw.com
*Counsel for Defendant*

JA6649

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Respectfully submitted,

Date: <u>November 3, 2022</u>                          <u>*/s/ Jesse Winograd*           </u>
                                                                      Jesse Winograd, Esq. (VA Bar #79778)

JA6650

| Case Number: | 1:18CR00123-002 |
|---|---|
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number:   1:18CR00123-002 |
| | ) | |
| ELMER ZELAYA MARTINEZ | ) | USM Number:   92331-083 |
| | ) | |
| a/k/a "Killer," "Morenito Martinez," "Daniel | ) | Manuel Leiva, Esquire |
| Perez," and "Chucho" | ) | Robert Jenkins, Esquire |
| | | Defendant's Attorneys |

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, and 8 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of E.E.E.M, in Aid of Racketeering Activity | 08/2016 | 1 |
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of S.A.A.T, in Aid of Racketeering Activity | 09/2016 | 2 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap E.E.E.M. | 08/2016 | 3 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap S.A.A.T. | 09/2016 | 4 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of E.E.E.M. in Aid of Racketeering Activity | 8/28/2016 | 5 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of S.A.A.T. in Aid of Racketeering Activity | 09/26/2016 | 6 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of E.E.E.M. Resulting in Death | 08/28/2016 | 7 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of S.A. A.T. Resulting in Death | 09/26/2016 | 8 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 2, 2022
Date of Imposition of Judgment

/s/

*Rossie D. Alston, Jr.*
**United States District Judge**

*December 29, 2022*
Date

JA6651

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
    Sheet 2 - Imprisonment

| | |
|---|---|
| Case Number: | 1:18CR00123-002 |
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

This term consists of terms of ONE HUNDRED TWENTY (120) MONTHS on each of Counts 1 and 2, and LIFE IMPRISONMENT on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at_____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By     _____
DEPUTY UNITED STATES MARSHAL

JA6652

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Case Number: | 1:18CR00123-002 |
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIVE (5) YEARS.

This term consists of terms of THREE (3) YEARS on each of Counts 1 and 2, and FIVE (5) YEARS on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA6653

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Page 4 of 7

| | |
|---|---|
| **Case Number:** | 1:18CR00123-002 |
| **Defendant's Name:** | ZELAYA MARTINEZ, ELMER |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____     Date

JA6654

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| Case Number: | 1:18CR00123-002 |
| --- | --- |
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Nationality Act, 8 U.S.C. 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States.

2) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

3) The defendant shall not use marijuana or cannabis in any form.

4) The defendant shall participate in a program of mental health counseling as directed by the Probation Office.

JA6655

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5a – Criminal Monetary Penalties

Page 6 of 7

| Case Number: | 1:18CR00123-002 |
|---|---|
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** |
|---|---|---|---|
| **TOTALS** | $ 800.00 | $ 28,215.00 | $ 0.00 |

☒ The defendant shall pay restitution in the amount of $28,215.00, pursuant to the Restitution Order entered by the Court on December 21, 2022.

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

　　☒ the interest requirement is waived for the ☐ fine ☒ restitution.

　　☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

**Payments of Restitution are to made payable to the Clerk, United States District Court, Eastern District of Virginia.**

JA6656

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case                                                                     Page 7 of 7
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Case Number: | 1:18CR00123-002 |
| Defendant's Name: | ZELAYA MARTINEZ, ELMER |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐   Lump sum payment of $_____ due immediately, balance due
        ☐  not later than _____, or
        ☐  in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☒   Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C**  ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $_____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☒   If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $25.00 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement.

**E**  ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☒   Jointly and Severally with Ronald Herrera Contreras (1:18CR123- 004), Henry Zelaya Martinez (1:18CR123-006), Pablo Velasco Barrera (1:18CR123- 008), Duglas Ramirez Ferrera (1:18CR123-012), and with any other defendants who are ordered to pay restitution for the same losses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

JA6657

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case                                                Page 1 of 7

| Case Number: | 1:18CR00123-006 |
| Defendant's Name: | ZELAYA MARTINEZ, HENRY |

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number:  1:18CR00123-006 |
| | ) | |
| HENRY ZELAYA MARTINEZ | ) | USM Number:  92818-083 |
| | ) | |
| a/k/a "Certero" and "El Kakarra," | ) | Charles Twist, Esquire |
| | ) | David Kiyonaga, Esquire |
| | ) | Defendant's Attorneys |

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, and 8 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of E.E.E.M, in Aid of Racketeering Activity | 08/2016 | 1 |
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of S.A.A.T, in Aid of Racketeering Activity | 09/2016 | 2 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap E.E.E.M. | 08/2016 | 3 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap S.A.A.T. | 09/2016 | 4 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of E.E.E.M. in Aid of Racketeering Activity | 8/28/2016 | 5 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of S.A.A.T. in Aid of Racketeering Activity | 09/26/2016 | 6 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of E.E.E.M. Resulting in Death | 08/28/2016 | 7 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of S.A. A.T. Resulting in Death | 09/26/2016 | 8 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 28, 2022
Date of Imposition of Judgment

/s/ _____
Rossie D. Alston, Jr.
United States District Judge

_December 21, 2022_
Date

JA6658

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| | |
|---|---|
| **Case Number:** | **1:18CR00123-006** |
| **Defendant's Name:** | **ZELAYA MARTINEZ, HENRY** |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

This term consists of terms of ONE HUNDRED TWENTY (120) MONTHS on each of Counts 1 and 2, and LIFE IMPRISONMENT on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

The Court makes the following recommendations to the Bureau of Prisons:

The Court recommends that the Defendant be evaluated by an ophthalmologist in the Bureau of Prisons, that he first be sent to the facility in Butner, NC for this evaluation, and ultimately be placed in a facility near the Washington, DC metropolitan area.

The defendant is remanded to the custody of the United States Marshal.

### RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By     _____
DEPUTY UNITED STATES MARSHAL

JA6659

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| **Case Number:** | **1:18CR00123-006** |
| **Defendant's Name:** | **ZELAYA MARTINEZ, HENRY** |

.

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIVE (5) YEARS.

This term consists of terms of THREE (3) YEARS on each of Counts 1 and 2, and FIVE (5) YEARS on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA6660

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| **Case Number:** | 1:18CR00123-006 |
| **Defendant's Name:** | ZELAYA MARTINEZ, HENRY |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____   Date _____

JA6661

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3A – Supervised Release

Page 5 of 7

| | |
|---|---|
| Case Number: | 1:18CR00123-006 |
| Defendant's Name: | ZELAYA MARTINEZ, HENRY |

# SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Nationality Act, 8 U.S.C. 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States.

2) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

3) The defendant shall not use marijuana or cannabis in any form.

JA6662

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5a – Criminal Monetary Penalties

| | |
|---|---|
| Case Number: | 1:18CR00123-006 |
| Defendant's Name: | ZELAYA MARTINEZ, HENRY |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** |
|---|---|---|---|
| **TOTALS** | $  800.00 | $  28,215.00 | $  0.00 |

☒  The defendant shall pay restitution in the amount of $28,215.00, pursuant to the Restitution Order entered by the Court on December 21, 2022.

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☒  the interest requirement is waived for the ☐ fine ☒ restitution.

   ☐  the interest requirement for the ☐ fine ☐ restitution is modified as follows:

**Payments of Restitution are to made payable to the Clerk, United States District Court, Eastern District of Virginia.**

JA6663

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
        Sheet 6 – Schedule of Payments

| | |
|---|---|
| **Case Number:** | 1:18CR00123-006 |
| **Defendant's Name:** | ZELAYA MARTINEZ, HENRY |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $_____ due immediately, balance due
    ☐ not later than _____, or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C** ☐ Payment in equal *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☒ If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $25.00 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement.

**E** ☐ Payment during the term of supervised release will commence within *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☒ Jointly and Severally with Elmer Zelaya Martinez (1:18CR123- 002); Ronald Herrera Contreras (1:18CR123-004), Pablo Velasco Barrera (1:18CR123- 008), Duglas Ramirez Ferrera (1:18CR123-012), and with any other defendants who are ordered to pay restitution for the same losses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

JA6664

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case

| | |
|---|---|
| **Case Number:** | 1:18CR00123-008 |
| **Defendant's Name:** | VELASCO BARRERA, PABLO MIGUEL |

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number: 1:18CR00123-008 |
| | ) | |
| PABLO MIGUEL VELASCO BARRERA | ) | USM Number: 92385-083 |
| | ) | |
| a/k/a "Pablo Miguel Barrera Velasco," Oscuro," | ) | Andrew Stewart, Esquire |
| and "Miguel Barrera," | ) | Paul Vangellow, Esquire |
| | | Defendant's Attorneys |

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, and 8 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of E.E.E.M, in Aid of Racketeering Activity | 08/2016 | 1 |
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of S.A.A.T, in Aid of Racketeering Activity | 09/2016 | 2 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap E.E.E.M. | 08/2016 | 3 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap S.A.A.T. | 09/2016 | 4 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of E.E.E.M. in Aid of Racketeering Activity | 8/28/2016 | 5 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of S.A.A.T. in Aid of Racketeering Activity | 09/26/2016 | 6 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of E.E.E.M. Resulting in Death | 08/28/2016 | 7 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of S.A. A.T. Resulting in Death | 09/26/2016 | 8 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 26, 2022
Date of Imposition of Judgment

/s/

_December 20, 2022_
Date

Rossie D. Alston, Jr.
United States District Judge

JA6665

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| | |
|---|---|
| Case Number: | 1:18CR00123-008 |
| Defendant's Name: | VELASCO BARRERA, PABLO MIGUEL |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

This term consists of terms of ONE HUNDRED TWENTY (120) MONTHS on each of Counts 1 and 2, and LIFE IMPRISONMENT on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

The Court makes the following recommendations to the Bureau of Prisons:

The court recommends that the defendant be designated in a facility which would address his medical and psychological needs, with a specific recommendation that that he be designated to the facility in Butner, North Carolina.  The Court further recommends that the deft participate in the Bureau of Prisons' Residential Drug Abuse Program (RDAP).

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____
at_____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By      _____
DEPUTY UNITED STATES MARSHAL

JA6666

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Case Number: **1:18CR00123-008**
Defendant's Name: **VELASCO BARRERA, PABLO MIGUEL**

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIVE (5) YEARS.

This term consists of terms of THREE (3) YEARS on each of Counts 1 and 2, and FIVE (5) YEARS on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA6667

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Case Number: | 1:18CR00123-008 |
| Defendant's Name: | VELASCO BARRERA, PABLO MIGUEL |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____   Date _____

JA6668

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| | |
|---|---|
| **Case Number:** | **1:18CR00123-008** |
| **Defendant's Name:** | **VELASCO BARRERA, PABLO MIGUEL** |

# SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Nationality Act, 8 U.S.C. 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States.

2) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

3) The defendant shall not use marijuana or cannabis in any form.

4) The defendant shall not associate with any known or suspected gang members.

5) The defendant shall participate in a program of mental health counseling as directed by the Probation Office.

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5a – Criminal Monetary Penalties

| | |
|---|---|
| Case Number: | 1:18CR00123-008 |
| Defendant's Name: | VELASCO BARRERA, PABLO MIGUEL |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** |
|---|---|---|---|
| **TOTALS** | $ 800.00 | $ 28,215.00 | $ 0.00 |

☒ The defendant shall pay restitution in the amount of $28,215.00, pursuant to the Restitution Order entered by the Court on December 21, 2022.

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived for the ☐ fine ☒ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

**Payments of Restitution are to made payable to the Clerk, United States District Court, Eastern District of Virginia.**

JA6670

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Case Number: | 1:18CR00123-008 |
| Defendant's Name: | VELASCO BARRERA, PABLO MIGUEL |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $_____ due immediately, balance due
       ☐ not later than _____ , or
       ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C** ☐ Payment in equal *(e.g., weekly, monthly, quarterly)* installments of $_____ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☒ If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $25.00 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement.

**E** ☐ Payment during the term of supervised release will commence within *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☒ Jointly and Severally with Elmer Zelaya Martinez (1:18CR123- 002); Ronald Herrera Contreras (1:18CR123-004), Henry Zelaya Martinez (1:18CR123- 006), Duglas Ramirez Ferrera (1:18CR123-012), and with any other defendants who are ordered to pay restitution for the same losses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

| Case Number: | 1:18CR00123-012 |
|---|---|
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number: 1:18CR00123-012 |
| | ) | |
| DUGLAS RAMIREZ FERRERA | ) | USM Number: 93006-083 |
| | ) | |
| a/k/a "Mortal," "Darwin," and "Artillero," | ) | Darwyn Easley, Esquire |
| | ) | Pleasant Brodnax, Esquire |
| | ) | Defendant's Attorneys |

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, and 8 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of E.E.E.M, in Aid of Racketeering Activity | 08/2016 | 1 |
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of S.A.A.T, in Aid of Racketeering Activity | 09/2016 | 2 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap E.E.E.M. | 08/2016 | 3 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap S.A.A.T. | 09/2016 | 4 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of E.E.E.M. in Aid of Racketeering Activity | 8/28/2016 | 5 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of S.A.A.T. in Aid of Racketeering Activity | 09/26/2016 | 6 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of E.E.E.M. Resulting in Death | 08/28/2016 | 7 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of S.A. A.T. Resulting in Death | 09/26/2016 | 8 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 12, 2022
Date of Imposition of Judgment

/s/

December 29, 2022
Date

**Rossie D. Alston, Jr.**
**United States District Judge**

JA6672

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| | |
|---|---|
| **Case Number:** | **1:18CR00123-012** |
| **Defendant's Name:** | **RAMIREZ FERRERA, DUGLAS** |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

This term consists of terms of ONE HUNDRED TWENTY (120) MONTHS on each of Counts 1 and 2, and LIFE IMPRISONMENT on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

The Court makes the following recommendations to the Bureau of Prisons:

The Court recommends that the defendant be designated to a facility in the Washington DC or Richmond metropolitan area.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at_____, with a certified copy of this Judgment.

_____

UNITED STATES MARSHAL

By        _____

DEPUTY UNITED STATES MARSHAL

JA6673

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Case Number: | 1:18CR00123-012 |
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIVE (5) YEARS.

This term consists of terms of THREE (3) YEARS on each of Counts 1 and 2, and FIVE (5) YEARS on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA6674

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| Case Number: | 1:18CR00123-012 |
|---|---|
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____    Date _____

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| | |
|---|---|
| Case Number: | 1:18CR00123-012 |
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Nationality Act, 8 U.S.C. 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States.

2) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

3) The defendant shall not use marijuana or cannabis in any form.

JA6676

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5a – Criminal Monetary Penalties

| Case Number: | 1:18CR00123-012 |
|---|---|
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine |
|---|---|---|---|
| **TOTALS** | $  800.00 | $  28,215.00 | $  0.00 |

☒ The defendant shall pay restitution in the amount of $28,215.00, pursuant to the Restitution Order entered by the Court on December 21, 2022.

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived for the ☐ fine ☒ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

**Payments of Restitution are to made payable to the Clerk, United States District Court, Eastern District of Virginia.**

JA6677

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Case Number: | 1:18CR00123-012 |
| Defendant's Name: | RAMIREZ FERRERA, DUGLAS |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐   Lump sum payment of $_____ due immediately, balance due
    ☐   not later than _____, or
    ☐   in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☒   Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C** ☐   Payment in equal   *(e.g., weekly, monthly, quarterly)* installments of $   over a period of   *(e.g., months or years)*, to commence   *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☒   If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $25.00 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement.

**E** ☐   Payment during the term of supervised release will commence within   *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☒   Jointly and Severally with Elmer Zelaya Martinez (1:18CR123- 002); Ronald Herrera Contreras (1:18CR123-04), Henry Zelaya Martinez (1:18CR123- 006), Pablo Velasco Barrera (1:18CR132-008), and with any other defendants who are ordered to pay restitution for the same losses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Case Number: **1:18CR00123-004**
Defendant's Name: **HERRERA CONTRERAS, RONALD**

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number:  1:18CR00123-004 |
| | ) | |
| RONALD HERRERA CONTRERAS | ) | USM Number:  92421-083 |
| | ) | |
| a/k/a "Espeedy," "Speedy," and "Joster Hmdz," | ) | Lana Manitta, Esquire |
| | ) | Jesse Winograd, Esquire |
| | ) | Gregory Stambaugh, Esquire |
| | | Defendant's Attorneys |

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, and 8 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of E.E.E.M, in Aid of Racketeering Activity | 08/2016 | 1 |
| 18 U.S.C. § 1959(a)(5) | Conspiracy to Commit Kidnapping and Murder of S.A.A.T, in Aid of Racketeering Activity | 09/2016 | 2 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap E.E.E.M. | 08/2016 | 3 |
| 18 U.S.C. § 1201(c) | Conspiracy to Kidnap S.A.A.T. | 09/2016 | 4 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of E.E.E.M. in Aid of Racketeering Activity | 8/28/2016 | 5 |
| 18 U.S.C. §§ 1959(a)(1) and 2 | Murder of S.A.A.T. in Aid of Racketeering Activity | 09/26/2016 | 6 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of E.E.E.M. Resulting in Death | 08/28/2016 | 7 |
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping of S.A. A.T. Resulting in Death | 09/26/2016 | 8 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

/s/

**Rossie D. Alston, Jr.**
**United States District Judge**

October 20, 2022
Date of Imposition of Judgment

December 29, 2022
Date

JA6679

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

**Case Number:**    1:18CR00123-004
**Defendant's Name:**    HERRERA CONTRERAS, RONALD

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

This term consists of terms of ONE HUNDRED TWENTY (120) MONTHS on each of Counts 1 and 2, and LIFE IMPRISONMENT on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

The Court makes the following recommendations to the Bureau of Prisons:

The Court recommends that the defendant not be designated to a facility in the Washington DC metropolitan area.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this Judgment.


_____
UNITED STATES MARSHAL


By    _____
DEPUTY UNITED STATES MARSHAL

JA6680

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Case Number: | 1:18CR00123-004 |
| Defendant's Name: | HERRERA CONTRERAS, RONALD |

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIVE (5) YEARS.

This term consists of terms of THREE (3) YEARS on each of Counts 1 and 2, and FIVE (5) YEARS on each of Counts 3, 4, 5, 6, 7, and 8, to run concurrently with each other.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA6681

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| **Case Number:** | **1:18CR00123-004** |
| **Defendant's Name:** | **HERRERA CONTRERAS, RONALD** |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____   Date _____

JA6682

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| Case Number: | 1:18CR00123-004 |
|---|---|
| Defendant's Name: | HERRERA CONTRERAS, RONALD |

## SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Nationality Act, 8 U.S.C. 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States.

2) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

3) The defendant shall not use marijuana or cannabis in any form.

4) The defendant shall not associate with any known or suspected gang members.

5) The defendant shall participate in a program of mental health counseling as directed by the Probation Office.

JA6683

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case                                                                 Page 6 of 7
Sheet 5a – Criminal Monetary Penalties

| Case Number: | 1:18CR00123-004 |
|---|---|
| Defendant's Name: | HERRERA CONTRERAS, RONALD |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** |
|---|---|---|---|
| **TOTALS** | $ 800.00 | $ 28,215.00 | $ 0.00 |

☒ The defendant shall pay restitution in the amount of $28,215.00, pursuant to the Restitution Order entered by the Court on December 21, 2022.

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived for the ☐ fine ☒ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

**Payments of Restitution are to made payable to the Clerk, United States District Court, Eastern District of Virginia.**

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Case Number: | 1:18CR00123-004 |
| Defendant's Name: | HERRERA CONTRERAS, RONALD |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $_____ due immediately, balance due
   ☐ not later than _____ , or
   ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C** ☐ Payment in equal *(e.g., weekly, monthly, quarterly)* installments of $ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☒ If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $25.00 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement.

**E** ☐ Payment during the term of supervised release will commence within *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☒ Jointly and Severally with Elmer Zelaya Martinez (1:18CR123- 002); Henry Zelaya Martinez (1:18CR123-006), Pablo Velasco Barrera (1:18CR132- 008), Duglas Ramirez Ferrera (1:18CR123-012), and with any other defendants who are ordered to pay restitution for the same losses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

_____

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| | ) |
| v. | )   Crim. No. 1:18-cr-123-RDA |
| | ) |
| HENRY ZELAYA MARTINEZ, | ) |
| | ) |
| Defendant. | ) |
_____)

**NOTICE OF APPEAL**

Please note that the Defendant, Henry Zelaya Martinez, by counsel, hereby appeals to the

United States Court of Appeals for the Fourth Circuit from the Judgment of Conviction and

Sentence imposed on December 21, 2022.

Respectfully Submitted,
HENRY ZELAYA MARTINEZ

By Counsel

_____/s/_____
David J. Kiyonaga, VSB 15026

510 King Street, #400
Alexandria, VA 22314
Ph: 703 549-7576
email: david@kiyolaw.com

1

JA6686

Certificate of Electronic Service

    I hereby certify that on December 29, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.


_____/s/_____
David J. Kiyonaga

JA6687

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　　Case No. 1:18-cr-00123 (RDA)
DUGLAS RAMIREZ FERRERA,　　　　)
　　　　　　　　　　　Defendant.　　)

<u>NOTICE OF APPEAL</u>

　　　　Defendant Duglas Ramirez Ferrera appeals to the United States Court of Appeals

for the Fourth Circuit from the judgment and sentence imposed on October 12, 2022 and

entered on December 21, 2022.

　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　DUGLAS RAMIREZ FERRERA
　　　　　　　　　　　　　　By Counsel

　　　　　　　　　　　　　　/s/ Pleasant S. Brodnax, III
　　　　　　　　　　　　　　Pleasant S. Brodnax, III, VSB No. 26477
　　　　　　　　　　　　　　1701 Pennsylvania Avenue, NW, Suite 200
　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　202.462.1100
　　　　　　　　　　　　　　Email: pleasant.brodnax@gmail.com


　　　　　　　　　　　　　　/s/ Darwyn L. Easley
　　　　　　　　　　　　　　Darwyn L. Easley, VSB No. 48250
　　　　　　　　　　　　　　10521 Judicial Drive, Suite 205
　　　　　　　　　　　　　　Fairfax, Virginia 22030
　　　　　　　　　　　　　　703.865.6610
　　　　　　　　　　　　　　Email: dle@easleyfirm.com


　　　　　　　　　　　　　　/s/ Laura Kelsey Rhodes
　　　　　　　　　　　　　　Laura Kelsey Rhodes
　　　　　　　　　　　　　　U.S. District Court Bar No. 12703 (Maryland)
　　　　　　　　　　　　　　200-A Monroe Street, Suite 305
　　　　　　　　　　　　　　Rockville, Maryland 20850
　　　　　　　　　　　　　　301.424.0094
　　　　　　　　　　　　　　lkr@lkrhodeslaw.com

JA6688

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed by CM/ECF on the 31st of December 2022, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III

JA6689

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

      v.                    Case No.:     18 cr 123

ELMER ZELAYA MARTINEZ.

## NOTICE OF APPEAL

Please take notice that the, Defendant ELMER ZELAYA MARTINEZ hereby appeals the final order entered in this matter dated December 22, 2022 to the United States Court of Appeals for the Fourth Circuit.


I ASK FOR THIS:

_____/s/_____
Robert L. Jenkins, Jr., Esq.
Virginia State Bar No.:  39161
Bynum & Jenkins Law
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309 0899 Telephone
(703) 549 7701 Fax
RJenkins@BynumAndJenkinsLaw.com
Counsel for Defendant ELMER ZELAYA MARTINEZ




## CERTIFICATE OF SERVICE

 I hereby certify that I caused a true and accurate copy of the foregoing to be served upon all counsel of record via ECF on January 10, 2023.

_____/s/_____
Robert L. Jenkins, Jr., Esq.
Virginia State Bar No.:  39161
Bynum & Jenkins Law
1010 Cameron Street

JA6690

Alexandria, Virginia 22314
(703) 309 0899 Telephone
(703) 549 7701 Fax
RJenkins@BynumAndJenkinsLaw.com
Counsel for Defendant ELMER ZELAYA MARTINEZ